

Deposition of:

# Brian Gambrell

*November 2, 2021*

In the Matter of:

# Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Veritext Legal Solutions

800.743.DEPO (3376) | Calendar-carolinas@veritext.com |
www.veritext.com

Page 1

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF SOUTH CAROLINA
2                  ROCK HILL DIVISION

3

   STACEY DARLENE POOLE,

4

              Plaintiff,

5

        vs.        CASE NO. 0:20-cv-3499-TLW

6

   BLACK, SLAUGHTER & BLACK, PA,

7

              Defendant.

8

9

10

11  DEPOSITION OF:  BRIAN GAMBRELL
12                  (Via videoconference)
13  DATE:           November 2, 2021
14  TIME:           11:09 a.m.
15  WITNESS
16  LOCATION:       Columbia, SC
17  TAKEN BY:       Counsel for the Defendant
18  REPORTED BY:    Lauren A. Balogh, RPR
19                  (Via videoconference)
20  _____
21

22

23

24

25

Brian Gambrell

November 2, 2021

Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 2

1    APPEARANCES OF COUNSEL:

2        ATTORNEY FOR PLAINTIFF
                STACEY DARLENE POOLE:

3
                HARRISON, RADEKER & SMITH, PA

4                BY:  ANDREW S. RADEKER
                    (Via videoconference)

5                923 Calhoun Street
                Columbia, SC  29201

6                (803) 779-2211
                Drew@harrisonfirm.com

7
        ATTORNEY FOR DEFENDANT

8                BLACK, SLAUGHTER & BLACK, PA:

9                COPELAND STAIR KINGMA & LOVELL
                BY:  MICHAEL C. MASCIALE

10                   (Via videoconference)
                40 Calhoun Street

11                Suite 400
                Charleston, SC  29401

12                (843) 266-8205
                Mmasciale@cskl.law

13

14

15

16                (INDEX AT REAR OF TRANSCRIPT)

17

18

19

20

21

22

23

24

25

Page 3

1              BRIAN GAMBRELL

2   being first duly sworn, testified as follows:

3                  EXAMINATION

4   BY MR. MASCIALE:

5       Q.   Good morning, Mr. Gambrell.  My name is

6   Michael Masciale and I represent the defendant in

7   this case, Black, Slaughter & Black, PA.  I know

8   we've corresponded a little bit over e-mail before,

9   but I don't think I've ever met you in person, so

10  it's good to put a face to the name.

11      A.   Yep.

12      Q.   Now obviously I understand that you're

13  an attorney and I'm sure you've taken several

14  depositions before, and you may have even given

15  deposition testimony, but just to go over the

16  ground rules, which I know you're familiar with,

17  but this is kind to refresh everybody's memory.

18          Obviously if you have any questions or

19  need me to clarify anything about what I'm going to

20  ask you, please direct your question to me and I'll

21  do my best to clarify any of my questions.  And

22  since this deposition is being done over Zoom -- I

23  don't know if you've had any before.  I think

24  probably everybody is somewhat familiar with them

25  by now with COVID.  It might be a little more

Brian Gambrell
November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 4

1  difficult for the court reporter to take down

2  everything we're saying, so just please be sure to

3  refrain from talking over me while I'm asking my

4  full question and I'll certainly do the same as

5  you're answering.

6           Honestly, if you need a break at any

7  time, please feel free to let me know.  I don't

8  think this is going to take too long, but, again,

9  let me know if you need a break.  I'm happy to

10  accommodate you.  And obviously if you discuss your

11  testimony or this case with anyone, even counsel,

12  other than to decide whether or not to assert a

13  privilege, I can ask you about the substance of

14  your conversation when we get back on the record.

15  That's fair enough?

16      A.   Fair.  And I'm purposely not -- I'm

17  looking down because watching someone talk is

18  disconcerting.  I normally turn -- like I normally

19  cover the camera to where I'm not watching when we

20  do Zoom or Webex meetings because it's just weird

21  to me.

22      Q.   I agree.  It is kind of hard looking at

23  yourself on a screen and looking at other people.

24      A.   Well, and, too, there's a slight delay

25  on the movement.  Like I nearly threw up the first

Brian Gambrell                                           November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

                                                      Page 5

1   time I watched my kids play Minecraft, and so it's

2   a little disconcerting.

3          Q.    Fair enough.

4               MR. RADEKER:  Mike, while we're at the

5   beginning, before we get started, the federal rules

6   about objections during depositions are even less

7   clear than the state rules about what's reserved

8   for trial.  So what I would like to do, if it's

9   okay with you, do this here, is just put on the

10  record that we're reserving all objections until

11  the time of trial.  That way I don't need to pop up

12  and say anything other than if there is like a

13  privilege instruction not to answer or something

14  like that, so I just let you do your thing, so...

15              MR. MASCIALE:  Okay.

16              MR. RADEKER:  All right.

17              MR. MASCIALE:  That's fine with me.

18  BY MR. MASCIALE:

19         Q.    All right.  Well, if you could please

20  state your full name for the record.

21         A.    It's Brian Carroll, with two Rs and two

22  Ls, Gambrell.

23         Q.    And what is your current address?

24         A.    My home address is 410 Finwood Court,

25  Columbia, South Carolina 29212.

Page 6

1          Q.   And how do you spell -- I'm sorry.  Was
2     it Finwood, Fenwood?
3          A.   Yes, Finwood.  Fin like the fin of a
4     fish.  Wood like wood of a tree.  I don't know why,
5     but when they made that cul-de-sac they called it
6     Finwood.
7          Q.   All right.
8          A.   Never heard of it.
9          Q.   And how long have you lived there?
10         A.   I'm doing the math in my head.
11    16 years, 15 years.  That was my oldest kid.  My
12    youngest kid, he's 15.  So 15 and a half years now.
13    Because we moved in in January and he was born in
14    July.
15         Q.   Okay.  And where were you before that?
16         A.   We rented a house off of North Royal
17    Tower Drive in Irmo.  We were there for four years,
18    I think.
19         Q.   And I'm sorry, where was that?
20         A.   North Royal Tower Drive in Irmo.  It's
21    the main road that goes through both old and new
22    Friarsgate.
23         Q.   Okay.  And are you from the Columbia
24    area originally?
25         A.   No.

Page 7

1          Q.    Okay.  And where are you from?

2          A.    I was born in Anderson, but I grew up

3     in southern Greenville County, and lived there my

4     whole life until I went to USC.

5          Q.    Okay.

6          A.    And then --

7          Q.    Oh, I'm sorry.  Go ahead.

8          A.    And then I moved to Columbia.

9          Q.    And what's your date of birth?

10         A.    It's May 7th, 1973.

11         Q.    Okay.  And I think you said you had at

12    least one child.  How many children do you have?

13         A.    I have two that I'm aware of.

14         Q.    I think you said one is 15?

15         A.    Yes.  My oldest son is 21.

16         Q.    Okay.  21.  And what's his name?

17         A.    His name is Balin, B-A-L-I-N.

18         Q.    Bailey Gambrell?

19         A.    Balin, B-A-L --

20         Q.    Oh, I'm sorry.

21         A.    Right.  The dwarf from the Hobbit or

22    one of the knights from King Arthur, which is where

23    I got it and where Tolkien got it.

24         Q.    And does he live in Columbia or in the

25    Columbia area as well?

Brian Gambrell

November 2, 2021

Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 8

1          A.    He does, but not with us.

2          Q.    Okay.  And are you married?

3          A.    I am.

4          Q.    And what's your wife's name?

5          A.    Amy with a Y.

6          Q.    So is it A-M-Y or --

7          A.    Yeah, A-M-Y.

8          Q.    And how old is she?

9          A.    45.

10         Q.    What does she do?

11         A.    She's a school teacher.  She teaches

12   middle school at White Knoll Middle.

13         Q.    Awesome.  My mom was a teacher.  She

14   just recently retired, so that's great.

15               Any grandchildren yet?

16         A.    None that I'm aware.

17         Q.    Okay.  And just for the purposes of

18   jury selection, if this case were to go to trial,

19   and bear with me because this is kind of a big list

20   of how the federal jury box kind of works.  Do you

21   have any relatives in York, Chester, Lancaster or

22   Fairfield counties?

23         A.    I do not.  My wife would.

24         Q.    Okay.  Do you know about how many or --

25   actually what's your wife's maiden name?

Page 9

1          A.    Catoe.

2          Q.    Can you spell that for --

3          A.    C-A-T-O-E.  And if you know anything

4    about Lancaster you can't swing a dead cat without

5    hitting a Catoe in life.

6          Q.    Okay.

7          A.    So we would be here literally all day

8    with me telling you about her various relations.

9    Understand that if you see the word "Catoe" there's

10   a substantial chance she's related to them.

11         Q.    Okay.

12         A.    I mean, she had -- she's got like --

13   she had three uncles, two of which have passed.

14   Each of her uncles has three to four kids.  Plus

15   they had I think 20 first cousins.  That's the

16   extent of how I know she's related to everybody in

17   Lancaster.

18         Q.    Okay.  What about any -- for either you

19   or your wife, in Kershaw, Lee, Richland, Sumter or

20   Calhoun Counties?

21         A.    No, none other than -- now our son

22   Balin lives in Richland County, but he's registered

23   to vote in Lexington County.  He lives in one of

24   the college apartments by the football stadium, but

25   his permanent address is still our house.  So he

Brian Gambrell
November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 10

1    votes and gets his government mail at our house.

2            Q.    Okay.    Let's see.    Lexington.    What

3    about Orangeburg, Aiken, Barnwell, Allendale or

4    Bamberg Counties?

5            A.    No.

6            Q.    Okay.    And where did you -- I think you

7    said you attended college at USC; is that correct?

8            A.    That's correct.

9            Q.    And when did you graduate?

10           A.    I graduated with an undergraduate

11   degree in 1995 and I graduated with a law degree in

12   2000.

13           Q.    And what was your undergraduate degree

14   in?

15           A.    The most useless degree imaginable.

16   Political science.

17           Q.    Well, that was one of my degrees, too,

18   so I agree with you.

19           A.    Look where it got you.

20           Q.    Yeah, exactly.    It's law school or

21   public service or pretty much nothing else.

22           A.    You're not even qualified to hold a

23   shovel.

24           Q.    That is painfully kind of true.

25                 So which bars are you admitted to

Brian Gambrell
November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 11

1    practice before and then when were you admitted?

2         A.    South Carolina is the only state bar

3    and I was admitted in November -- I'm looking at my

4    license.  Hang on.  I don't even remember what

5    date.  It's November of 2000, the 13th of November.

6    And I'm also admitted to practice before the U.S.

7    District Court of South Carolina and the Fourth

8    Circuit Court of Appeals.  The U.S. District Court

9    I was admitted I think February or March of 2001

10   and the Fourth Circuit was 2009.

11        Q.    Now, have you ever given deposition

12   testimony before?

13        A.    One time before when I was in law

14   school.

15        Q.    In law school?

16        A.    That's correct.

17        Q.    Okay.  And what did that case involve?

18        A.    I was the person in charge of reviewing

19   discovery documents produced by -- I believe it was

20   IndyMac Bank or one of the big banks, I can't

21   remember, on a class action lawsuit involving the

22   attorney preference form in real estate closings.

23   At one point in time you could sue in class for

24   violations of the Unfair Trades Practices Act.

25   That statute, after that series of suits was filed,

Brian Gambrell                          November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 12

1    was amended to prevent that.  So this suit was kind

2    of grandfathered in.

3              Two lawyers out of Aiken hired me to go

4    through the discovery documents that were produced

5    at the office of what is today I think Bobby Stepp

6    and Betsy Gray.  I forget, is it still Gray and

7    Lafitte?  But at the time it was called something

8    else.  But it was -- Bobby Stepp was the lawyer for

9    the defense.  The documents were produced at his

10   office, so even though I worked for attorneys in

11   Aiken I actually worked physically at Bobby's

12   office.  And so after I finished my review I

13   produced a summary report and then Bobby deposed me

14   on that report.  So I think it was in 1998.  It

15   could be 1999.  I'm not -- I'm not entirely sure

16   which summary that was.

17        Q.   Okay.  And do you recall the case title

18   or caption or which county it was filed in?

19        A.   Not a clue.  I remember we had a

20   hearing one time in Orangeburg County, so it might

21   be Orange -- it might have been filed in

22   Orangeburg.  It was a class case, so I think it was

23   designated complex and assigned to Judge Williams.

24   So I don't think the county really mattered, but

25   the title, the name of the case, I have absolutely

Brian Gambrell                                                November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 13

1   no idea.  That was more than 20 years ago.

2          Q.    That's the only deposition you've ever

3   given?

4          A.    Correct.  I've taken hundreds, but...

5          Q.    Okay.  And who is your current

6   employer?

7          A.    South Carolina Department of

8   Transportation.  SCDOT is what we call it.

9          Q.    Okay.  And in what capacity are you

10  employed with SCDOT?

11         A.    I'm assistant chief counsel.  I'm one

12  of three -- four --

13         Q.    Okay.

14         A.    -- assistants.

15         Q.    And how long have you been in that

16  position?

17         A.    Since February.  My first day was the

18  day Rush Limbaugh died.

19         Q.    Hmm.

20         A.    So February -- I don't remember the

21  exact date.  I just -- I was getting my badge made

22  when the news broke.  So the 15th, I think, or

23  16th.

24         Q.    And so generally what does the position

25  of assistant chief counsel entail?

Brian Gambrell                    November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 14

1          A.    Basically whatever the chief counsel
2    tells me to do, but my role typically is to deal
3    with construction contracts and
4    construction-related issues.  Within the department
5    I'm mostly -- that's -- who I interface with is the
6    construction office and that involves all phases
7    including procurement through delivery.  Also I
8    have some responsibility for maintenance contracts,
9    but not very many.  Probably 95 percent of my time
10   involves dealing with construction-related issues.
11         Q.    Okay.  And any litigation role in that
12   capacity?
13         A.    Absolutely zero, which is the reason I
14   made the move.
15         Q.    I thought you might say something like
16   that.  I understand that.
17         A.    Best decision I ever made in my life.
18   Outside of me marrying my wife.
19         Q.    By whom were you employed prior to
20   SCDOT?
21         A.    The Law Firm of Jason E. Taylor.
22         Q.    Okay.  And how long were you employed
23   there?
24         A.    More than five years.
25         Q.    And what was your role there?

Page 15

1          A.    I was an associate attorney and I was

2     the lead attorney in Columbia, South Carolina.  In

3     fact, for a long period of time I was the only

4     lawyer actually physically based in South Carolina.

5          Q.    And what kinds of cases did you handle

6     while you were there?

7          A.    I was a plaintiff's lawyer, so

8     plaintiff's cases.  Car wrecks, motorcycle wrecks.

9     I was one of the counsel on the SCANA Dominion

10    case.  I handled -- I sued a lot of HOAs because

11    they're all breaking the law.  I'm trying to think

12    what else.  Medical malpractice.

13         Q.    Okay.  And on the --

14         A.    Oh, I forgot.  I also made fun of Drew

15    quite a lot.  That's part of my job, to make fun of

16    Drew.

17              MR. RADEKER:  Correct, that's true.

18              THE WITNESS:  I'm good at it, too, but

19    there's ample material I get away with.  What's

20    funny is I now work with Drew's wife, Adriane.

21    Adriane is -- works for the deputy director of

22    finance and her office is next door to mine.

23    BY MR. MASCIALE:

24         Q.    Oh, man.

25         A.    So I see Adriane every day.  Keep the

Brian Gambrell

November 2, 2021

Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 16

1   good Radeker.  She's the smart one.

2                MR. RADEKER:  That's also correct.

3                MR. MASCIALE:  Oh, boy.  Drew, you

4   better watch out.  I'm sure she's getting an ear

5   full about --

6                THE WITNESS:  Oh, no, trust me, it's

7   the other way around.

8                MR. RADEKER:  Yeah, I didn't want this

9   to happen.

10               THE WITNESS:  I may have recently

11  mentioned that a good criminal defense attorney is

12  generally cheaper than a divorce attorney.

13               MR. MASCIALE:  Oh, my gosh.

14               THE WITNESS:  And you might end up with

15  less time.

16               MR. RADEKER:  I'm working hard to keep

17  Lady Radeker happy in life.

18               THE WITNESS:  She is quite the

19  formidable person.

20  BY MR. MASCIALE:

21       Q.   Okay.  So now in regard to the HOA

22  litigation you mentioned, do you know about how

23  many cases you filed against HOAs?

24       A.   Not really.

25       Q.   You say it's -- go ahead.

Page 17

1      A.   Well, no.  It would have been more than

2  ten, but I wouldn't have a good number.  I mean, I

3  don't have access to that information anymore so

4  it's not like I can readily come up with a number.

5      Q.   Any class actions, anything like that?

6      A.   Yeah, we tried that -- I tried that

7  route once and Judge Gergel basically said get a

8  ruling out of the Supreme Court and Court of

9  Appeals saying you can't do a foreclosure and then

10  we'll talk about it again.  And we got that ruling

11  2019, so -- but I decided to not refile and then I

12  made this move, so...

13      Q.   And while you were there at the Law

14  Firm of Jason E. Taylor any -- specifically, other

15  than this case, had you filed any Fair Debt

16  Collection Practices Act claims other -- in a

17  counterclaim or just an actual complaint before?

18      A.   Not that I can remember, no.

19      Q.   Okay.  What about Unfair Trade Practice

20  claims?

21      A.   Just about every counterclaim involving

22  HOAs involved the Unfair Trade Practices Claim Act.

23  Because the two -- FDCPA and the Unfair Trade

24  Practices Act do typically work together.  They're

25  complementary legislation.  But until this

Brian Gambrell
November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 18

1  particular case everybody generally stays within

2  the white lines on the road.  They might not be in

3  the right lane, but they're at least between the

4  white lines.

5          Q.   All right.  Prior to Jason E. Taylor

6  were you with any other firms?

7          A.   Before I joined Jason I worked for a

8  defense firm out of Ohio named Janik.  They had a

9  Columbia office for about a year then decided to

10 beef up their Hilton Head office partly because the

11 partners of the firm all have condos in Hilton

12 Head, so they opened a Hilton Head office as a way

13 to travel to their condo as a tax write off.

14          And then before that I was with a firm

15 out of Atlanta named Helmes & Greene.  Helmes &

16 Greene is a defense firm, but that -- I think I

17 joined them in May and then while I was in a

18 deposition in Dallas the firm imploded.  So I had

19 to find a job relatively fast, so I went with

20 Janik.  So I was probably with Helmes & Greene

21 maybe two, three months.

22          Q.   Okay.  And how do you spell the Ohio

23 defense firm?

24          A.   J-A-N-I-K, I believe.  Their main

25 office is in Cleveland.

Brian Gambrell                    November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 19

1          Q.    Okay.  And you said you were there for
2     about a year?
3          A.    It was a year -- yeah, it was exactly a
4     year.
5          Q.    Okay.  And prior to Helmes & Greene
6     were there any other firms you were associated
7     with?
8          A.    Yeah, I worked for -- now this is going
9     to be kind of complicated, but the firm I was with
10    before joining Helmes & Greene was called Hamilton
11    & Associates.  That was the descendant firm from
12    the second law firm I ever worked for which was
13    Ratchford & Hamilton.  Mr. Ratchford retired and it
14    became Hamilton & Associates.  I left Hamilton &
15    Associates and came back.  And I worked in that
16    intervening time with, Roger, Townsend & Thomas.
17    And then for a very brief period of time with
18    McCabe, Trotter & Beverly.  So I worked for
19    Mr. Hamilton for more than ten years and then for
20    maybe a year and a half after my defense firm.
21         Q.    Okay.  And when you were with Rogers
22    Townsend, about how long were you there?
23         A.    It was a year and a half.
24         Q.    And what did you do there?
25         A.    I did exclusively homeowners'

Brian Gambrell                    November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 20

1    association law and particularly homeowners'

2    association law collections.  That sum of what I

3    did involved answering legal questions that were

4    posed by the HOAs, like, for example,

5    interpretations of their covenants, whether they

6    could fine someone, whether they could enforce

7    specific restrictive covenants as far as

8    appearance.

9              I filed enforcement actions on some of

10   that, like, for example, the neighbor -- like we

11   had one case in Spartanburg where a woman took a

12   1500 square foot house and build a 1500 square foot

13   addition and never received architectural review

14   board approval.  And so it worked out the HOA all

15   the time was telling her to stop and she wouldn't,

16   so finally we had to sue.  So that was the kind of

17   -- and then I would also handle contested HOA

18   foreclosure cases if an attorney appeared.  I would

19   litigate those.  And sometimes, very rarely, but

20   sometimes I would go and appear in court for the

21   other -- one of the other lawyers if there was a

22   schedule conflict on the uncontested roster.

23        Q.   So both contested and uncontested HOA

24   foreclosures, but mostly contested?

25        A.   Yes.  Probably 95 percent of what I did

Brian Gambrell

November 2, 2021

Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 21

1   was contested and probably -- I think maybe once a

2   quarter I had to go -- because I think Berkeley and

3   another county had their uncontested hearings the

4   same day.  I can't remember.  I remember having to

5   go to Moncks Corner at least three times.

6        Q.   Okay.  And I don't think this is true,

7   but was Judge Van Slambrook master-in-equity then?

8        A.   No clue.  I have no recollection.

9        Q.   Okay.  Now I know you said you were

10  briefly with McCabe Trotter.  How briefly were you

11  there?

12       A.   Our last day with Rogers Townsend was

13  like sometime mid August and I resigned Labor Day

14  weekend, so three weeks.

15       Q.   And why did you leave?

16       A.   Mainly because I was thrown under the

17  bus for something I didn't do.  And in particular,

18  we were working on a brief together, and it wasn't

19  my case.  I had nothing to do with the case.  Never

20  litigated the case.  And I wrote a brief and handed

21  it to Ryan for him to proof and add, and basically

22  he filed it without having added it, without having

23  reviewed it, and we missed a significant issue,

24  which I of course would have had no knowledge of

25  because I didn't litigate the case.  And instead of

Brian Gambrell                                November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 22

 1    taking ownership for his mistake he decided to

 2    blame me, and I realized that that was not going to

 3    be fruitful for continued partnership.  It wasn't

 4    our mistake.  It was my mistake.  I should have

 5    known things that I didn't know.  So I left.

 6         Q.    Okay.  And when you say Ryan are you

 7    referring to Ryan McCabe?

 8         A.    That's correct.

 9         Q.    Okay.  Do you recall the case that was

10    on?

11         A.    I remember it involved an HOA in

12    Greenville.  I mean, it was an HOA in Greenville.

13    I don't remember the name of the HOA or the case

14    name.  I think the case ultimately resolved while

15    on appeal.  I don't think there's a recorded

16    decision on it.  My recollection was that the

17    position that the HOA had taken was out on a limb,

18    so the appeal really had no chance anyway.

19         Q.    And what position was that?

20         A.    I don't -- I mean, I think it involved

21    sound restrictions or -- now that I'm remembering

22    it, it involved a church that had been -- part of

23    the church had been converted into condos, but the

24    sanctuary had not, and then they leased the

25    sanctuary to a new church that was in that like New

Brian Gambrell                    November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 23

1   Spring Elevation.  They play lots of loud music,

2   light shows, and it was disturbing the neighbors.

3   But there was a specific provision in the covenants

4   that allowed the church to lease the sanctuary for

5   worship purposes.

6            I'm sorry.  I got an e-mail from the --

7   we have an issue going on, so I had to say, no,

8   don't bother me now.

9            But that's all I remember of the case.

10  I don't remember the name of the HOA or the -- but

11  if I recall, that that was the -- that was

12  essentially the reason why we would never prevail,

13  is that the covenants, if I recall right, didn't

14  define worship, what a worship was, and so -- and

15  actually worship would make noise, and so because

16  the covenants specifically said that they had the

17  right to do it, I didn't see where the homeowners'

18  association had much of a right to challenge it.

19  If you move next to a church you should expect

20  church on Sunday mornings.

21       Q.    Okay.  And do you recall about when

22  that case was decided at the -- well, first at the

23  trial level?

24       A.    No.  I mean, I was with Rogers Townsend

25  from December 2010 until August of 2012, so

Brian Gambrell                    November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 24

1    sometime in that window.  No idea otherwise.

2         Q.   Okay.  All right.  And I think we've

3    covered already -- well, were there any other firms

4    or is that it?

5         A.   That's it, I think.

6         Q.   Okay.  Now, in preparing for this

7    deposition today -- well, actually hang on.  Let me

8    back up.  I think you said you have represented

9    parties in the past in FDCPA actions; is that

10   correct, or just one?

11        A.   This is it.  This is the first action

12   that I remember filing as a plaintiff.  I was

13   involved, in fact, kind of became, our team at

14   Rogers Townsend, the FDCPA compliance person.  In

15   other words, I'm the one that kind of looked over

16   all of our stuff.  I kept up with any changes to

17   the FDCPA.  An important FDCPA change happened

18   sometime in that time in which the Supreme Court

19   decided a major FDCPA case, and so we had to modify

20   our rules, modify our warnings and things that we

21   were sending out.  So to the extent -- I mean, I

22   wasn't filing FDCPA cases, but I was on the other

23   side of ensuring compliance.

24        Q.   Okay.

25        A.   And making sure that we had -- not only

Page 25

1    that we had a bona fide procedure to avoid it, but

2    that we were actually following it.  So that was

3    kind of going hand in hand.

4         Q.   Okay.  Now in preparing for your

5    deposition today, did you discuss this case or your

6    testimony with anyone?

7         A.   I talked to Drew yesterday briefly to

8    find out what the status of the case was.

9    Obviously I haven't looked at it or dealt with it

10   since I've been here.  And I did go on PACER and

11   redownload the complaint and the exhibits just to

12   refresh my recollection of the exact wording of

13   specific documents.  And I looked at the Rules of

14   Professional Conduct and the Rules of Civil

15   Procedure.  And I made fun of Drew.  But that

16   should be assumed by now.

17        Q.   Okay.  So you spoke with Drew

18   yesterday?

19        A.   Yes.  We groused about baseball and how

20   dare the Braves blow their chance to win it all.

21        Q.   Yeah.  And as it pertains to this case,

22   when you say you discussed the status of the case,

23   what do you mean by that?

24        A.   Is it civil litigation.  What the

25   outcome of the motion hearing was.  I mean, what

Brian Gambrell
November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 26

1    the motion I think you filed was, and that was

2    about it.  I mean, where -- I'm being deposed, is

3    there more to -- is discovery ongoing, that was

4    essentially -- where we were on the litigation

5    timeline.

6            Q.    Okay.  And --

7            A.    If Judge Wooten still had the case.

8            Q.    Okay.  So what is your understanding of

9    the case's posture right now?

10           A.    Motion was denied.  We moved on to

11   discovery.

12           Q.    Okay.  And that's it?

13           A.    That's it.

14           Q.    Okay.

15           A.    I think I asked how Stacey was doing

16   just as a general concern.

17           Q.    Did you discuss -- and just for

18   clarity's sake, I will refer to the underlying

19   case, the Cole Creek Homeowners' Association, Inc.

20   Versus Stacey D. Poole, Case No. 2018-CP-46-03714

21   in the York County, South Carolina Court of Common

22   Pleas.  I'll refer to that as the "HOA foreclosure

23   action" going forward.

24                 Did you discuss the HOA foreclosure

25   action at all with Drew?

Page 27

1          A.   Not -- not yesterday, but I have --

2     some months ago I think Drew asked me in a

3     telephone call if I remembered the name of the

4     court reporter who was there for one of the

5     hearings, and I did not, so at that point he told

6     me that the motion for summary judgment had been

7     granted and that case is now on appeal.  I think

8     that's the extent of what I know about that case.

9          Q.   Okay.  And you aren't aware of the

10    disposition of that appeal?

11         A.   No.

12         Q.   Okay.

13         A.   Or if there even is an appeal, to be

14    honest.

15         Q.   Well, I'll just -- I don't think it's

16    worth going into the appeal too much, but I'll just

17    submit that I think when I checked it on C-Track it

18    had been dismissed, but anyway.  Let's see.

19              So other than everything you had told

20    me that you have -- have you done anything else to

21    prepare for the deposition?

22         A.   I refreshed my recollection on the

23    FDCPA, in particular the exact provisions of

24    Section 1692 subparts -- well, little c, subpart

25    two.  And then also the -- I looked at the case

Page 28

1    that I actually was referring to, which was Jerman

2    versus Carlisle, which was the big FDCPA case that

3    came out while I was at Rogers Townsend.  It's

4    559 U.S. 573 and it's a 2010.

5        Q.    And just briefly, if you can summarize

6    the Court's holding in that case.

7        A.    Very broadly it talks about the

8    relevant procedures to avoid -- the bona fide

9    procedures even includes mistakes of law.  So

10   essentially it's just supposed to have a procedure

11   not only to prevent sending out notices to people

12   you shouldn't send out, but also to batch stop your

13   interpretation of the FDCPA.

14       Q.    And that's it?

15       A.    Yeah, that's all I remember.

16       Q.    Okay.  And you didn't review anything

17   else in preparation for the deposition?

18       A.    That's it.  The initial pleading and

19   the e-mail exchanges that I filed.

20       Q.    Okay.  Now, we -- or my office

21   previously served a subpoena on you for today's

22   deposition; is that correct?

23       A.    That's correct.

24       Q.    And the subpoena also required you to

25   produce certain documents relating to this matter;

Page 29

```
1    is that correct?

2           A.    That's correct.

3           Q.    Okay.  And I believe you recently

4    responded that you had no documents responsive to

5    the subpoena.  And just for a reference, the

6    subpoena request said any and all non-privileged

7    correspondence, letters, e-mails, and I'm

8    paraphrasing, but any other documents related to

9    the matters forming the basis of this action.  And

10   I believe you recently responded you did not have

11   any responsive documents; is that correct?

12          A.    That's correct.  I do -- now after

13   sending that e-mail I did download from PACER the

14   pleadings in those e-mails, so I can produce those

15   to you, but I think you already have them.

16          Q.    That's fine.

17          A.    I can produce to you the Rules of Civil

18   Procedure and the Rules of Professional Conduct, if

19   you would like that as well.

20          Q.    I think I've got enough copies already.

21          A.    Okay.

22          Q.    But I appreciate it.

23          A.    Essentially that's all I have.  I did

24   not take with me or keep any client-related

25   material since I was going into government.  I
```

Brian Gambrell
November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 30

1    would no longer have civil clients, so there was no

2    need to take that stuff with me.

3         Q.   Okay.  So you're not -- just to -- I

4    just want to be clear.  So you're not withholding

5    any subpoena documents or information under a claim

6    of privilege; you simply just don't have anything?

7         A.   That's correct, I do not have anything.

8         Q.   Okay.  So would your former firm have

9    those documents?

10        A.   They would, but my recollection of the

11   file we gave, I think we gave it all to Drew.  We

12   gave Drew a complete copy of that file since he

13   took over the representation.  And, if I recall,

14   the only documents that were in that file would be

15   privileged information such as my contemporaneous

16   notes, my research, which I would fully expect Drew

17   to already have designated as attorney-client

18   material.

19        Q.   Okay.

20        A.   And my communications back and forth

21   with Stacey which would obviously also be

22   privileged.

23        Q.   Any other specific types of documents

24   you can recall?

25        A.   I think I have a copy of the covenants.

Brian Gambrell

November 2, 2021

Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 31

1    I had a copy of the pleadings filed by Black,

2    Slaughter & Black, the discovery documents that

3    would have been in that folder, both what I was

4    served and what I served.

5              Q.   Okay.  Now, I would like to turn to the

6    HOA foreclosure action.  And you represented

7    Ms. Poole in the HOA foreclosure action for a

8    certain period of time; is that correct?

9              A.   That's correct.

10             Q.   And when were you retained to represent

11   her?

12             A.   When?

13             Q.   Yes.

14             A.   No idea.  It would have been shortly

15   after she was served the complaint.  So as far as a

16   timing issue, around about there.

17             Q.   Okay.  Do you know about when that

18   would have been?

19             A.   No.

20             Q.   Was that in -- okay.

21             A.   I mean, I assume you have access to the

22   summons, so it would be within the period of time

23   that the summons would have allowed an answer

24   because we timely filed an answer and counterclaim.

25   But I think we initially filed a motion to dismiss,

Brian Gambrell                    November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 32

1   but I don't -- I actually did not go back and look

2   at that file or any pleadings in that file for

3   today.

4        Q.   Okay.  Let me see.  I'll try and share

5   my screen and not mess this up, so bear with me one

6   second.

7        A.   Are you trying to pull up the summons?

8        Q.   I am, yeah.  I think I should be able

9   to get it.  I'm even a little out of practice with

10  Webex depositions, so bear with me one second.

11       A.    I pulled it up on the SC Court's

12  website.  It looked like --

13       Q.   I've got it up and share my screen.

14            All right.  Can everyone see that?

15       A.   Right.  I looked -- I pulled up the

16  answer --

17       Q.   Okay.

18       A.   -- that I filed and the answer was

19  filed on December 27th of 2018.

20       Q.   Okay.  And we'll --

21       A.    It would have been around about -- and

22  it looked like they served it or filed it on

23  December 7th, so it would have been between -- it

24  would have been that two weeks between when they

25  filed and summons and complaint lis pendens and

Page 33

1  when I answered it.

2          Q.   Okay.  And we're going to mark -- or

3  this will be marked Defendant's 1.  This is the

4  summons and complaint for the HOA foreclosure

5  action filed December 7th, 2018.

6              (GAMBRELL EXHIBIT 1, summons and

7  complaint for judgement of foreclosure, enforcement

8  of equitable lien, and enforcement of declaration,

9  was marked for identification.)

10 BY MR. MASCIALE:

11         Q.   You received a copy of this document;

12 is that correct?

13         A.   That's correct, yes.

14         Q.   Okay.  And how did you receive it, if

15 you can recall?

16         A.   I think Stacey gave me the case number

17 and I went and downloaded it myself using the SC

18 Court's e-filing system.

19         Q.   Now at that time were you an authorized

20 electronic filer on the e-filing system?

21         A.   Yes, I was authorized from day one.

22         Q.   Okay.  And you received electronic

23 filing notifications through that system for your

24 cases?

25         A.   After I made an appearance, yes.

Brian Gambrell                          November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 34

1       Q.   Okay.

2       A.   But I mean -- but there's a way you can

3   go look at the pleadings without having to --

4       Q.   Right.

5       A.   Records aside.

6       Q.   Right.  Now this will be marked

7   Defendant's 2.

8            (GAMBRELL EXHIBIT 2, answer and

9   counterclaim, was marked for identification.)

10  BY MR. MASCIALE:

11      Q.   Do you recognize this document?

12      A.   Yes.

13      Q.   And is this the answer and counterclaim

14  that you filed on behalf of Ms. Poole?

15      A.   It looks like it.

16      Q.   Okay.  And does that appear to be your

17  electronic signature that appears at the bottom of

18  page four there?

19      A.   It is.

20      Q.   Okay.  Now, turning to -- and really

21  the only thing I want to go over with you about

22  this is paragraph seven here.  Do you see that?

23      A.   Yeah.

24      Q.   And that's a denial of paragraphs 8

25  through 16 of the complaint, Exhibit 1?

Page 35

1          A.    That's correct.

2          Q.    Okay.  Now I'm going to go back to

3    Exhibit 1.  So if you just want to take a second

4    and review these allegations and just make sure

5    that that's your answers and accurately -- or

6    that's a of denial of those allegations?

7          A.    The denial is accurate.

8          Q.    Okay.  And that includes paragraph nine

9    here where the HOA alleged Ms. Poole owes about

10   $7,005.00 in assessments, principal, late fees,

11   interest, costs of collection?

12         A.    That's what the HOA alleged.

13         Q.    Okay.  And that was denied, correct?

14         A.    It was denied, correct.

15         Q.    Okay.  Now, in response to the

16   complaint that was filed, did you do anything else

17   or file anything else in the HOA foreclosure case?

18         A.    I'm sure I did.  I think I filed a memo

19   in response to a motion for summary judgment.  I

20   think we had a hearing on a notice to amend -- I

21   mean, a notice of a motion to dismiss before Judge

22   Kimball.  And I filed a motion for sanctions

23   arising out of the incident that gave rise to this

24   complaint.  So there was several -- I mean, if the

25   -- there were things filed and served in that case.

Brian Gambrell                                November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 36

1          Q.    And I'll get to the motion for

2    sanctions in a bit.

3                Now, let's see.  I think we've already

4    answered this, but just to clarify, in the answer

5    and counterclaim that you filed, Ms. Poole denied

6    liability for any unpaid assessments; is that

7    correct?

8          A.    That's correct.

9          Q.    And she asserted a counterclaim for an

10   alleged breach of HOA covenants for failure to

11   maintain the common elements; is that also correct?

12         A.    That's correct.

13         Q.    Okay.  Now, with regard to the case

14   you're here for today and the HOA foreclosure

15   action, while you were involved in both, how was

16   your -- did you maintain a single file or did you

17   maintain two separate files for each case?

18         A.    It would have been a single file.

19         Q.    A single file.

20         A.    Just different folders.

21         Q.    Okay.

22         A.    We -- my -- the firm Jason E. Taylor

23   tried to be as paperless as possible.  And since we

24   had offices kind of regionally in Hickory,

25   Charlotte, Columbia, and Rock Hill it didn't make

Brian Gambrell                    November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 37

1   sense to have a physical folder in four different

2   places, so typically it would be an electronic

3   file.  The only physical file that we would have

4   had would have involved documents that were served

5   on us or that we had to print out and then we would

6   have put those documents in a file.

7           Q.   Okay.  Now, in regard to those files,

8   how did you track your time on those?

9           A.   I mean, at the time that was what I was

10  using.  I graduated to an iPad, but as far as

11  specific amounts of time that I would have spent it

12  would have involved for -- not necessarily for the

13  HOA case, but like, for example, the FDCPA case

14  would have involved time entries that I would have

15  handwritten.

16          Q.   I've got you.

17          A.   And then ultimately with the goal or

18  the idea of transposing those into a written format

19  in the form of an attorney's fee affidavit that

20  would have been submitted.

21          Q.   And the HOA case did not involve time

22  entries?

23          A.   I did not typically make time entries

24  in those.

25          Q.   Okay.

Brian Gambrell
November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 38

1          A.    Given the posture of those cases.

2          Q.    Okay.  Is that case on a -- is that on

3    an hourly rate or is that a contingency fee?

4          A.    It was a contingency fee.  Like I said,

5    the posture of it involved -- since it involved

6    kind of the same legal theory over multiple cases

7    it was really difficult to assign a time value to a

8    particular file, so I was going to deal with it, if

9    we got there, with trying to figure out some

10   proportion under some sort of lodestar analysis.

11         Q.    And now was the FDCPA case -- I know

12   you kind of tracked your time for that.  Was that

13   also part of the contingency fee or was that

14   hourly?

15         A.    That was a contingency fee.

16         Q.    Okay.  And you said you tracked your

17   time with handwritten notes.  Were those ever

18   converted to electronic records?

19         A.    No.  I spent only like an hour or three

20   responding to the memo, responding to the motion

21   that was filed, so the timestamp was relatively de

22   minimus.  And I had left not too long after that,

23   so...

24         Q.    Okay.  So who is in possession of those

25   handwritten notes capturing your time?

Brian Gambrell                November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 39

1        A.    No one.  Like I said, theoretically it

2    could be me, but I don't remember physically

3    writing ones down for this case because, like I

4    said, it -- I had such little time in it -- I mean,

5    we filed this one at the end of October.  I had

6    already interviewed with SCDOT, knew I was leaving,

7    so I knew that we wouldn't have much time in it,

8    so, I mean, I responded to like one memo and that

9    was it.

10       Q.    Okay.  And do you know how bills were

11   generated to Ms. Poole?

12       A.    No bills were generated to Ms. Poole.

13   It was a contingency case.

14       Q.    Right.  Any bills for costs or the cost

15   of filing a motion or filing the action?

16       A.    They would have been generated in a

17   Word document at the end of the case in a

18   disbursement sheet which we would have reflected --

19   the amounts reflected discounted against the cost

20   and then she would have gotten that result.  We --

21   as a plaintiff's firm we didn't have billing

22   software.  We didn't routinely track time.  In

23   fact, I think I was the only lawyer in the firm

24   that had causes of action where an attorney's time

25   was an element of potential damages.  I think we

Brian Gambrell                                November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 40

1    had a case in North Carolina like that and we just

2    -- the lawyers did timesheets, just physically

3    wrote it down and we typed it up when there was an

4    award of attorney's fees.

5              Q.    And that was going to be my next

6    question, because I believe here Ms. Poole is

7    claiming or attempting to recover her attorney's

8    fees in this case.  And so it's your testimony then

9    that there was never -- or there are no current

10   notes capturing your time for work billed on this

11   case?

12             A.    That's correct.  I could reconstruct it

13   based on e-mails that I've sent.  I can -- I mean,

14   again, it would be -- because I spent very little

15   time on the case, I didn't know when we -- when you

16   filed the motion.  So I mean, we're talking three,

17   four hours at the most I think I might have -- so

18   that would be easy to reconstruct.

19             Q.    Okay.  Now, after -- and I know you

20   said earlier that you had also filed a memorandum

21   in opposition to the HOA's motion for summary

22   judgment as well as a motion for sanctions in the

23   HOA foreclosure case.  Did you do anything -- well,

24   first of all, when were you -- when did you

25   withdraw as Ms. Poole's counsel and Drew was

Brian Gambrell
November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 41

1   substituted in?

2          A.    It would have been January, February

3   this year.

4          Q.    Okay.  February 11th, 2021 sound

5   correct?

6          A.    Yeah, that's my brother's birthday, so,

7   yeah, that would have been -- I'm pretty sure that

8   would have been the date that it was filed.  That

9   would have been right before -- I was supposed to

10  start at SCDOT on February the 1st, but my wife

11  ended up with COVID and I tested positive, so I

12  ended up getting a COVID-related two weeks off.  So

13  during that period of time I was at home with

14  nothing to do, so I was helping with file transfers

15  and things that -- facilitating that while I was

16  waiting to start here.

17         Q.    And up until -- so from December -- let

18  me make sure I get this right.  December 27, 2018,

19  when you made an appearance and filed an answer and

20  counterclaim, through February 11, 2021, other than

21  filing the memorandum in response to a motion for

22  summary judgment as well as the motion for

23  sanctions, did you do anything else with regard to

24  the HOA foreclosure action?

25         A.    Oh, no, we -- there was -- in the HOA

Brian Gambrell
November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 42

1  foreclosure action there were motion hearings,

2  drafting memos, responding.  I mean, on the HOA

3  side of it there was -- I mean, it was litigated.

4  I can't say that it was vigorously litigated within

5  an inch of everyone's life, but certainly there was

6  a lot of stuff that went back and forth as far as

7  memos and cases and research and that sort of

8  thing.

9        Q.   And -- go ahead.

10        A.   Right.  I mean, so -- and some of that

11  research would have preexisted the Stacey Poole

12  case.  So to the extent that it has a time value,

13  again, that would have to be -- if you use the same

14  memo for five different cases is it fair to charge

15  full freight five times?  I don't think so.  So if

16  there would have been some sort of analysis, like a

17  lodestar analysis, I would have had to have done to

18  try and figure out how to assess that research

19  across the various files in which that research

20  applied.

21        Q.   Okay.  And in terms of actually any

22  filings with the HOA foreclosure case, did you file

23  anything else?

24        A.   There was a memo in opposition which

25  were -- probably had been the most substantial or

1   substantive thing that we worked on.  The motion

2   for sanctions was fairly short.  We had a couple of

3   status conferences that we had to deal with.  I

4   think all of them occurred either by -- I think

5   they all occurred by phone actually.  I don't think

6   we physically had to go.

7            But what's funny is I'm looking at the

8   file, I distinctly remember having a hearing with

9   Judge Kimball in this case well before he retired

10  and then we had another hearing with the new master

11  that covered largely the same ground.  And I think

12  I filed a motion to reconsider his denial of a

13  motion to dismiss, but I don't see that listed

14  here.  But when cases get referred to the master

15  it's -- ECF creates like two different timelines or

16  two different files, and so I know we did it and I

17  know we were there because I know, for example, one

18  of the issues that Judge Kimball raised was

19  directly addressed by the Supreme Court in Winrose.

20  And so when we went back in front of the new master

21  I had a copy of Winrose.  It said, see, see, here,

22  read this.  So I know that that case -- there was a

23  discussion that occurred early in that case that

24  was -- that Winrose had a significant impact on.

25  In fact, I want to think I -- I remember addressing

Brian Gambrell                      November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 44

1    that with the new master saying we shouldn't be

2    here at all anymore because the Supreme Court has

3    already said that this is not the relief of first

4    choice.

5              Essentially the argument that I was

6    advancing, which was what the HOA should have done,

7    which is filed an action at law for breach of

8    contract was -- the appropriate remedy that the HOA

9    should have sought was kind of -- well, not kind

10   of, it is supported by Winrose, that foreclosures

11   is a drastic remedy that should only be used as a

12   very, very, very last resort, not as a routine

13   business model which clearly Black, Slaughter &

14   Black I believe still uses as a business model.

15             So to the extent that there were things

16   that were filed and discussed in the case, I don't

17   know if the ECF accurately reflects everything that

18   went on, but that would be -- since I'm no longer

19   with that firm and no longer have access to the

20   file, the ECF is really the only timeline I have.

21   But I distinctly remember other things going on

22   that would have been filed and served and discussed

23   and litigated beyond just what's in there.

24        Q.   And I don't want to cut you off, but --

25   I know I said if you needed to take a break, please

Page 45

1  let me know, but I actually think I'm going to take

2  just a five-minute break to run to the restroom

3  real quick if that's all right with everybody.

4           THE WITNESS:  That's fine.

5           MR. RADEKER:  I was wondering when I

6  was going to pop up and suggest one.

7           (A recess transpired from 12:19 p.m.

8  until 12:31 p.m.)

9  BY MR. MASCIALE:

10      Q.   To get back to where we left off, and

11 we had just discussed your filings in the HOA

12 foreclosure case.  Now, I assume, and correct me if

13 I'm wrong, but you are aware at the time that the

14 plaintiff, the HOA, filed a motion for summary

15 judgment in that case; is that correct?

16      A.   That's correct.

17      Q.   And do you recall when that was filed?

18      A.   It looks like November 26th, 2019.

19      Q.   Okay.  This will be -- let me share my

20 screen again.  This will be Defendant's 3.

21           (GAMBRELL EXHIBIT 3, Plaintiff's motion

22 for summary judgement, was marked for

23 identification.)

24      Q.   Okay.  This will be Defendant's 3.  And

25 this is the Plaintiff's motion for summary judgment

Brian Gambrell                          November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 46

1    filed in that case.  And you've seen this document

2    before?

3           A.   Yes.

4           Q.   Okay.  And were you aware that the

5    motion was primarily based on Ms. Poole's failure

6    to timely respond to a set of requests for

7    admissions served on her?

8           A.   I am aware.

9           Q.   And were those requests for admissions

10   ever responded to?

11          A.   I think we filed a -- it was part of

12   our hearing, an opportunity to serve responses

13   under -- I can't remember the name of the case.

14          Q.   And I'll just submit to you the Court

15   ultimately denied that request and found that

16   Ms. Poole should have responded on time.  And you

17   received those requests -- those requests to admit

18   were served on you, correct?

19          A.   I believe so.  I mean, I don't have any

20   -- I don't have access to the file or my notes or

21   anything like that, so I wouldn't remember.

22          Q.   Okay.  And in response to the

23   Plaintiff's motion for summary judgment, I know you

24   filed a memorandum in opposition, but did you do

25   anything else?  Did you conduct any discovery,

Page 47

1    serve any discovery, take any depositions, anything
2    like that?
3           A.    I didn't take any depositions.  I don't
4    remember about discovery.
5           Q.    So what did you use to oppose the
6    motion for summary judgment?
7           A.    The restrictive covenants.
8           Q.    And that's it?
9           A.    And discussions with Stacey.
10          Q.    Discussions with -- what do you mean by
11    that?
12          A.    I mean, I interviewed my client.  She
13    had pictures.
14          Q.    And I'm sorry.  Just to clarify, I mean
15    in terms of evidence or facts submitted to the
16    Court.
17          A.    Yeah, I mean, the covenants.  We spent
18    a lot of time discussing the interpretation of the
19    covenants themselves, whether there was a common
20    element, whether the exterior of the building was
21    part of the common elements, the -- what the duty
22    of the HOA was vis-a-vis maintaining the common
23    elements and waterproofing.  My recollection, the
24    HOA asserted that was an original building defect,
25    the failure to include waterproofing.  But because

Brian Gambrell
November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 48

1    it's a condominium Ms. Poole didn't own anything

2    below the paint.  Her property was paint to paint,

3    floor to ceiling.  So if it's not her -- the water

4    had to have at least at some point passed through

5    the common elements on its way to her unit, so that

6    was -- that was part of the issue.

7            And because, in fact, she had spent

8    thousands of dollars I think we had some bills or

9    estimates that we responded with, now that I'm kind

10   of going back through my recollection, of the

11   monies that she spent would have theoretically

12   offset the assessments that she allegedly owed.  If

13   I recall, they almost completely canceled each

14   other out.  Because I know that she had water

15   intrusion damage I think on two or three separate

16   occasions, but my recollection is pretty fuzzy.

17       Q.   And did you all ever discuss or was the

18   possibility ever raised trying to sue the developer

19   of that condominium?

20           MR. RADEKER:  I'm going to instruct him

21   not to answer to the extent of what you're asking,

22   and this might not even be what you're asking.  To

23   the extent of what you're asking is, like, did he

24   discuss that with his client, who is my client now,

25   then, no, that's privileged.  I'm going to instruct

Brian Gambrell                         November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 49

1  him not to answer that.

2            MR. MASCIALE:  Right.

3            MR. RADEKER:  Yeah, but you just said

4  like did you ever discuss.  I would be like,

5  discuss with who?

6  BY MR. MASCIALE:

7        Q.   I'll try and I'll rephrase it.

8            Did you ever -- did you -- was it ever

9  -- did you ever consider bringing an action against

10  the developer for the construction defect issues?

11       A.   I mean, that would be my privileged

12  information, but I will say that, as a matter of

13  fact, the developer had declared bankruptcy and had

14  received bankruptcy protection.  And so the

15  entities that had constructed the buildings had

16  long since -- not only were bankrupt, but had --

17  were nonexistent and would be under -- their

18  insurance information was unavailable.  So to the

19  extent that the developer was a potential

20  defendant, but the way I looked at it, it's not the

21  homeowners' responsibility to sue the developer.

22  It would have been the HOA's responsibility to sue

23  the developer as soon as we filed our counterclaim

24  alleging that there was a water intrusion issue.

25  Because under South Carolina law the developer has

Page 50

1    the duty to turn over common elements in good

2    repair.

3              So that cause of action actually didn't

4    belong to Stacey.  It belonged to the HOA.  To the

5    extent anyone should have sued the developer for

6    any sort of recovery it should have been the HOA.

7    And if they didn't do that, then that would be

8    perhaps a separate breach of fiduciary duty by the

9    HOA to its members including Stacey.  So to the

10   extent that that doesn't -- I mean, I think I

11   looked into it, but to the extent that that's

12   really not her game to play.

13        Q.   And that's -- and just so I make sure,

14   that's based on your interpretation of the

15   covenants that that particular waterproofing

16   membrane is included in the common elements of the

17   HOA?

18        A.   That's correct.  It would be included

19   within the exterior close which you would define --

20   which most covenants would define, I think

21   reasonable people would define, as the -- from the

22   exterior vinyl or brick or whatever it was all the

23   way up to the paint.  Because under an HOA, under

24   condominium law, the owner of an unit doesn't own

25   anything below the paint, anything below the

Brian Gambrell                              November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 51

1   drywall.  That's all they own.  They don't own

2   anything in the wall.  That's all HOA common

3   element.

4           Q.   And I know you referenced the covenants

5   with regard to the counterclaim that you filed.

6   Was there any evidence or facts that you used or

7   submitted to the Court to oppose Ms. Poole's

8   liability for unpaid assessments on the HOA's

9   claim?

10          A.   I don't remember.  I want to think that

11  she had a -- I know we did an affidavit in which

12  she swore to the amount she had spent on repairs

13  over the years, but I might be -- I don't remember.

14          Q.   Okay.

15          A.   I'm dimly remembering something like

16  that.  I know we submitted pictures showing

17  evidence of the water intrusion.  Like I said, I

18  know we sent or we showed -- we gave that in -- and

19  I think we discussed that, but I don't really

20  remember.

21          Q.   Okay.  And to the extent that the HOA

22  directly alleged that Ms. Poole was liable for

23  unpaid assessments, there was nothing submitted

24  directly to contradict that or to create a factual

25  issue regarding...

Brian Gambrell
November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 52

1      A.    I don't remember.  I know that what we
2   advocated was that it would be a setoff.
3   Essentially what she spent in repairs should be
4   used to set off the amount in the assessments.
5      Q.    Okay.  And I'm sure you're aware that
6   as we discussed the motion for summary judgment
7   that the plaintiff filed was based in relatively
8   large part on Ms. Poole's admissions and the
9   liability for the alleged debt.  And I'll -- I'm
10  sorry.  I'll share my screen again.
11     A.    I'm aware that that's what the judge
12  decided, but --
13     Q.    Okay.
14     A.    -- I'm also aware that we have a Court
15  of Appeals and the Supreme Court.  I mean, trial
16  judges don't always get it right.
17     Q.    And --
18     A.    And particularly I found that the trial
19  courts really don't understand the Horizontal
20  Property Regime Act, but I'm not even sure the
21  Court of Appeals does, to be honest.
22     Q.    And just so -- just to clarify, you're
23  not involved in Ms. Poole's appeal, are you?
24     A.    No.
25     Q.    And you were only involved at the trial

Page 53

1   level?

2          A.    That's correct, up until the point that

3   I left early February.

4          Q.    Okay.  And so I think we discussed

5   this, but the plaintiff filed their motion for

6   summary judgment based in large part on Ms. Poole's

7   admissions on November 26, 2019; is that correct?

8          A.    That's correct.  That was the basis of

9   the motion.  Whether it was a proper basis or what

10  the judge ultimately decided is -- I mean, I think

11  reasonable minds differ.

12         Q.    And you received a copy of that motion

13  and you were aware that was the basis for their

14  motion; is that correct?

15         A.    That's correct.

16         Q.    At the time?

17         A.    That's correct.  But none of the

18  admissions actually undercut the fact that she had

19  spent the money and would be entitled to an offset

20  to the assessments.  There was nothing about damage

21  or how much damages had been incurred or as far as

22  -- so to the extent that there were admissions it

23  did eliminate allegedly some issues, but not the

24  whole case.  In fact, my understanding of the order

25  was kind of inconsistent.  It essentially decided

Brian Gambrell
Poole, Stacey Darlene Vs. Black Slaughter & Black PA
November 2, 2021

Page 54

1    two mutually exclusive things and there was no way
2    to kind of reconcile both halves of her ruling.
3           Q.    And I'll share my screen again.  If we
4    take a look at paragraph five in the subparagraphs,
5    this is a plaintiff's motion for summary judgment.
6    Looking at Subparagraph D, could you read that for
7    me.
8           A.    Sure.  It says "admit that the
9    association is not responsible for alleged water
10   intrusion on the Defendant's property."
11          Q.    And I understand your position on that
12   issue, but as far as the admissions were concerned,
13   as far as the facts admitted, would you agree that
14   would -- if upheld, would kind of defeat your
15   breach of contract claim?
16          A.    No, no, I wouldn't think so.  And the
17   reason why is because it says the association is
18   not responsible for any alleged water intrusion.
19   The problem with that is the word "responsible."
20   What does the word "responsible" mean?  Did it
21   cause it?  Well, no.  No one is alleging that the
22   association went out there with a garden hose or
23   fire hose and squirted the water on the wall.
24                What the problem was was after it
25   occurred and it damaged my client's unit, they had

Brian Gambrell                                    November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 55

1    a duty under -- they had a duty to the entire
2    association and to Ms. Poole in particular to go in
3    and correct that issue.  And the failure to do that
4    is a breach.  The fact that it's -- unless they had
5    gone out there and fixed it since, it's still going
6    to be a breach.
7               And so to the extent that -- and I
8    think you could go look back against B, you're
9    right, she had no recovery against the developer or
10   original builder because the original builder
11   doesn't exist anymore.  So who is quote/unquote
12   responsible for maintaining the common elements?
13   The common elements responsibility indues to the
14   board.  The board -- the HOA has that
15   responsibility to maintain the common elements and
16   their failure to do so is what caused the damage to
17   my client's unit.  The fact that it was water -- it
18   was water this time.  It could be any number of
19   things the next time.  So what was responsible
20   wasn't necessarily the water intrusion.  It was the
21   failure to maintain the common elements.
22               So none of these requests to admit ever
23   discussed whether they had a duty to maintain the
24   common elements, whether they did maintain the
25   common elements.  It really referenced the fact

Brian Gambrell                                    November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 56

1   that the association is trying to blame the
2   developer for it, but -- and I think you've
3   scrolled up to number two.  It's a duty to maintain
4   the common elements which is what caused the
5   damage.  The water was simply the mechanism.  I
6   think their argument kind of substitutes the cause
7   for -- the mechanism for the cause.  If the
8   association common elements had been properly
9   maintained or repaired when she first tells them
10  about it, then that's the problem.  They don't --
11  she has no duty to mitigate any of the water, for
12  example.  I mean, it's not her -- she only owns
13  air.  So...
14          Q.   Okay.  I'll -- this will obviously be
15  an exhibit, and I think it speaks for itself.
16              Now, to move on, did you -- were you
17  part of a status conference in the HOA foreclosure
18  action in January of 2020?
19          A.   January of 2020?
20          Q.   That's correct.
21          A.   It's possible.
22          Q.   Okay.  And I'll -- and this will be
23  Defendant's -- go ahead.
24          A.   I don't remember which one was -- I
25  know we had multiple.  And I know there was one

Brian Gambrell
November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 57

1   where we were on the -- I was on the phone, because

2   I had a hearing in Greenville or the upstate, so we

3   did it -- I was in my car on the phone.  I don't

4   remember which date was which.

5               (GAMBRELL EXHIBIT 4, Cole Creek

6   Homeowners Association, Inc. V. Stacey D. Poole

7   Status Conference, was marked for identification.)

8   BY MR. MASCIALE:

9        Q.   Okay.  And this will be Defendant's 4.

10  And is this the status conference report that was

11  filed in the HOA foreclosure action?

12       A.   It looks like it.

13       Q.   Okay.

14       A.   I know David typed one up.

15       Q.   And did you receive a copy of this?

16       A.   I'm sure I did.

17       Q.   Okay.

18       A.   I mean, it has the file stamp on it, so

19  it would have been sent to me via the electronic

20  filing.

21       Q.   And so here -- let's see.  Well, first

22  we're going to look at length of trial where it

23  claims that no facts seem to be in dispute and it

24  seems that the case would be ripe for judicial

25  determination.  Did you at that time disagree with

Brian Gambrell
November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 58

1   that characterization of the case?

2          A.   I would.  I mean, this is the

3   Plaintiff's status conference response to the

4   request from the judge.  I didn't draft this.

5   Those aren't my scheduled conflicts.  Those are

6   Mr. Wilson's.

7          Q.   Okay.  And here --

8          A.   And I would dispute his formulation of

9   discovery issues.  He never filed a motion to

10  compel, for example, and it's hard to complain

11  about discovery issues if you haven't compelled

12  them.  But I know that we sent him photos and

13  pictures along the way, so I would -- I think his

14  -- and if you notice it's signed just by him.  It's

15  not signed by me.  So I mean, I realize that's his

16  characterization of it.  That's not how I would

17  characterize it, and so...

18         Q.   Okay.

19         A.   I mean, I know what the document says.

20         Q.   And you received that and you're aware

21  that that was how my clients viewed that -- the

22  posture of the case at the time; is that correct?

23         A.   Sure.

24         Q.   Okay.  Let's see.  Now, after that I

25  want to go to -- and this will be the first full --

Brian Gambrell                           November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 59

1    let's talk about it.  I believe in September of
2    2020, and these are attached as exhibits to the
3    complaint in this case, which I'll get to in a
4    minute, something happened with regard to notices
5    of a hearing with the master-in-equity in the HOA
6    foreclosure case; is that correct?
7              A.    That's right.  I think Lynn with the
8    master-in-equity's office either sent Mr. Wilson
9    and I an e-mail or she might have even called.  I
10   don't remember.  But essentially it was what are
11   some dates that you all would be available to come
12   to York and have a hearing.  Because between this
13   period of time is when Judge Kimball retired and
14   there was a new master installed, and so there was
15   a period of time in which the new master I think --
16   I just think I read her name was Judge Weaver, was
17   given a period of time to kind of ramp up.
18              So I know that there was a discussion
19   about a range of dates, but I also know that there
20   was a -- and I think we had an agreement to, yeah,
21   exchange e-mails as to an agreeable date.  I would
22   think it was all in e-mail.  I don't think it
23   occurred by phone.  So that would have been -- what
24   date that occurred, I'm not sure.  My dad died in
25   July of 2020, and so I was out of the office a good

Brian Gambrell

November 2, 2021

Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 60

1   bit of time in the later part of July, early

2   August.  Plus we had COVID going on, so the timing

3   of when things occurred during that period of time

4   is kind of -- I don't have a clear memory of the

5   sequencing.

6           Q.   On or around September 9, 2020, did you

7   receive a notice of hearing sent by my clients in

8   the HOA foreclosure action?

9           A.   I don't think I received it direct -- I

10  didn't receive it by e-mail.  If my --

11          Q.   He sent it by e-mail?

12          A.   No, I don't think it was --

13          Q.   Oh, okay.

14          A.   I don't think it was sent by e-mail.  I

15  think it was mailed.  Not only was it mailed, it

16  was not mailed to me.  It was mailed directly to my

17  client.  Now, I think I was CC'd on it where there

18  was like carbon copies of it that were sent to both

19  me and to my client, but she got it well before I

20  did because I think he mailed it to -- yeah, the

21  certificate of service says the 9th of September,

22  2020.  And so the notice of hearing was sent

23  directly to her and then to me, and because of the

24  COVID we weren't -- I wasn't necessarily in the

25  office every day.  And one of the problems with

Brian Gambrell                                November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 61

1   that location is the post office was not as

2   efficient as it should have been delivering the

3   mail, but I know for certain Stacey got it before I

4   did.

5          Q.    Okay.  It was sent to you both; she

6   just happened to receive it first?

7          A.    That's correct, because it was mailed

8   from Charlotte, according to the envelope.

9          Q.    Which makes sense.

10         A.    She lives in Fort Mill and I'm in

11  Columbia, so -- well, that's -- the timing of the

12  sequence of who got what when is the only thing

13  that makes sense.  I don't know why he's sending a

14  notice of hearing to begin with because we were

15  involved in the scheduling of it and it was -- I

16  mean, it was unnecessary since we had discussed

17  when the hearing was.  We had a specific date

18  picked out with the master.

19              I don't know if you practice routinely

20  in front of the masters.  The masters operate

21  completely different than circuit court in which

22  everything is arranged.  Everything is scheduled.

23  So I mean, it really -- there's no roster like you

24  would normally have where they would publish a

25  roster and then it would be the responsibility of

Brian Gambrell                    November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 62

1    the moving party to notify everyone else of the

2    publication of the roster.  This is a -- this was

3    arranged like a dentist appointment or a doctor's

4    appointment.  I mean, we knew we had an appointment

5    with the judge at that time on that date.  I mean,

6    we were one of three cases for September 29th at

7    2:30.

8           Q.   And I think, and correct me if I'm

9    wrong, I used to do a little bit of work with the

10   masters, but the party scheduling the hearing is

11   sort of required to send out a notice of hearing

12   under the rules; is that correct?  I think at least

13   ten days prior to the hearing.

14          A.   I mean, you could.  I mean, I think the

15   rule does say that, but if I'm -- I know when I'm a

16   plaintiff and I'm scheduling stuff with the master

17   and the defendant is on the other -- is part of the

18   chain, I didn't send the notice to him because it

19   would be superfluous.  I mean, not only that, with

20   electronic filing, why would you even physically

21   mail it to begin with?  Why not just -- if you're

22   going to do it you can do it by electronic filing

23   so that it's -- I mean, it's done right then.  It

24   seemed to be unnecessary to physically mail a

25   notice of hearing.

Brian Gambrell        November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 63

1       Q.   Okay.  But you would agree with me that

2  there's nothing, in and of itself, improper about

3  sending a notice of hearing if it's sent to the

4  correct party?

5       A.   To the correct party, no, there's

6  nothing -- it does not violate the rule --

7       Q.   Okay.

8       A.   -- in the way you formulate it.  Now,

9  is it necessary to physically mail it anymore, no.

10  We have electronic filing.  There's no -- there was

11  no reason to physically mail it at all.  Service by

12  electronic filing is effective just as mailing it.

13  So if the concern was, I want to be sure that the

14  defendant has notice of the hearing, I'm going to

15  inform his lawyer by filing it electronically,

16  which is how we file everything now.

17       Q.   Okay.  And just for clarity's sake, I'm

18  going to refer to the amended complaint that was

19  filed in the action.  This will be Defendant's 5.

20       A.   Right.  Because that's -- I think I had

21  some Scrivener's errors.  I think I used an older

22  complaint, federal complaint, that I had as the

23  model for the action and I forgot to delete some of

24  it, so I went back in and corrected it.

25           (GAMBRELL EXHIBIT 5, amended complaint,

Brian Gambrell                    November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 64

1   was marked for identification.)

2       Q.   Okay.  And so speaking -- and we're

3   discussing this first notice of hearing dated

4   September 9th, 2020.  And I believe you had said

5   that both you and your client received this notice

6   of hearing; she just received it before you?

7       A.   She did.  She received it well before I

8   did.

9       Q.   Okay.

10      A.   My recollection is one of the two -- I

11  know I had to have gotten both because I had the

12  envelopes.

13      Q.   Okay.  And when was the first time you

14  saw this particular notice of hearing, this

15  September 9th, 2020?

16      A.   When she texted a picture of it to me

17  on a Friday evening at like eight or nine o'clock.

18      Q.   Okay.  Is that the date she received

19  it, I assume?

20      A.   I assume.

21      Q.   Okay.  And what did you do in response

22  to receiving that text?

23      A.   Now I'm looking at the notice.  It was

24  sent the 9th.  It was 9/11 the Friday that she got

25  it.  Because I distinctly remember it was a Friday

Brian Gambrell
November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 65

1    evening.  We -- our office closed early on Fridays,

2    so I was probably out of there probably close --

3    and this was football season, band season.  So I

4    don't exactly remember what I had to do that Friday

5    night, whether it was a high school football game

6    or whether there was a band practice, but I had

7    remembered that I had gotten home from whatever it

8    was.  She texted me, so then I immediately -- we

9    could remote log in.  We had that capability before

10   COVID.

11            So I remoted in so that I could -- I

12   texted that photo -- I e-mailed that photo to

13   myself so that I could blow it up on my computer so

14   I could read it.  Because my eyesight is not that

15   great.  I have bifocals and all I could see it on

16   was my iPhone and the picture quality wasn't that

17   great.

18            Q.   Okay.  Then after reading that what did

19   you do next?

20            A.   Without revealing privilege, I called

21   Stacey and had a conversation with her about the

22   substance of the hearing notice and told her

23   something that I can't tell you because of

24   attorney-client privilege.

25            Q.   Did you explain the hearing notice to

Brian Gambrell                    November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 66

1   her?

2        A.   I will decline to answer that based on

3   the attorney-client privilege.

4             MR. RADEKER:  Yeah, I'm going to have

5   to instruct him not to answer what explanation he

6   gave her and...

7             MR. MASCIALE:  I'm not asking for the

8   substance of the explanation.  I'm just asking if

9   he explained it to her.

10  BY MR. MASCIALE:

11       Q.   And I think you already kind of

12  answered that.  You said you had a conversation

13  about the substance of the notice.

14       A.   Correct, I did.

15       Q.   Okay.

16            MR. RADEKER:  Yeah, I'm not trying to

17  make issues to go have motions about it if we can

18  avoid that.  I know it can be difficult when a

19  lawyer is the witness to how do you do it and avoid

20  getting into privilege, so...

21            MR. MASCIALE:  Yeah.

22  BY MR. MASCIALE:

23       Q.   Okay.  So after that conversation with

24  Ms. Poole, what -- did you do anything else in

25  response to her receiving that notice of hearing?

Brian Gambrell                          November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 67

1           A.    Not Friday night.

2           Q.    Well, the conversation took place

3    Friday night?

4           A.    Correct.  It might have occurred Monday

5    night now that I'm looking at it, because it looks

6    like I sent an e-mail to Mr. Wilson on the 14th as

7    of 11:38 p.m., and so I must -- it must have been

8    Monday night, now that I think about it, the 14th,

9    because I'm not normally in the office that late at

10   night and there would be -- this was sent from my

11   computer, not from my phone.  So I logged into the

12   computer system to send this e-mail.

13          Q.    Okay.  So you --

14          A.    It must have been Monday the 14th, now

15   that I'm looking at my e-mail and the timestamp.

16          Q.    Okay.  So just to clarify then,

17   Ms. Poole sent you a picture of the September 9th,

18   2020 notice of hearing on Friday evening of --

19          A.    No, I think it was now Monday evening.

20   I think it was Monday the 14th, not 11th.

21          Q.    That's when she sent you the notice of

22   hearing?

23          A.    That's correct.  I think all of that

24   sequence of events occurred on the 14th.

25          Q.    Okay.

Brian Gambrell
November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 68

1          A.    Because of -- because I immediately

2     e-mailed Mr. Wilson.  I didn't wait all day on

3     Monday to do it.  I'm pretty sure that -- from the

4     tone and tenor of this e-mail, I'm pretty sure that

5     that's when I sent him that e-mail, was at 11:38 at

6     night.  I did it before I went to bed and I'm

7     pretty sure I was so peeved off I didn't even go to

8     bed after that.

9          Q.    Okay.  And just to be clear, is this

10    the e-mail you're referring to, to Mr. Wilson?

11         A.    That's correct.

12         Q.    Okay.

13         A.    You can see it was sent at 11:38 at

14    night.

15         Q.    And is this before or after you had a

16    conversation with Ms. Poole on the phone?

17         A.    This would have been after.

18         Q.    After.  Okay.

19         A.    Because the first paragraph refers to

20    the contents of the hearing notice.  And if you'll

21    notice I said "my client received the notice of

22    hearing in the mail."  It doesn't say I received

23    it.  She received it.

24         Q.    Okay.

25         A.    And so I was able to read both the fact

Page 69

1    that he sent a notice directly to her and also that

2    it contained this paragraph that talked about that

3    she was in default.

4         Q.   Which was not the case at the time,

5    correct?

6         A.   That is correct.  That -- as I said, in

7    the e-mail, that was patently false.

8         Q.   Okay.  Let's see.

9         A.   And I think now my 9/11 recollection I

10   think is that second paragraph.  I think I found

11   out on that day that I had a phone conference or

12   something of the sort on a federal case in

13   Charleston.  I'm trying to remember which federal

14   case that would have been.  I don't remember.  But

15   essentially I got -- one of it was a hearing that I

16   physically had to attend and the hearing in

17   Charleston was a motions hearing, I think, that was

18   going to be done remotely, and I was the only

19   counsel that could do both.  And since I knew Judge

20   Weaver scheduled things by the month in federal

21   court, you have no idea when things are going to

22   get scheduled, I made the decision that it was the

23   state court thing that had to move.

24        Q.   Okay.  And I'm almost done with this

25   first notice, but I just want to go through some of

Brian Gambrell

November 2, 2021

Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 70

1    this with you.  Now -- and take a look for a second

2    just to refamiliarize yourself with it and let me

3    know when you're ready.

4         A.    I'm ready.

5         Q.    Okay.  Do you disagree with anything --

6    or do you believe anything in the first paragraph

7    is inaccurate?

8         A.    Yeah.

9         Q.    And what is that?

10        A.    For one, he's giving her legal advice,

11   from the first paragraph.  When he says "you have

12   the option to appear at the hearing using the

13   remote communication technology such as

14   videoconference or telephone conference", that is a

15   -- that's a conversation that she and I need to

16   have about how and when to appear, what would be

17   better, what I was anticipating on doing.

18        Q.    And you believe that's legal advice?

19        A.    I think it goes to strategy.  I think

20   it goes to courtroom tactics, courtroom strategies.

21   So yes, I think it falls into legal advice.

22        Q.    And so this next sentence then, which

23   gives the master-in-equity's number to provide

24   further details about the hearing, if the

25   master-in-equity gave those details, would you

Brian Gambrell                              November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 71

1    consider that legal advice?

2           A.    No, but why would she call the

3    master-in-equity when she has a lawyer?  She

4    shouldn't be calling the master-in-equity's office

5    at all.  That's why she has a lawyer.

6           Q.    Okay.

7           A.    So all he's doing in that sentence is

8    confusing her.

9           Q.    Moving to the second paragraph,

10   obviously I know you disagree -- or you believe a

11   lot of things in there or a lot of sentences in

12   there are inaccurate.  So can you identify each of

13   those for me?

14          A.    Sure.  The first sentence is a complete

15   lie.  It wasn't treated as an uncontested matter

16   and she didn't fail to plead.  She pled in answers

17   required by law.  So in telling someone that she's

18   failed to plead when she hired a lawyer to do just

19   that is -- it's a direct violation of the Rules of

20   Professional Conduct.  Particular -- it's Rule 4.2.

21   I mean, this is a law school ethics class example

22   of something not to do.  I mean, it's not a "may

23   not", it's a "shall not."  He's telling her at this

24   point that her lawyer has failed to plead as

25   required by law.  So that's an enormous problem.

Brian Gambrell                          November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 72

1          In effort not to increase attorney's

2     fees, he knew that he was going to show up to

3     present in person.  So the second sentence is a

4     lie.  He knew he was going -- David Wilson was not

5     going to appear by affidavit in this case.  He was

6     going to show up and present.  And then he's -- the

7     second -- and then the next sentence is half of a

8     lie because he says he's not going to present live

9     testimony unless you appear and contest.  Well,

10    that's what we filed an answer and a counterclaim

11    for.

12          And then he directs my client at the

13    time to call him if she's intending to appear.  Why

14    in the world is he ever telling her to call him?

15    He has no right to do that.  He has -- in fact, he

16    has an ethical responsibility not to do that.  I

17    mean, I've got Rule 4.2 in front of me, and comment

18    one goes to the very heart of why this just -- it

19    still ticks me off.  It says "this rule contributes

20    to the proper functioning of the legal system by

21    protecting a person who has chosen to be

22    represented by a lawyer in a matter against

23    possible overreaching by other lawyers who are

24    participating in the matter, interference by those

25    lawyers with a client-lawyer relationship, and the

Page 73

1    uncounseled disclosure of information related to

2    that representation."

3              What he did by telling her to call him,

4    frankly is what he did by the whole notice, is

5    interfere with my relationship with my client.

6         Q.    Okay.  And everything you've just

7    testified to, is that also your understanding of

8    those statements at the time you received the

9    notice of hearing?

10         A.    That's correct.

11         Q.    Okay.

12         A.    And if -- and then he says "if you fail

13    to do so."  So he's saying -- it's a threat.  If

14    she doesn't call him he may ask the Court to

15    reschedule it so he can increase his attorney's

16    fees.  So that entire second paragraph, besides the

17    problem I pointed out in the first paragraph,

18    almost every jot and tittle in that second

19    paragraph is a direct violation of Rule 4.2 and

20    it's a violation of the FDCPA.  I mean, the FDCPA

21    points out in Subsection (c)(2) that "if the debt

22    collector", who is Mr. Wilson, "knows the consumer

23    is represented by an attorney with respect to such

24    debt and has knowledge of or can regularly

25    ascertain such attorney's name and address, unless

Brian Gambrell                                    November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 74

1    the attorney fails to respond within a reasonable

2    period of time to a communication from the debt

3    collector or unless the attorney consents to direct

4    communication with the consumer."

5              Now, there is no exceptions for

6    scheduling.  There's no exceptions for legal

7    process.  He has an ethical responsibility, but he

8    has a legal duty under the FDCPA as a debt

9    collector to never call my client anymore.  The

10   only time he's permitted to talk to my client

11   directly is in a deposition.  Once I have appeared

12   it triggers 1692c subpart two and 4.2.

13             So I don't understand how in God's

14   green earth this notice ever made it out of his

15   office.  I really don't.  What it tells me -- what

16   this -- in my experience having done this kind of

17   debt collection before, what it tells me is they

18   have an automated system, a computer system that

19   they use to track scheduling and deadlines, and

20   they -- somebody put in the date of this hearing

21   and instead of saying, whoa, this is a contested

22   matter, let's not -- let's do something different

23   or the same -- because I know the system that we

24   used at Rogers Townsend, if an attorney made an

25   appearance, then we actually disabled that file

Page 75

1   within the automated system to prevent something

2   like this from happening.  And so then it was

3   created -- we created a different way of handling

4   those files in our system.  Rogers Townsend at the

5   time, I don't know if they do now, essentially had

6   one system for collection actions and one system

7   for every other type of litigation they did.  And

8   when a contested foreclosure started -- occurred

9   that system -- the paralegal on that file went in

10  and closed that out of the automated system and

11  opened it in the contested system so that it

12  wouldn't generate these automatic hearing notices.

13          And so -- because you can tell -- wait,

14  you're scrolling too fast.  Go back up.  If you

15  look at the -- go back to the top of this whole

16  page.  Okay.  Yeah, if you come down to where the

17  signature is.  A little more.  A little more.  A

18  little more, where you can see the line at the

19  bottom.  It's not on that page.  It must be on the

20  next page.  There's like a line or there's some --

21          Q.    That?

22          A.    Yeah, it's the certification of

23  compliance, that looks -- that SCCA/256A looks like

24  that that's some sort of...

25          Q.    Are you okay?

Brian Gambrell
November 2, 2021

Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 76

1          A.    I know what that is.  That's a form

2     number from the court system.

3          Q.    Okay.  That's a court form then?

4          A.    Yeah, I think so.  It's a certification

5     of compliance.

6          Q.    Okay.  Well, I'm going to move on.

7     So --

8          A.    But everything else in that looks like

9     it was automatically generated.

10         Q.    So -- go ahead.

11         A.    Because it looks like it just filled in

12    the dates and times and names.

13         Q.    Okay.  And I know we talked about this

14    e-mail already.  Okay.  And now I'm going to scroll

15    down to this e-mail from David Wilson, Tuesday,

16    September 15th, 2020 at 8:09 a.m.  Did you receive

17    this e-mail from Mr. Wilson?

18         A.    I did, but this copy is something that

19    I printed out because you can see my name at the

20    top.  That's our Outlook print-out things from...

21         Q.    And after you received this e-mail did

22    you do anything else or did you do anything further

23    in regard to that September 9th, 2020 notice of

24    hearing?

25         A.    I called my client and I did reply to

Brian Gambrell
November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 77

1   this e-mail, I believe, to get some October dates

2   to reschedule.

3        Q.   Okay.  So you called your client a

4   second time?

5        A.   I'm sure I did.  I called her after

6   this e-mail came in.  What we discussed I will not

7   talk about because it's attorney-client.  And then

8   I replied to that e-mail with October dates to

9   reschedule.  I'm pretty sure that was the order of

10  sequence.  I may not have talked to Stacey directly

11  at 8:09 in the morning.  I normally go to the

12  office that early, so I probably was in the office

13  when this e-mail came through.  I probably waited

14  up until the morning to call her because I don't

15  know what people's work schedule -- and I may have

16  even just e-mailed her and said, hey, call me,

17  because I don't know what people's work schedules

18  are.  My dad worked swing shifts for 30 years and I

19  don't like to -- if somebody is trying to sleep I

20  don't want to call them.  So I probably -- that's

21  probably what I did, but I don't remember.

22       Q.   Okay.  Did you ever forward Ms. Poole

23  David's e-mail?

24       A.   I don't remember.  Whether I did or

25  didn't, it would be privileged, but I don't

Brian Gambrell
November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 78

1  remember.  I might have.  I might not have.  I

2  might have just -- since it's so short I might have

3  just simply characterized it.

4          Q.   I'm sorry?

5          A.   I might have just said what it said and

6  not --

7          Q.   Okay.  You believe she was aware of the

8  e-mail or the substance of the e-mail?

9          A.   That's correct, my understanding.

10         Q.   Okay.  Now -- and was anything else

11 done after that or was the matter kind of dropped

12 at that point?

13         A.    It was dropped at that point other than

14 to -- excuse me, other than to contact Mr. Wilson

15 for those hearing dates.

16         Q.   Okay.  Now, afterwards -- and now I'm

17 getting into the second notice of hearing which is

18 dated September 18th, 2020.

19         A.    Sorry, I just noticed that he did

20 e-file it on 9/10, but I don't know when that was

21 accomplished.  It says "completion date."  I don't

22 remember seeing or uploading or downloading that

23 hearing notice.  And it might have been I was -- I

24 don't remember.  I don't know why I didn't see it

25 that day.

Brian Gambrell

November 2, 2021

Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 79

1       Q.   That was filed September 10th?

2       A.   I don't know if I was out sick.  For

3  some reason I didn't look at my work e-mail that

4  morning, if I had some sort of hearing or motion or

5  -- I don't know.  I didn't see it on the tenth.

6  And in fact, I know I didn't see it until Stacey

7  sent it to me, and I think that might have been

8  when I went into my e-mail to check.

9       Q.   Okay.

10       A.   Yeah, I see that looking at it now, but

11  I know for certain the first time I saw it was when

12  Stacey sent it to me.

13       Q.   Okay.  And I think we touched on this

14  before, but just because now it was brought up,

15  since you were an authorized e-filer, you would

16  have or your understanding of the system is that

17  you would have gotten the notice of this filing at

18  1:56 -- or I'm sorry, 1:58 p.m. on September 10th,

19  2020?

20       A.   That's correct.  I might have seen it

21  pop up and not looked at it because, again, he and

22  I had discussed the hearing, so I knew it was

23  coming, so I probably already had it on my calendar

24  to go to it that day and may simply not have gone

25  through the -- because unlike PACER our ECF system

Page 80

1   doesn't have a link.  So in order to pull the

2   document there's like three or four steps you've

3   got to do.  And so since I knew when the hearing

4   was going to be I may not have even -- I might have

5   gotten the e-mail notification and simply not gone

6   and pulled the document if I was -- it wouldn't

7   have been necessary for me to look at it at that

8   moment because I already knew about the hearing.

9           Q.    Okay.  And --

10          A.    And I knew the substance of what the

11  hearing would have been about, so it wasn't like

12  there was any information within it that I wouldn't

13  have already known, like the address or the master

14  or anything like that.

15          Q.    Okay.  And I want to go to now the

16  second notice of hearing, which I'll get back to

17  Defendant's 5 in a bit, but just to -- along the

18  same lines of the e-filing, I know you -- well,

19  first of all, when did you first receive this

20  notice of hearing, the notice of hearing dated

21  September 18th of 2020?

22          A.    Probably when it was filed.  I don't

23  have my calendar from that period of time, so I

24  don't know if I was on the road in depositions or

25  whatever, but I know that -- I know I saw it pretty

Brian Gambrell                                    November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 81

1   soon thereafter because I think my reaction was

2   something to the effect of, I can't believe he did

3   it again.

4            Q.   So on the day it was filed, then you

5   were already aware it had been sent to Ms. Poole

6   again?

7            A.   That's what it said.  I mean, if you

8   look at the notice of hearing on the 18th --

9            Q.   Let me get back to -- hang on.

10           A.   -- it clearly says that's what he's

11  doing.

12           Q.   Sorry.

13           A.   On the certificate of service it

14  says --

15           Q.   And this is the -- just to clarify,

16  this is the copy that was filed with -- as an

17  exhibit to the complaint, so I believe you redacted

18  Ms. Poole's address.

19           A.   That's correct.  Which is not redacted

20  in the state court system, but that's not my --

21  that's his compliance for the e-filing rules, not

22  mine.

23           Q.   Okay.  And when you received this

24  notice of hearing what did you do thereafter?

25           A.   Without revealing confidential

Brian Gambrell
November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 82

1   attorney-client information, I contacted my client
2   and then...
3         Q.    And when did you do that, first of all?
4         A.    I have no idea.  I don't know if it was
5   that day.  That would have been -- it would have
6   been 11:28 in the morning.  I don't know if it was
7   later that afternoon or if it was the next day.  I
8   don't remember.
9         Q.    But it was -- would you say it was
10   within a day of receiving that notice?
11         A.    I feel relatively confident that that's
12   what happened.  Because I certainly didn't want a
13   repeat of her getting the hearing notice in the
14   mail and having a less-than-optimal response.
15         Q.    Okay.  So when you called her then just
16   to -- I'm just trying to get the timing down, she
17   -- had she received that notice of hearing yet?
18         A.    I'm not sure I called her.  I might
19   have forwarded it to her by e-mail with
20   instructions.
21         Q.    Okay.
22         A.    I don't remember whether I called her,
23   whether I e-mailed her.  I don't remember.
24         Q.    Okay.  But you're certain you did
25   contact her?

Brian Gambrell
November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 83

1          A.    I did contact her and I feel reasonably

2     certain that it was before she would have received

3     it in the mail, but I can't say that with

4     absolutely certainty, but, I mean, it's possible

5     she got the second one before I did based on --

6          Q.    The same day?

7          A.    She would have gotten it the same day

8     via electronic filing, but, I mean, I just don't

9     remember.

10         Q.    Okay.

11         A.    And there was a substantial amount of

12    that time that I was having to go back and forth to

13    and from Greenville where my mom lives, dealing

14    with certain aspects of my dad's passing.  So I --

15    like I think my mom had had hip surgery a couple of

16    weeks before my dad died and so I needed to go back

17    and go to the doctor with my mom.  So there was

18    times when I was not physically in the office -- or

19    certainly wasn't physically in the office because

20    of COVID, but there were also periods of time in

21    which I was simply not there because I was dealing

22    with family-related stuff.

23         Q.    Okay.

24         A.    So I don't remember how I communicated

25    it or when I communicated it.  I feel fairly

Brian Gambrell
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

November 2, 2021

Page 84

1   certain that it was before that she got the second

2   one.

3           Q.   Okay.  And did you --

4           A.   But I will say that if I've written

5   something or she says something to the contrary,

6   I'm not disputing that.  I'm just -- again, without

7   a timeline, without our -- without my internal

8   notes or anything like that that I would have kept,

9   I don't remember.

10          Q.   Right.  I see.  And going through the

11  second notice of hearing, we don't have to go

12  through each statement again unless you want to,

13  but would you agree with me that other than the

14  hearing date and time it's a verbatim copy of the

15  first notice of hearing dated September 9th, 2020?

16          A.   I would agree with you that it is an --

17  that it is virtually identical except for the

18  addition of the word "amended" and the change in

19  the dates.  But what it also shows me, both the

20  first one and this one, since they were both

21  electrically filed, it's the first time -- I can

22  kind of forgive a mistake, which I did actually.  I

23  raised it.  I felt like I got it off my chest.

24  Having practiced in a high volume debt collection

25  firm I understand sometimes things happen.

Brian Gambrell
November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 85

1         But particularly because it was e-filed

2    and it was e-filed that day, that meant either --

3    that just proves to me he has reviewed it before it

4    went into the system.  It is as if he signed it.

5    That's Rule 11.  He has -- his S slash at the

6    bottom of that is his representation to the world

7    and particularly to the Court that he has reviewed

8    and approved this prior to filing.

9         So on the first one it gets filed and

10   he says it was inadvertent and he didn't see it,

11   okay?  But the second time around it happens

12   identically again and he has S slash signed it and

13   filed it and at least at some point put it in the

14   mail.  So at some point in time he's telling the

15   Court he has reviewed this under Rule 11 and signed

16   it, excuse me, when -- and scroll up.  Is this the

17   one that was -- this was not the one that was

18   e-filed.  I think I waited to scan this one in as

19   the mailed copy when I got the envelope.

20        Q.   Now because --

21        A.   Because the e-filed one would have --

22   the e-filed one would have the ECF on the side.

23        Q.   Yes.

24        A.   Whereas the federal court puts it at

25   the top.

Brian Gambrell
November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 86

1        Q.    Right.

2        A.    This is the one that was filed in the

3   federal court, so this would have highly likely

4   been the physically mailed one that I got in the

5   mail and I scanned in with the envelope.

6        Q.    Now --

7        A.    But getting back to the point I was

8   making, even if you assume that the first filing is

9   inadvertent and you believe what David says, that

10  it was a paralegal that didn't know any better and

11  she was just sending out a batch of hearing notices

12  and this one just slipped through, then how in the

13  world did one just quote/unquote slip through and

14  get e-filed?  And not only does he do it once, he

15  does it twice.  So the second time is the one that

16  -- I had a really severe problem with the first

17  one.  I'm still not understanding how you make the

18  same mistake twice, particularly when you've been

19  warned about it.  That's a problem.

20       Q.    And you're aware that there were two

21  affidavits filed in connection with our first

22  motion to dismiss that addressed that issue; is

23  that correct?

24       A.    Yeah.  I mean, I know what the motion

25  -- I know what your memo says, but I also know

Brian Gambrell

November 2, 2021

Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 87

1  that, as a factual matter, he's e-filed these

2  hearing notices, and under Rule 11 he's required to

3  read them.  And if he's reading this, then doesn't

4  the 4.2 violation just simply jump off the page?

5  Why in the world does he have an address of a

6  represented party on the notice of hearing to

7  physically mail out?  And it was physically mailed

8  out because if you scroll up, I got it and she got

9  it.  In fact, if I'm recalling, this is not just my

10 copy.  This is actually her copy that she scanned

11 and e-mailed me.  So I'm not the one that actually

12 e-mailed and scanned it in.  I believe Stacey

13 e-mailed me exactly what she received.

14      Q.   Okay.  And we talked a little while ago

15 about this, the electronic signature, e-filing and

16 mailing, but let me ask you this:  When you were

17 doing actual litigation work and doing filings and

18 mailings and everything, did you personally e-file

19 all of your pleadings and motions and send and

20 serve any documents by mail all the time?

21      A.   I always e-filed my own documents,

22 federal or state court, because e-filing is the

23 equivalent of me signing a pleading, and that's why

24 I've never had a stamp of my signature.  I know

25 some lawyers have done that in the past.  I have

Brian Gambrell
November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 88

1    not done it, would never do that, because, frankly,
2    an attorney in one of the firms I worked in,
3    Ratchford & Hamilton, when she left -- she left
4    Ratchford & Hamilton and went to work for Brock &
5    Scott.  A paralegal started filing bankruptcy court
6    pleadings using her electronic signature that she
7    had not reviewed.  And Judge Waites was less than
8    enthusiastic about the practice and suspended her
9    from the practice before bankruptcy court and
10   levied a substantial fine against Brock & Scott.
11   So after those events occurred no one in the office
12   had my either -- either password.  I never gave
13   those out.
14         Q.   After those events occurred do you mean
15   prior to those other people in your office had your
16   login and password?
17         A.   No, no, they never did anyway, but I
18   would certainly -- after that event it was like my
19   -- it validated my thought to never give that
20   information out.
21         Q.   Okay.  So it's your testimony then that
22   you've never used a legal secretary or a paralegal
23   to do any of your filings or mailings?
24         A.   No, I didn't say anything about
25   mailings.  Mailings is different.  I would have

Brian Gambrell                          November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 89

1    signed it, but someone else would have physically

2    licked the envelope to put it in the mail.

3         Q.   Okay.

4         A.   But as far as -- a legal assistant

5    might have printed it and brought it to me for

6    signing and then physically mailed it, but when we

7    were still signing things by pen that signature was

8    always mine.  The only exceptions would have been

9    if I was out of the office on vacation or in a

10   deposition, then another lawyer in the office would

11   have signed it for me.

12             Now, certificates of service are

13   different.  Certificates can be signed by staff

14   because all that is is an affidavit saying that I,

15   so-and-so, have put this in the mail.  But as far

16   as pleadings go, things that required a lawyer's

17   signature, that was always a lawyer's signature

18   either mine or someone -- another lawyer in the

19   office.  I would have -- I would not have ever

20   allowed a staff member to e-file something for me.

21   That is an absolute recipe for getting in trouble

22   and/or getting disbarred.

23        Q.   Okay.  And for the sake of brevity, on

24   the second notice of hearing, I know you said it's

25   a -- I think you said it's an almost identical copy

Brian Gambrell
November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 90

1   except with the "amended" added and the dates

2   change.  Is it fair to say the same inaccuracies or

3   disagreements you pointed out in the first notice

4   of hearing can also be incorporated with regards to

5   this notice of hearing?

6        A.   That's correct.  I mean, that is

7   equally false as the first one.  In fact, even more

8   so because at some point in time somebody had to go

9   in and add the word "amended."

10       Q.   Okay.  And after you received this you

11  sent this to Ms. Poole; is that correct?

12       A.   I don't know.  I don't know if I sent

13  it to her.  I let her know -- without saying

14  exactly what I said, I informed her of something

15  important regarding the circumstances.

16       Q.   Okay.  And so would it be fair to say

17  that she was aware of this second notice of

18  hearing, is that correct, before she received it or

19  she was aware of the mailing of it and your

20  disagreements with its substance?

21       A.   I don't know if I can answer the way

22  you posed it.

23       Q.   You discussed the notice of hearing,

24  the substance with her; is that correct?

25       A.   I can't -- the attorney-client

Brian Gambrell                    November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 91

1    privilege prevents me from testifying what I've

2    discussed.

3            Q.    Okay.

4            A.    I can say that it is my understanding

5    that Stacey was not surprised when the second

6    notice showed up.

7            Q.    Okay.  And then at that point what did

8    you -- well, you filed a -- so you believe you

9    received the second notice of hearing sometime

10   around September 18th, 2020; is that correct?

11           A.    I received the e-signature that day.  I

12   think I -- I know we waited until Stacey received

13   the mailed copy to be sure that he had physically

14   mailed it because it was possible they just used

15   the same form and e-filed it and did not mail it.

16   I was trying to give Mr. Wilson the benefit of the

17   doubt, but then when it showed up -- and like I

18   said, I'm pretty sure this is -- the one that I

19   e-filed was the one that Stacey physically

20   received.

21           Q.    Okay.  And now, September --

22           A.    Because you could see on the envelope

23   that it's not addressed to me, it's addressed to

24   Stacey.  In fact, if you'll even notice the

25   envelope, it's even more egregious than even what I

Brian Gambrell                    November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 92

1   remembered because they didn't just print a label.

2   Someone had to physically handwrite her address on

3   to that envelope.  It's not a preprinted envelope.

4   So someone had to take the time to write out that

5   address before they put it in the mail.

6             So yeah, now that I'm recalling this,

7   we waited until she physically received it.  And if

8   you could see that, that it's postmarked that day

9   and it's been mailed by -- I assume that e-stamp

10  account traces back to Black, Slaughter and Black,

11  and it looks like it was mailed on that September

12  the 18th.

13       Q.   Okay.  And now -- so you've waited

14  until you received the mailed copy.  Then you filed

15  your motion for sanctions on September 30th, 2020;

16  is that correct?

17       A.   That's correct.

18       Q.   Okay.  And this will be I think

19  Defendant's 6.

20            (GAMBRELL EXHIBIT 6, motion for

21  sanctions, was marked for identification.)

22  BY MR. MASCIALE:

23       Q.   It's really -- I don't know if I'm

24  really going to ask you too much about the

25  substance of it other than you filed -- you filed

Brian Gambrell                    November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 93

1   this motion for sanctions based on these two

2   notices of hearing.  Was there -- is there anything

3   else supporting the motion?  Were there any other

4   alleged violations of either the Rules of

5   Professional Conduct or the FDCPA?

6        A.   I don't think I elaborated in the

7   motion for sanctions as much about the different

8   points that I've made in the deposition.  I think I

9   relied on the fact that the e-mail -- the contents

10  of the e-mails themselves and the sequence.  And I

11  did, I think, file a motion to a memo of law in

12  support that would have elucidated various points

13  of 4.2 and what a violation of that consists of.

14       Q.   And then you filed this case officially

15  on -- let me make sure I get the timing right

16  because I was looking at the amended complaint.

17  You filed this case initially --

18       A.   I filed it on --

19       Q.   -- on October 2nd, 2020; does that

20  sound right?

21       A.   The timestamp on this is 10/30/20.

22       Q.   Well, that's the amended complaint.

23       A.   Okay.  Then, yeah, if you've got the

24  date of the initial.

25       Q.   Yeah, it looks like it was dated

Brian Gambrell

November 2, 2021

Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 94

1    October 2nd, 2020.  Whose decision was it to bring

2    -- well, one to file the motion for sanctions in

3    the HOA foreclosure case?

4            MR. RADEKER:  Yeah, I'm going to

5    instruct him not to answer that.  That's either

6    privileged or work product or both.

7            MR. MASCIALE:  Yeah, I mean, I think it

8    goes to -- I think it does kind of go to the

9    motivation -- one, the bad faith issue as well as

10   the potential attorney's fees recovery.  I

11   certainly understand if you want to object to that.

12           MR. RADEKER:  Yeah, I'm going to have

13   to instruct him not to answer just to do my job to

14   protect privileges, so...

15   BY MR. MASCIALE:

16       Q.   Okay.  Well, let me see if I can -- we

17   will see if I can straighten it out a little --

18   straighten the questioning out a little bit.

19           So just to clarify for accuracy, in

20   response to receiving these two notices of hearing,

21   if I got your testimony correctly, you discussed

22   them with your client a total of three times?

23       A.   It might have been more than that.  I

24   don't have a specific recollection of how many

25   times.  It might have been a combination of e-mails

Brian Gambrell                    November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 95

1    and phone calls.  I mean, again, I don't work for

2    the Law Office of Jason E. Taylor anymore, so I

3    don't have access to anything that would be

4    informative as far as how many times and when she

5    and I either talked on the phone or traded e-mails.

6    Some clients are easy to get on the phone.  Some

7    clients are impossible to get on the phone.  And I

8    don't remember what kind of client Stacey was,

9    frankly, as far as ease of communication.

10          Q.    Okay.  Was the FDCPA ever raised?

11                MR. RADEKER:  I'm going to have to

12   instruct him not to answer that.  That would be --

13   I mean, that's the essence of privilege, is you're

14   asking him what he talked to her about.

15                MR. MASCIALE:  Well, I don't know if

16   it's anything necessarily specific other than just

17   the cause of action which they've alleged against

18   Black, Slaughter & Black.  I think that's probably

19   -- I mean, I don't want to go too much further into

20   that, but I think that's probably fair.

21                MR. RADEKER:  Well, I mean, I guess

22   it's safe -- like I'm instructing him not to answer

23   it on attorney-client privilege grounds, so -- and

24   we'll talk about it when we get -- sometime after

25   we get done like within the next day or so, but

Brian Gambrell
November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 96

1   like I'm hoping to avoid having to have motions

2   about these instructions not to answer if we can,

3   but I've got to protect the privilege, too.

4   BY MR. MASCIALE:

5           Q.    Okay.  Well, then just for the record,

6   was the South Carolina Unfair Trade Practices Act

7   ever discussed?

8                 MR. RADEKER:   Same instruction.

9   BY MR. MASCIALE:

10          Q.    All right.  And I think you did say,

11  though -- well, actually I'll move on.

12          A.    Certainly you said about bad faith and

13  filing the action.  I don't understand how and when

14  a lawyer can break the Rules of Professional

15  Conduct to directly communicate with my client and

16  then all of a sudden the assertion of my client of

17  her rights under federal law somehow becomes bad

18  faith.  If that's where you're headed with this I

19  think you're -- I think -- I just don't have

20  anything positive to say or think about that.

21                Again, no one forced David Wilson to

22  directly communicate with my client, and then threw

23  his own staff under the bus in front of the judge

24  when he did it.  To me that was -- yeah, he should

25  have owned that mistake.  He's the one that e-filed

Brian Gambrell                                    November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 97

1    it.  If he shouldn't have he should have said that,
2    but that's not been his approach.  It was, oops, my
3    bad.  Not "I'm sorry", not "it won't happen again."
4    He just -- he characterizes it as inadvertent.
5    Inadvertent is when I accidently spilled coffee on
6    myself a little while ago.  E-filing a notice that
7    violates the Rules of Professional Conduct and the
8    FDCPA is a little more than inadvertent.
9          Q.    Well, let me ask you this:  During the
10   duration of your involvement in the foreclosure
11   case, did David Wilson or anyone from Black
12   Slaughter & Black ever communicate directly with
13   your client other than those two notices of
14   hearing?
15         A.    Not that I'm aware of, no, other than
16   the initial service -- other than the initial
17   service of the summons and complaint, which is
18   proper.  But as soon as I filed the notice of
19   appearance all communication is required to stop.
20   So should I applaud them for obeying the rules
21   98 percent of the time, no.
22         Q.    And other than those two notices of
23   hearing and up until that point they had been
24   communicating only with you and your office; is
25   that correct?

Brian Gambrell                                November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 98

1          A.    That's correct.

2          Q.    And after those two notices of hearing,

3     from September 30th or thereabouts, 2020 onward,

4     they only communicated with you and your office; is

5     that correct?

6          A.    Until -- that's correct, until the time

7     I stopped representing Stacey.  But I understand

8     that the -- that period of time was after we had a

9     motions hearing on the motion for sanctions as well

10    in which Mr. Wilson was severely admonished by

11    Judge Weaver about violating the Rules of

12    Professional Conduct.  And so I would think that

13    after having a judge directly admonish you for

14    violating what -- I understand sometimes issues of

15    privilege get kind of confusing.  I understand

16    issues of client relationships when you have

17    multiple clients could be somewhat difficult to

18    understand.  But this Rule 4.2 is seriously the

19    easiest rule in the world to comply with.  Don't

20    mail stuff to opposing parties.  I mean, it's kind

21    of like that Jim Carrey moment in Liar Liar when

22    they ask -- when the secretary says "I've got a

23    client on the phone that needs legal advice" and he

24    shouts in the phone "stop breaking the law,

25    asshole."  I mean, that's kind of how simple

Page 99

1    compliance with 4.2 is.  You just don't do it.

2                    And I don't understand how in the --

3    not only do you do it once, he did it twice.  And

4    like I said, I forgive the first time because I get

5    it.  I mean, you have an automated process.

6    Sometimes it hard for, you know, Ford makes lemons

7    on the same assembly line they make good parts, but

8    the second time around is a little more -- that's

9    why I -- that's when the motions and this suit got

10   filed.  It wasn't after the first time.  It was

11   after the second time.  It was after being warned

12   not to do it and he does it again.  That to me goes

13   from accident to intentional.

14                   And I would also note the FDCPA

15   liability statute.  There's no intent involved.

16   It's if you do it you're liable.  So in actuality

17   we could have sued after the first one, but we

18   didn't.  We waited until after the second one.

19           Q.    Okay.  And I'm almost done.

20                  Okay.  So circle back to the motion for

21   summary judgment.  Do you know -- I know you had

22   said, first of all, with regard to the motion for

23   sanctions that Mr. Wilson was admonished by Judge

24   Weaver.  Were any other sanctions or were any

25   substantive sanctions imposed on him?

Brian Gambrell                    November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 100

1          A.    No, but I raised to Judge Weaver that

2     we would file the action under the FDCPA and we

3     would seek relief under that statute.  And so she

4     was aware that federal action was pending at that

5     time, so we didn't -- I believe what my

6     recollection is, I told her that in relation to the

7     motion for sanctions in state court, that the

8     appropriate remedy before her was the admonishment,

9     which is what she did.  We didn't seek -- because

10    we would be seeking FDCPA -- damages under the

11    FDCPA to avoid the appearance or even the argument

12    of double dipping.  The admonishment was the

13    appropriate relief in state court.  And I do not

14    know if she reported Mr. Wilson to the disciplinary

15    council.  I did not.

16          Q.    Okay.

17          A.    But she is required to under the rules

18    of -- the canons of judicial conduct if there's an

19    issue of compliance with the Rules of Professional

20    Conduct.

21          Q.    Now, are you aware of how the motion

22    for -- the Plaintiff's motion for summary judgment

23    worked out?  Are you aware of the disposition of

24    that motion?

25          A.    I think Drew told me that there was a

Page 101

1  partial grant, but then there was a motion to

2  reconsider.  I mean, other than that, that's all I

3  know.  I don't know anything about -- I haven't

4  read the order.  I haven't read the motion to

5  reconsider.  I routinely don't make it a habit of

6  reading pleadings that I'm not interested in

7  because I have enough to read.

8         Q.   And just --

9         A.   And that was -- and it's now -- and

10  Stacey is now his client, not my client.

11        Q.   And just to confirm, at the time you

12  filed the motion for sanctions you were aware that

13  a motion for summary judgment had been filed by the

14  plaintiff -- well, first of all, you were aware

15  that a motion for summary judgment had been filed;

16  is that correct?

17        A.   I was aware.

18        Q.   Okay.  And you were also aware that the

19  motion for summary judgment was based in large part

20  on your client's failure to respond to requests for

21  admission?

22        A.   I know that that was one of the

23  arguments advanced by the plaintiff.

24        Q.   Okay.

25        A.   But certainly --

Brian Gambrell
November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 102

1          Q.   Go ahead.

2          A.   But I don't see how that permits or

3    excuses a violation of the FDCPA.  There's even

4    case law that says that the validity of the

5    underlying debt is of no relation to the violation

6    of the statute.  In other words, you can be

7    collecting a proper debt all you want all day long,

8    but you can't violate the statute.  In other words,

9    it's not a -- just because the debt might be valid

10   is not a get-out-of-a-responsibility free card.

11   I've seen it where like an a hundred dollar debt

12   ends up with a large FDCPA judgment.  So sometimes

13   those numbers -- or in fact, the amount of the debt

14   and the amount of the award under FDCPA is of no

15   relation.

16         Q.   And I think, as we discussed earlier,

17   you and your client weren't actually disputing the

18   validity and the amount of the alleged debt; is

19   that correct?

20         A.   That's correct, which is the reason why

21   Mr. Wilson shouldn't have contacted her either

22   time.

23         Q.   Yeah.  And yet there was nothing

24   actually done or filed to oppose summary judgment

25   for her liability for these alleged assessments,

Brian Gambrell
November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 103

1   was there?

2          A.   I would greatly dispute your assessment

3   of nothing.  We filed a memo in opposition.  I

4   filed one, two, three, four, five things including

5   this evidence.  Part of the dispute with the

6   homeowners' association also involved the way they

7   were going about collecting the debt.  It had to do

8   with an argument about whether a homeowners'

9   association has the right under South Carolina law

10  to use foreclosure as a remedy or whether it's

11  action at law versus an action in equity, which is

12  the point I made earlier about Winrose.

13          So that was part of the argument, was

14  that even if the debt was valid, the mechanism of

15  collection was improper.  They were -- essentially

16  they had legal damages, but were seeking an

17  equitable remedy which is first year law, you can't

18  do.  So there were complex issues in the case that

19  went beyond simply who wrote what to who, but also

20  it involved the propriety of the collection method,

21  the validity of the collection method, and whether

22  that method would be allowed to persist or

23  continue.

24          Q.   Right.

25          A.   To some extent Winrose, the Supreme

Brian Gambrell                    November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 104

1    Court kind of -- although I think not completely

2    and not correctly validated the arguments we were

3    making about the --

4         Q.   Yeah, I certainly -- I've seen that

5    argument before where an attorney will say Winrose,

6    and I know what it says.  I mean, I know it's

7    mostly -- but it is -- it expresses the Supreme

8    Court's distaste for that, but I think you -- would

9    you agree with me, though, that in any -- in a debt

10   collection action one of the principal factual and

11   legal issues to be established is the validity of

12   the underlying debt?

13        A.   That's certainly one element, but you

14   also have to establish the right to collect.  You

15   also have to establish -- I mean, again, just

16   because someone owes money doesn't mean they owe to

17   the penny what you said they owed.  For example, it

18   could be they calculated the interest incorrectly.

19   They could be trying to collect debt that had

20   expired because of the statute of limitations.  I

21   mean, there is -- there's a lot of different

22   factors that go into -- having been on both sides

23   of the debt collection litigation issue, a

24   plaintiff still always bears the ultimate

25   responsibility of proving -- of proving liability.

Brian Gambrell                      November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 105

1  And if I had a nickel for every answer that flatly

2  denied liability for every litigation I filed, then

3  I would have a house in Italy right now because

4  every answer filed in every case in South Carolina

5  contains a general denial and contains denials of

6  alleged facts from beginning to end.

7          I mean, I was thinking of an example as

8  you were saying something of an action I filed in

9  which I said -- well, like this one, for example,

10 the 4.2 violation is in black and white and yet the

11 answer in this case denies that it's a violation.

12 I mean, so the general denial is not -- I mean,

13 again, it was ultimately up to the association to

14 prove the debt.  And then also collect it in a way

15 that's proper both legally under federal law, but

16 also under South Carolina law.  So for example, you

17 can't collect debt that's more than three years

18 old.  It's expired by the statute of limitations.

19 You should have done it a long time ago, even on a

20 revolving account.  So it's their responsibility to

21 prove the debt.  I don't have to admit as an answer

22 to anything.  I just denied it and that's --

23     Q.    That's subject to Rule 11, correct?

24     A.    Correct, yeah, right, but should Drew

25 file a Rule 11 motion because of the violation of

Brian Gambrell                    November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 106

1  failing to admit that this is a violation of Rule

2  4.2, I mean, I think it's pretty self-evident that

3  it is.

4          Q.   Well, at the time the answer and

5  counterclaims were filed was there any -- was there

6  a -- was there a factual basis to deny that she

7  owed that -- or that she did not owe unpaid

8  assessments to the HOA?

9          A.   Yes.

10         Q.   And what was that?

11         A.   I mean, that there was damage to her

12  unit because of failure to maintain the common

13  elements.  And the -- at the time of the filing of

14  the summons and complaint that was -- the failure

15  to abide by the restrictive covenants was a major

16  issue.  I'm pretty sure it's still an issue, so --

17         Q.   So the admissions -- the resulting

18  admissions from her failures to respond, is it your

19  testimony then that they contradict your position

20  regarding disputing the debt?

21         A.   They do, I think.  I mean, it does

22  contradict, but under housing it removes that.  I

23  understand the consequences of failing to respond

24  to requests to admit.

25         Q.   Okay.

Brian Gambrell    November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 107

1          A.    But that doesn't undermine -- I still

2    don't understand how that relates to or connects to

3    the failure of Black, Slaughter & Black to follow

4    the FDCPA.  Again, a valid -- you can collect a --

5    you can violate FDCPA while you're in the process

6    of collecting a valid debt.  Those two are not

7    linked issues.

8          Q.    Right.  And I know --

9          A.    If they were linked, then no one could

10   ever sue for FDCPA because --

11         Q.    Okay.

12         A.    -- in 99.9 percent of the time these

13   actions arise not out of the collection of an

14   improper debt, but the collection of a valid debt.

15   So I understand --

16         Q.    Well, and I --

17         A.    -- the discussion we're having, but I

18   just don't see the --

19         Q.    That's fine.

20         A.    -- how the two issues are legally

21   linked.

22         Q.    That's fine.  Well, I'll close with

23   this.  You testified just earlier regarding the

24   need to establish the amount of debt and calculate

25   it correctly, everything like that.  Is there --

Brian Gambrell
November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 108

1    and I think I know this, but there was nothing done

2    to dispute the amount of the alleged debt, was

3    there, the validity of the amount?

4         A.   I know we served discovery.  I don't

5    remember anything beyond that.

6         Q.   Okay.  And no --

7         A.   And assuming, too, that we would have

8    had a hearing that would have -- I would have

9    deposed a witness to testify as to the amount of

10   the unpaid -- of the amounts they were alleging

11   either monthly, quarterly, yearly, calculating the

12   interest.  So there would have been -- we were at

13   the summary judgment stage, not trial stage.

14        Q.   And you didn't take any depositions

15   prior to summary judgment?

16        A.   No.

17        Q.   Or kind of perhaps summary judgment

18   continued for depositions?

19        A.   No, the amount of the -- my

20   understanding, the amount of the debt was under

21   $30,000, so I'm not even sure that we could have

22   even done depositions because of the amount of the

23   underlying debt.  But no, we had not yet done

24   depositions.  I think I did ask for additional time

25   to do additional discovery within the response to

Brian Gambrell                     November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 109

1    the motion for summary judgment.

2         Q.    Okay.  Which I don't think -- well,

3    obviously the Court -- well, you went through, but

4    obviously the Court would have denied it, it seems.

5              All right.  The --

6         A.    I mean, yeah, I mean, I guess that's

7    your opinion, not mine.

8         Q.    Well, she didn't continue --

9         A.    Well, that's because she didn't like

10   Drew.  There are plenty of people that don't like

11   Drew.

12        Q.    No, but a last -- just to confirm that,

13   that nothing else was presented in opposition to

14   the liability issue on plaintiff's motion for

15   summary judgment.  The only thing that was done,

16   this motion for summary judgment pending, was a

17   motion for sanctions filed and the filing of this

18   case; is that correct?

19        A.    No.  In fact, we filed the memorandum

20   in response.

21        Q.    Other than the memorandum, if there's

22   any discovery or evidence presented to oppose the

23   motion for summary judgment.

24        A.    We did.  There was one, two, three,

25   four, five exhibits to my memo.

Brian Gambrell                    November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 110

1          Q.    Okay.  And I'll share --

2          A.    Which includes the pictures and the

3     covenants.

4          Q.    And I'll share my screen just to pull

5     that up.  This will be Defendant's 7, I believe.

6                (GAMBRELL EXHIBIT 7, memorandum in

7     opposition to Plaintiff's motion for summary

8     judgment, was marked for identification.)

9     BY MR. MASCIALE:

10         Q.    So yes, a couple of pictures.  Were

11    these ever produced in discovery or authenticated

12    in any way?

13         A.    Well, again, this is a motion -- this

14    is a memo in response.

15         Q.    So it's not evidence, is what you're

16    saying?

17         A.    I mean, did we do an affidavit?

18         Q.    Let me see.

19         A.    I don't recall that we did because I

20    think I remember having issues with getting her

21    signature.

22         Q.    Yeah, I don't see an affidavit.  At

23    least --

24                MR. RADEKER:  Not to interrupt the

25    questioning.  I can hang out for a little longer,

Brian Gambrell

November 2, 2021

Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 111

1    but not a lot longer.

2             MR. MASCIALE:  Yeah, I'm almost done.

3             MR. RADEKER:  Okay.

4    BY MR. MASCIALE:

5        Q.    So there --

6        A.    Yeah, there were 28 pictures under one.

7    The covenants were there, and we filed a couple of

8    cases.  So no, we must not -- I think we intended

9    to do an affidavit, but there was logistical issues

10   getting it done, so -- but, no, we filed it -- we

11   filed a memo in opposition and also exhibits.

12   Because again, the relief sought in the complaint

13   was not just the collection of the debt, but

14   foreclosure, to foreclose -- not -- there wasn't a

15   -- understand that the complaint didn't seek a

16   breach of contract.  It didn't seek promissory

17   estoppel.  It sought foreclosure as the cause of

18   action in remedy.

19             So again, you can have a valid debt,

20   but an improper collection method and prevail under

21   that just like you can have a valid debt, but then

22   fail under the statute of limitations for other

23   defenses.  So in other words, we had defenses to

24   the complaint as alleged by the plaintiff.  We're

25   not -- I'm not required, as a defense, to draft

Brian Gambrell                        November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 112

1    their complaint to avoid my defenses.  So we were

2    responding to the complaint as alleged, not -- in

3    fact, I think there was even -- I said there was a

4    discussion about, hey, about that the cause of

5    action was flawed to begin with.  There is no lien,

6    equitable lien, yet because there's no established

7    debt as a matter of law.  There's an alleged debt.

8          Q.   Well, and that's what I'm getting at.

9    Would you -- I mean, you would agree that there was

10   no evidence presented to the Court to dispute that

11   alleged debt?

12         A.   There was no evidence produced of the

13   alleged debt.  I mean, the only thing that we had

14   was the summons and complaint.

15         Q.   Well, there is a -- and I'll submit

16   that the summary judgment order was granted on

17   liability and there will be, I think, further

18   proceedings to determine the exact amount.  But to

19   dispute liability for the alleged debt, I think

20   your client admitted to liability for it.

21         A.   Again, she recognized that there were

22   certainly assessments that had been levied.

23   Whether she was entirely responsible for every

24   penny --

25         Q.   So is it your testimony then she knew

Brian Gambrell                          November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 113

1  she was liable for -- she knew she was liable for

2  the payment of assessments?

3        A.   For assessments in general, right.  In

4  other words, she was obligated under the

5  restrictive covenants.

6        Q.   Okay.

7        A.   But whether the exact -- she wasn't

8  saying that she was never responsible to pay

9  assessments at all.  It was whether the amounts

10  that were alleged by the association were proper

11  and there had been -- whether there had been a

12  proper accounting of the exact amounts that she was

13  owed versus whether there was any sort of offset

14  versus money that she had had to spend to fix

15  common elements and/or her unit.

16        Q.   Okay.  I think that is -- let me see.

17  Actually, last question:  Have you spoken with

18  anyone else since -- or regarding the foreclosure

19  case or this case that we're here for today since

20  you withdrew as counsel for Ms. Poole?

21        A.   No.

22        Q.   Okay.  Have you spoken with Ms. Poole?

23        A.   No, not since -- not since the day I

24  told her I was leaving the firm and suggested that

25  she contact Drew.

Brian Gambrell                    November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 114

1          MR. MASCIALE:  Okay.  All right.  Well,

2    I think that's all I have.  I appreciate your time

3    today.  And sorry it went a little longer than

4    anticipated, Drew.

5          MR. RADEKER:  It's all good.  I don't

6    have any questions.

7          (The witness, after having been advised

8    of his right to read and sign this transcript,

9    waives that right.)

10         (The deposition was concluded at 2:23

11   p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Brian Gambrell                                November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 115

1                CERTIFICATE OF REPORTER

2

3          I, Lauren A. Balogh, Registered

4    Professional Reporter and Notary Public for the

5    State of South Carolina at Large, do hereby certify

6    that the foregoing transcript is a true, accurate,

7    and complete record.

8               I further certify that I am neither

9    related to nor counsel for any party to the cause

10   pending or interested in the events thereof.

11              Witness my hand, I have hereunto

12   affixed my official seal this 17th day of November,

13   2021 at Murrells Inlet, Horry County, South

14   Carolina.

15

16

17

18

19

20

21

22

23   _____

     Lauren A. Balogh

24   My Commission expires

     March 19, 2030

25

Page 116

1                    I N D E X

2

3                                        Page       Line

4    BRIAN GAMBRELL                        3          1

5    EXAMINATION                           3          3

6    BY MR. MASCIALE:

7    CERTIFICATE OF REPORTER             115          1

8

9                    E X H I B I T S

10

11                                       Page        Line

12   EXHIBIT 1, summons                   33          6

13   and complaint for judgement of

14   foreclosure, enforcement of

15   equitable lien, and

16   enforcement of declaration

17   EXHIBIT 2, answer and                34          8

18   counterclaim

19   EXHIBIT 3,                           45          21

20   Plaintiff's motion for summary

21   judgement

22   EXHIBIT 4, Cole Creek                57          5

23   Homeowners Association, Inc.

24   V. Stacey D. Poole Status

25   Conference

Brian Gambrell        November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

Page 117

1    EXHIBIT 5, amended        63        25

2    complaint

3    EXHIBIT 6, motion for        92        20

4    sanctions

5    EXHIBIT 7, memorandum        110        6

6    in opposition to Plaintiff's

7    motion for summary judgment

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Brian Gambrell
November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

[& - accuracy]

Page 1

**&**

**&**  1:6 2:3,8,9 3:7
18:15,15,20 19:5
19:10,11,13,14,14
19:16,18 31:2
44:13 88:3,4,4,10
95:18 97:12 107:3

**0**

**0:20**  1:5

**1**

**1**  33:3,6 34:25
35:3 116:4,7,12
**10/30/20**  93:21
**10th**  79:1,18
**11**  41:20 85:5,15
87:2 105:23,25
**110**  117:5
**115**  116:7
**11:09**  1:14
**11:28**  82:6
**11:38**  67:7 68:5,13
**11th**  41:4 67:20
**12:19**  45:7
**12:31**  45:8
**13th**  11:5
**14th**  67:6,8,14,20
67:24
**15**  6:11,12,12 7:14
**1500**  20:12,12
**15th**  13:22 76:16
**16**  6:11 34:25
**1692**  27:24
**1692c**  74:12
**16th**  13:23
**17th**  115:12
**18th**  78:18 80:21
81:8 91:10 92:12
**19**  115:24
**1973**  7:10

**1995**  10:11
**1998**  12:14
**1999**  12:15
**1:56**  79:18
**1:58**  79:18
**1st**  41:10

**2**

**2**  1:13 34:7,8
73:21 116:17
**20**  9:15 13:1 117:3
**2000**  10:12 11:5
**2001**  11:9
**2009**  11:10
**2010**  23:25 28:4
**2012**  23:25
**2018**  26:20 32:19
33:5 41:18
**2019**  17:11 45:18
53:7
**2020**  56:18,19 59:2
59:25 60:6,22
64:4,15 67:18
76:16,23 78:18
79:19 80:21 84:15
91:10 92:15 93:19
94:1 98:3
**2021**  1:13 41:4,20
115:13
**2030**  115:24
**21**  7:15,16 116:19
**21885**  115:21
**25**  117:1
**256a**  75:23
**26**  53:7
**266-8205**  2:12
**26th**  45:18
**27**  41:18
**27th**  32:19
**28**  111:6
**29201**  2:5

**29212**  5:25
**29401**  2:11
**29th**  62:6
**2:30**  62:7
**2nd**  93:19 94:1

**3**

**3**  45:20,21,24
116:4,5,5,19
**30**  77:18
**30,000**  108:21
**30th**  92:15 98:3
**33**  116:12
**34**  116:17
**3499**  1:5

**4**

**4**  57:5,9 116:22
**4.2**  72:17 73:19
87:4 93:13 98:18
99:1 105:10 106:2
**4.2.**  71:20 74:12
**40**  2:10
**400**  2:11
**410**  5:24
**45**  8:9 116:19
**46-03714**  26:20

**5**

**5**  63:19,25 80:17
116:22 117:1
**559**  28:4
**57**  116:22
**573**  28:4

**6**

**6**  92:19,20 116:12
117:3,5
**63**  117:1

**7**

**7**  110:5,6 117:5
**7,005.00**  35:10

**779-2211**  2:6
**7th**  7:10 32:23
33:5

**8**

**8**  34:24 116:17
**803**  2:6
**843**  2:12
**8:09**  76:16 77:11

**9**

**9**  60:6
**9/10**  78:20
**9/11**  64:24 69:9
**92**  117:3
**923**  2:5
**95**  14:9 20:25
**98**  97:21
**99.9**  107:12
**9th**  60:21 64:4,15
64:24 67:17 76:23
84:15

**a**

**a.m.**  1:14 76:16
**abide**  106:15
**able**  32:8 68:25
**absolute**  89:21
**absolutely**  12:25
14:13 83:4
**access**  17:3 31:21
44:19 46:20 95:3
**accident**  99:13
**accidently**  97:5
**accommodate**
4:10
**accomplished**
78:21
**account**  92:10
105:20
**accounting**  113:12
**accuracy**  94:19

accurate 35:7
115:6
accurately 35:5
44:17
act 11:24 17:16,22
17:24 52:20 96:6
action 11:21 24:11
26:23,25 29:9
31:6,7 33:5 36:15
39:15,24 41:24
42:1 44:7 49:9
50:3 56:18 57:11
60:8 63:19,23
95:17 96:13 100:2
100:4 103:11,11
104:10 105:8
111:18 112:5
actions 17:5 20:9
24:9 75:6 107:13
actual 17:17 87:17
actuality 99:16
add 21:21 90:9
added 21:22 90:1
addition 20:13
84:18
additional 108:24
108:25
address 5:23,24
9:25 73:25 80:13
81:18 87:5 92:2,5
addressed 43:19
86:22 91:23,23
addressing 43:25
admission 101:21
admissions 46:7,9
52:8 53:7,18,22
54:12 106:17,18
admit 46:17 54:8
55:22 105:21
106:1,24

admitted 10:25
11:1,3,6,9 54:13
112:20
admonish 98:13
admonished 98:10
99:23
admonishment
100:8,12
adriane 15:20,21
15:25
advanced 101:23
advancing 44:6
advice 70:10,18,21
71:1 98:23
advised 114:7
advocated 52:2
affidavit 37:19
51:11 72:5 89:14
110:17,22 111:9
affidavits 86:21
affixed 115:12
afternoon 82:7
ago 13:1 27:2
87:14 97:6 105:19
agree 4:22 10:18
54:13 63:1 84:13
84:16 104:9 112:9
agreeable 59:21
agreement 59:20
ahead 7:7 16:25
42:9 56:23 76:10
102:1
aiken 10:3 12:3,11
air 56:13
allegations 35:4,6
alleged 35:9,12
36:10 51:22 52:9
54:9,18 93:4
95:17 102:18,25
105:6 108:2
111:24 112:2,7,11

112:13,19 113:10
allegedly 48:12
53:23
alleging 49:24
54:21 108:10
allendale 10:3
allowed 23:4
31:23 89:20
103:22
amend 35:20
amended 12:1
63:18,25 84:18
90:1,9 93:16,22
117:1
amount 51:12
52:4 83:11 102:13
102:14,18 107:24
108:2,3,9,19,20,22
112:18
amounts 37:11
39:19 108:10
113:9,12
ample 15:19
amy 8:5
analysis 38:10
42:16,17
anderson 7:2
andrew 2:4
answer 5:13 31:23
31:24 32:16,18
34:8,13 36:4
41:19 48:21 49:1
66:2,5 72:10
90:21 94:5,13
95:12,22 96:2
105:1,4,11,21
106:4 116:17
answered 33:1
36:4 66:12
answering 4:5
20:3

answers 35:5
71:16
anticipated 114:4
anticipating 70:17
anymore 17:3
44:2 55:11 63:9
74:9 95:2
anyway 22:18
27:18 88:17
apartments 9:24
appeal 22:15,18
27:7,10,13,16
52:23
appeals 11:8 17:9
52:15,21
appear 20:20
34:16 70:12,16
72:5,9,13
appearance 20:8
33:25 41:19 74:25
97:19 100:11
appearances 2:1
appeared 20:18
74:11
appears 34:17
applaud 97:20
applied 42:20
appointment 62:3
62:4,4
appreciate 29:22
114:2
approach 97:2
appropriate 44:8
100:8,13
approval 20:14
approved 85:8
architectural
20:13
area 6:24 7:25
argument 44:5
56:6 100:11 103:8

Brian Gambrell
November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

[argument - bit]

Page 3

103:13 104:5

**arguments** 101:23
104:2

**arising** 35:23

**arranged** 61:22
62:3

**arthur** 7:22

**ascertain** 73:25

**aside** 34:5

**asked** 26:15 27:2

**asking** 4:3 48:21
48:22,23 66:7,8
95:14

**aspects** 83:14

**assembly** 99:7

**assert** 4:12

**asserted** 36:9
47:24

**assertion** 96:16

**assess** 42:18

**assessment** 103:2

**assessments** 35:10
36:6 48:12 51:8
51:23 52:4 53:20
102:25 106:8
112:22 113:2,3,9

**asshole** 98:25

**assign** 38:7

**assigned** 12:23

**assistant** 13:11,25
89:4

**assistants** 13:14

**associate** 15:1

**associated** 19:6

**associates** 19:11
19:14,15

**association** 20:1,2
23:18 26:19 54:9
54:17,22 55:2
56:1,8 57:6 103:6
103:9 105:13

113:10 116:23

**assume** 31:21
45:12 64:19,20
86:8 92:9

**assumed** 25:16

**assuming** 108:7

**atlanta** 18:15

**attached** 59:2

**attempting** 40:7

**attend** 69:16

**attended** 10:7

**attorney** 2:2,7
3:13 11:22 15:1,2
16:11,12 20:18
30:17 65:24 66:3
73:23 74:1,3,24
77:7 82:1 88:2
90:25 95:23 104:5

**attorney's** 37:19
39:24 40:4,7 72:1
73:15,25 94:10

**attorneys** 12:10

**august** 21:13
23:25 60:2

**authenticated**
110:11

**authorized** 33:19
33:21 79:15

**automated** 74:18
75:1,10 99:5

**automatic** 75:12

**automatically**
76:9

**available** 59:11

**avoid** 25:1 28:8
66:18,19 96:1
100:11 112:1

**award** 40:4 102:14

**aware** 7:13 8:16
27:9 45:13 46:4,8
52:5,11,14 53:13

58:20 78:7 81:5
86:20 90:17,19
97:15 100:4,21,23
101:12,14,17,18

**awesome** 8:13

**b**

**b** 7:17,19 55:8
116:9

**back** 4:14 19:15
24:8 30:20 32:1
35:2 42:6 43:20
45:10 48:10 55:8
63:24 75:14,15
80:16 81:9 83:12
83:16 86:7 92:10
99:20

**bad** 94:9 96:12,17
97:3

**badge** 13:21

**bailey** 7:18

**balin** 7:17,19 9:22

**balogh** 1:18 115:3
115:23

**bamberg** 10:4

**band** 65:3,6

**bank** 11:20

**bankrupt** 49:16

**bankruptcy** 49:13
49:14 88:5,9

**banks** 11:20

**bar** 11:2

**barnwell** 10:3

**bars** 10:25

**baseball** 25:19

**based** 15:4 40:13
46:5 50:14 52:7
53:6 66:2 83:5
93:1 101:19

**basically** 14:1 17:7
21:21

**basis** 29:9 53:8,9
53:13 106:6

**batch** 28:12 86:11

**bear** 8:19 32:5,10

**bears** 104:24

**bed** 68:6,8

**beef** 18:10

**beginning** 5:5
105:6

**behalf** 34:14

**believe** 11:19
18:24 29:3,10
40:6 44:14 46:19
59:1 64:4 70:6,18
71:10 77:1 78:7
81:2,17 86:9
87:12 91:8 100:5
110:5

**belong** 50:4

**belonged** 50:4

**benefit** 91:16

**berkeley** 21:2

**best** 3:21 14:17

**betsy** 12:6

**better** 16:4 70:17
86:10

**beverly** 19:18

**beyond** 44:23
103:19 108:5

**bifocals** 65:15

**big** 8:19 11:20
28:2

**billed** 40:10

**billing** 39:21

**bills** 39:10,12,14
48:8

**birth** 7:9

**birthday** 41:6

**bit** 3:8 36:2 60:1
62:9 80:17 94:18

**black** 1:6,6 2:8,8 3:7,7 31:1,2 44:13 44:14 92:10,10 95:18,18 97:11,12 105:10 107:3,3
**blame** 22:2 56:1
**blow** 25:20 65:13
**board** 20:14 55:14 55:14
**bobby** 12:5,8,13
**bobby's** 12:11
**bona** 25:1 28:8
**born** 6:13 7:2
**bother** 23:8
**bottom** 34:17 75:19 85:6
**box** 8:20
**boy** 16:3
**braves** 25:20
**breach** 36:10 44:7 50:8 54:15 55:4,6 111:16
**break** 4:6,9 44:25 45:2 96:14
**breaking** 15:11 98:24
**brevity** 89:23
**brian** 1:11 3:1 5:21 116:4
**brick** 50:22
**brief** 19:17 21:18 21:20
**briefly** 21:10,10 25:7 28:5
**bring** 94:1
**bringing** 49:9
**broadly** 28:7
**brock** 88:4,10
**broke** 13:22
**brother's** 41:6

**brought** 79:14 89:5
**build** 20:12
**builder** 55:10,10
**building** 47:20,24
**buildings** 49:15
**bus** 21:17 96:23
**business** 44:13,14

**c**

**c** 2:9 9:3 27:17,24 73:21
**calculate** 107:24
**calculated** 104:18
**calculating** 108:11
**calendar** 79:23 80:23
**calhoun** 2:5,10 9:20
**call** 13:8 27:3 71:2 72:13,14 73:3,14 74:9 77:14,16,20
**called** 6:5 12:7 19:10 59:9 65:20 76:25 77:3,5 82:15,18,22
**calling** 71:4
**calls** 95:1
**camera** 4:19
**canceled** 48:13
**canons** 100:18
**capability** 65:9
**capacity** 13:9 14:12
**caption** 12:18
**capturing** 38:25 40:10
**car** 15:8 57:3
**carbon** 60:18
**card** 102:10
**carlisle** 28:2

**carolina** 1:1 5:25 11:2,7 13:7 15:2,4 26:21 40:1 49:25 96:6 103:9 105:4 105:16 115:5,14
**carrey** 98:21
**carroll** 5:21
**case** 1:5 3:7 4:11 8:18 11:17 12:17 12:22,25 15:10 17:15 18:1 20:11 21:19,19,20,25 22:9,13,14 23:9,22 24:19 25:5,8,21,22 26:7,19,20 27:7,8 27:25 28:2,6 33:16 35:17,25 36:13,17 37:13,13 37:21 38:2,11 39:3,13,17 40:1,8 40:11,15,23 42:12 42:22 43:9,22,23 44:16 45:12,15 46:1,13 53:24 57:24 58:1,22 59:3,6 69:4,12,14 72:5 93:14,17 94:3 97:11 102:4 103:18 105:4,11 109:18 113:19,19
**case's** 26:9
**cases** 15:5,8 16:23 20:18 24:22 33:24 38:1,6 42:7,14 43:14 62:6 111:8
**cat** 9:4
**catoe** 9:1,5,9
**cause** 50:3 54:21 56:6,7 95:17 111:17 112:4 115:9

**caused** 55:16 56:4
**causes** 39:24
**cc'd** 60:17
**ceiling** 48:3
**certain** 28:25 31:8 61:3 79:11 82:24 83:2,14 84:1
**certainly** 4:4 42:5 82:12 83:19 88:18 94:11 96:12 101:25 104:4,13 112:22
**certainty** 83:4
**certificate** 60:21 81:13 115:1 116:7
**certificates** 89:12 89:13
**certification** 75:22 76:4
**certify** 115:5,8
**chain** 62:18
**challenge** 23:18
**chance** 9:10 22:18 25:20
**change** 24:17 84:18 90:2
**changes** 24:16
**characterization** 58:1,16
**characterize** 58:17
**characterized** 78:3
**characterizes** 97:4
**charge** 11:18 42:14
**charleston** 2:11 69:13,17
**charlotte** 36:25 61:8
**cheaper** 16:12

Brian Gambrell                                    November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

**[check - consequences]**                                    Page 5

check  79:8
checked  27:17
chest  84:23
chester  8:21
chief  13:11,25
  14:1
child  7:12
children  7:12
choice  44:4
chosen  72:21
church  22:22,23
  22:25 23:4,19,20
circle  99:20
circuit  11:8,10
  61:21
circumstances
  90:15
civil  25:14,24
  29:17 30:1
claim  17:22 30:5
  51:9 54:15
claiming  40:7
claims  17:16,20
  57:23
clarify  3:19,21
  36:4 47:14 52:22
  67:16 81:15 94:19
clarity's  26:18
  63:17
class  11:21,23
  12:22 17:5 71:21
clear  5:7 30:4 60:4
  68:9
clearly  44:13
  81:10
cleveland  18:25
client  29:24 30:17
  47:12 48:24,24
  60:17,19 64:5
  65:24 66:3 68:21
  72:12,25 73:5

74:9,10 76:25
  77:3,7 82:1,1
  90:25 94:22 95:8
  95:23 96:15,16,22
  97:13 98:16,23
  101:10,10 102:17
  112:20
client's  54:25
  55:17 101:20
clients  30:1 58:21
  60:7 95:6,7 98:17
close  50:19 65:2
  107:22
closed  65:1 75:10
closings  11:22
clue  12:19 21:8
coffee  97:5
cole  26:19 57:5
  116:22
collect  104:14,19
  105:14,17 107:4
collecting  102:7
  103:7 107:6
collection  17:16
  35:11 74:17 75:6
  84:24 103:15,20
  103:21 104:10,23
  107:13,14 111:13
  111:20
collections  20:2
collector  73:22
  74:3,9
college  9:24 10:7
columbia  1:16 2:5
  5:25 6:23 7:8,24
  7:25 15:2 18:9
  36:25 61:11
combination
  94:25
come  17:4 59:11
  75:16

coming  79:23
comment  72:17
commission
  115:24
common  26:21
  36:11 47:19,21,22
  48:5 50:1,16 51:2
  55:12,13,15,21,24
  55:25 56:4,8
  106:12 113:15
communicate
  96:15,22 97:12
communicated
  83:24,25 98:4
communicating
  97:24
communication
  70:13 74:2,4 95:9
  97:19
communications
  30:20
compel  58:10
compelled  58:11
complain  58:10
complaint  17:17
  25:11 31:15 32:25
  33:4,7 34:25
  35:16,24 59:3
  63:18,22,22,25
  81:17 93:16,22
  97:17 106:14
  111:12,15,24
  112:1,2,14 116:13
  117:2
complementary
  17:25
complete  30:12
  71:14 115:7
completely  48:13
  61:21 104:1

completion  78:21
complex  12:23
  103:18
compliance  24:14
  24:23 75:23 76:5
  81:21 99:1 100:19
complicated  19:9
comply  98:19
computer  65:13
  67:11,12 74:18
concern  26:16
  63:13
concerned  54:12
concluded  114:10
condo  18:13
condominium
  48:1,19 50:24
condos  18:11
  22:23
conduct  25:14
  29:18 46:25 71:20
  93:5 96:15 97:7
  98:12 100:18,20
conference  56:17
  57:7,10 58:3
  69:11 70:14
  116:25
conferences  43:3
confident  82:11
confidential  81:25
confirm  101:11
  109:12
conflict  20:22
conflicts  58:5
confusing  71:8
  98:15
connection  86:21
connects  107:2
consents  74:3
consequences
  106:23

Brian Gambrell
November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

[consider - date]

Page 6

consider 49:9 71:1
consists 93:13
constructed 49:15
construction 14:3
14:4,6,10 49:10
consumer 73:22
74:4
contact 78:14
82:25 83:1 113:25
contacted 82:1
102:21
contained 69:2
contains 105:5,5
contemporaneous
30:15
contents 68:20
93:9
contest 72:9
contested 20:17,23
20:24 21:1 74:21
75:8,11
contingency 38:3
38:4,13,15 39:13
continue 103:23
109:8
continued 22:3
108:18
contract 44:8
54:15 111:16
contracts 14:3,8
contradict 51:24
106:19,22
contrary 84:5
contributes 72:19
contribution 4:14
65:21 66:12,23
67:2 68:16 70:15
converted 22:23
38:18
copeland 2:9

copies 29:20 60:18
copy 30:12,25
31:1 33:11 43:21
53:12 57:15 76:18
81:16 84:14 85:19
87:10,10 89:25
91:13 92:14
corner 21:5
correct 10:7,8
11:16 13:4 15:17
16:2 22:8 24:10
28:22,23 29:1,2,11
29:12 30:7 31:8,9
33:12,13 35:1,13
35:14 36:7,8,11,12
40:12 41:5 45:12
45:15,16 46:18
50:18 53:2,7,8,14
53:15,17 55:3
56:20 58:22 59:6
61:7 62:8,12 63:4
63:5 66:14 67:4
67:23 68:11 69:5
69:6 73:10 78:9
79:20 81:19 86:23
90:6,11,18,24
91:10 92:16,17
97:25 98:1,5,6
101:16 102:19,20
105:23,24 109:18
corrected 63:24
correctly 94:21
104:2 107:25
corresponded 3:8
correspondence
29:7
cost 39:14,19
costs 35:11 39:14
council 100:15
counsel 1:17 2:1
4:11 13:11,25

14:1 15:9 40:25
69:19 113:20
115:9
counterclaim
17:17,21 31:24
34:9,13 36:5,9
41:20 49:23 51:5
72:10 116:18
counterclaims
106:5
counties 8:22 9:20
10:4
county 7:3 9:22,23
12:18,20,24 21:3
26:21 115:13
couple 43:2 83:15
110:10 111:7
course 21:24
court 1:1 4:1 5:24
11:7,8,8 17:8,8
20:20 24:18 26:21
27:4 43:19 44:2
46:14 47:16 51:7
52:14,15,21 61:21
69:21,23 73:14
76:2,3 81:20 85:7
85:15,24 86:3
87:22 88:5,9
100:7,13 104:1
109:3,4 112:10
court's 28:6 32:11
33:18 104:8
courtroom 70:20
70:20
courts 52:19
cousins 9:15
covenants 20:5,7
23:3,13,16 30:25
36:10 47:7,17,19
50:15,20 51:4
106:15 110:3

111:7 113:5
cover 4:19
covered 24:3
43:11
covid 3:25 41:11
41:12 60:2,24
65:10 83:20
cp 26:20
create 51:24
created 75:3,3
creates 43:15
creek 26:19 57:5
116:22
criminal 16:11
cskl.law 2:12
cul 6:5
current 5:23 13:5
40:9
cut 44:24
cv 1:5

d

d 26:20 54:6 57:6
116:1,24
dad 59:24 77:18
83:16
dad's 83:14
dallas 18:18
damage 48:15
53:20 55:16 56:5
106:11
damaged 54:25
damages 39:25
53:21 100:10
103:16
dare 25:20
darlene 1:3 2:2
date 1:13 7:9 11:5
13:21 41:8 57:4
59:21,24 61:17
62:5 64:18 74:20
78:21 84:14 93:24

**[dated - discussed]**

**dated** 64:3 78:18 80:20 84:15 93:25

**dates** 59:11,19 76:12 77:1,8 78:15 84:19 90:1

**david** 57:14 72:4 76:15 86:9 96:21 97:11

**david's** 77:23

**day** 9:7 13:17,18 15:25 21:4,12,13 33:21 60:25 68:2 69:11 78:25 79:24 81:4 82:5,7,10 83:6,7 85:2 91:11 92:8 95:25 102:7 113:23 115:12

**days** 62:13

**de** 6:5 38:21

**dead** 9:4

**deadlines** 74:19

**deal** 14:2 38:8 43:3

**dealing** 14:10 83:13,21

**dealt** 25:9

**debt** 17:15 52:9 73:21,24 74:2,8,17 84:24 102:5,7,9,11 102:13,18 103:7 103:14 104:9,12 104:19,23 105:14 105:17,21 106:20 107:6,14,14,24 108:2,20,23 111:13,19,21 112:7,7,11,13,19

**december** 23:25 32:19,23 33:5 41:17,18

**decide** 4:12

**decided** 17:11 18:9 22:1 23:22 24:19 52:12 53:10 53:25

**decision** 14:17 22:16 69:22 94:1

**declaration** 33:8 116:16

**declared** 49:13

**decline** 66:2

**default** 69:3

**defeat** 54:14

**defect** 47:24 49:10

**defendant** 1:7,17 2:7 3:6 49:20 62:17 63:14

**defendant's** 33:3 34:7 45:20,24 54:10 56:23 57:9 63:19 80:17 92:19 110:5

**defense** 12:9 16:11 18:8,16,23 19:20 111:25

**defenses** 111:23 111:23 112:1

**define** 23:14 50:19 50:20,21

**degree** 10:11,11 10:13,15

**degrees** 10:17

**delay** 4:24

**delete** 63:23

**delivering** 61:2

**delivery** 14:7

**denial** 34:24 35:6 35:7 43:12 105:5 105:12

**denials** 105:5

**denied** 26:10 35:13,14 36:5 46:15 105:2,22 109:4

**denies** 105:11

**dentist** 62:3

**deny** 106:6

**department** 13:7 14:4

**deposed** 12:13 26:2 108:9

**deposition** 1:11 3:15,22 11:11 13:2 18:18 24:7 25:5 27:21 28:17 28:22 74:11 89:10 93:8 114:10

**depositions** 3:14 5:6 32:10 47:1,3 80:24 108:14,18 108:22,24

**deputy** 15:21

**descendant** 19:11

**designated** 12:23 30:17

**details** 70:24,25

**determination** 57:25

**determine** 112:18

**developer** 48:18 49:10,13,19,21,23 49:25 50:5 55:9 56:2

**died** 13:18 59:24 83:16

**differ** 53:11

**different** 36:20 37:1 42:14 43:15 43:16 61:21 74:22 75:3 88:25 89:13 93:7 104:21

**difficult** 4:1 38:7 66:18 98:17

**dimly** 51:15

**dipping** 100:12

**direct** 3:20 60:9 71:19 73:19 74:3

**directly** 43:19 51:22,24 60:16,23 69:1 74:11 77:10 96:15,22 97:12 98:13

**director** 15:21

**directs** 72:12

**disabled** 74:25

**disagree** 57:25 70:5 71:10

**disagreements** 90:3,20

**disbarred** 89:22

**disbursement** 39:18

**disciplinary** 100:14

**disclosure** 73:1

**disconcerting** 4:18 5:2

**discounted** 39:19

**discovery** 11:19 12:4 26:3,11 31:2 46:25 47:1,4 58:9 58:11 108:4,25 109:22 110:11

**discuss** 4:10 25:5 26:17,24 48:17,24 49:4,5

**discussed** 25:22 44:16,22 45:11 51:19 52:6 53:4 55:23 61:16 77:6 79:22 90:23 91:2 94:21 96:7 102:16

Brian Gambrell
November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

[discussing - equity]

Page 8

discussing 47:18
64:3
discussion 43:23
59:18 107:17
112:4
discussions 47:9
47:10
dismiss 31:25
35:21 43:13 86:22
dismissed 27:18
disposition 27:10
100:23
dispute 57:23 58:8
103:2,5 108:2
112:10,19
disputing 84:6
102:17 106:20
distaste 104:8
distinctly 43:8
44:21 64:25
district 1:1,1 11:7
11:8
disturbing 23:2
division 1:2
divorce 16:12
doctor 83:17
doctor's 62:3
document 33:11
34:11 39:17 46:1
58:19 80:2,6
documents 11:19
12:4,9 25:13
28:25 29:4,8,11
30:5,9,14,23 31:2
37:4,6 87:20,21
doing 6:10 26:15
70:17 71:7 81:11
87:17,17
dollar 102:11
dollars 48:8

dominion 15:9
door 15:22
double 100:12
doubt 91:17
download 29:13
downloaded 33:17
downloading
78:22
draft 58:4 111:25
drafting 42:2
drastic 44:11
drew 2:6 15:14,16
16:3 25:7,15,17
26:25 27:2 30:11
30:12,16 40:25
100:25 105:24
109:10,11 113:25
114:4
drew's 15:20
drive 6:17,20
dropped 78:11,13
drywall 51:1
duly 3:2
duration 97:10
duty 47:21 50:1,8
55:1,1,23 56:3,11
74:8
dwarf 7:21

e

e 3:8 9:3 14:21
17:14 18:5 23:6
28:19 29:7,13,14
33:18,20 36:22
40:13 59:9,21,22
60:10,11,14 65:12
67:6,12,15 68:2,4
68:5,10 69:7
76:14,15,17,21
77:1,6,8,13,16,23
78:8,8,20 79:3,8
79:15 80:5,18

81:21 82:19,23
85:1,2,18,21,22
86:14 87:1,11,12
87:13,15,18,21,22
89:20 91:11,15,19
92:9 93:9,10
94:25 95:2,5
96:25 97:6 116:1
116:9
ear 16:4
earlier 40:20
102:16 103:12
107:23
early 43:23 53:3
60:1 65:1 77:12
earth 74:14
ease 95:9
easiest 98:19
easy 40:18 95:6
ecf 43:15 44:17,20
79:25 85:22
effect 81:2
effective 63:12
efficient 61:2
effort 72:1
egregious 91:25
eight 64:17
either 9:18 43:4
59:8 85:2 88:12
88:12 89:18 93:4
94:5 95:5 102:21
108:11
elaborated 93:6
electrically 84:21
electronic 33:20
33:22 34:17 37:2
38:18 57:19 62:20
62:22 63:10,12
83:8 87:15 88:6
electronically
63:15

element 39:25
47:20 51:3 104:13
elements 36:11
47:21,23 48:5
50:1,16 55:12,13
55:15,21,24,25
56:4,8 106:13
113:15
elevation 23:1
eliminate 53:23
elucidated 93:12
employed 13:10
14:19,22
employer 13:6
ended 41:11,12
ends 102:12
enforce 20:6
enforcement 20:9
33:7,8 116:14,16
enormous 71:25
ensuring 24:23
entail 13:25
enthusiastic 88:8
entire 55:1 73:16
entirely 12:15
112:23
entities 49:15
entitled 53:19
entries 37:14,22
37:23
envelope 61:8
85:19 86:5 89:2
91:22,25 92:3,3
envelopes 64:12
equally 90:7
equitable 33:8
103:17 112:6
116:15
equity 21:7 59:5
70:25 71:3 103:11

Brian Gambrell
Poole, Stacey Darlene Vs. Black Slaughter & Black PA    November 2, 2021

[equity's - filed]    Page 9

**equity's** 59:8
70:23 71:4
**equivalent** 87:23
**errors** 63:21
**essence** 95:13
**essentially** 23:12
26:4 28:10 29:23
44:5 52:3 53:25
59:10 69:15 75:5
103:15
**establish** 104:14
104:15 107:24
**established** 104:11
112:6
**estate** 11:22
**estimates** 48:9
**estoppel** 111:17
**ethical** 72:16 74:7
**ethics** 71:21
**evening** 64:17
65:1 67:18,19
**event** 88:18
**events** 67:24 88:11
88:14 115:10
**everybody** 3:24
9:16 18:1 45:3
**everybody's** 3:17
**everyone's** 42:5
**evidence** 47:15
51:6,17 103:5
109:22 110:15
112:10,12
**evident** 106:2
**exact** 13:21 25:12
27:23 112:18
113:7,12
**exactly** 10:20 19:3
65:4 87:13 90:14
**examination** 3:3
116:5

**example** 20:4,10
37:13 43:17 56:12
58:10 71:21
104:17 105:7,9,16
**exceptions** 74:5,6
89:8
**exchange** 59:21
**exchanges** 28:19
**exclusive** 54:1
**exclusively** 19:25
**excuse** 78:14
85:16
**excuses** 102:3
**exhibit** 33:6 34:8
34:25 35:3 45:21
56:15 57:5 63:25
81:17 92:20 110:6
116:12,17,19,22
117:1,3,5
**exhibits** 25:11
59:2 109:25
111:11
**exist** 55:11
**expect** 23:19 30:16
**experience** 74:16
**expired** 104:20
105:18
**expires** 115:24
**explain** 65:25
**explained** 66:9
**explanation** 66:5,8
**expresses** 104:7
**extent** 9:16 24:21
27:8 42:12 44:15
48:21,23 49:19
50:5,10,11 51:21
53:22 55:7 103:25
**exterior** 47:20
50:19,22
**eyesight** 65:14

**f**

**face** 3:10
**facilitating** 41:15
**fact** 15:3 24:13
39:23 43:25 48:7
49:13 53:18,24
55:4,17,25 68:25
72:15 79:6 87:9
90:7 91:24 93:9
102:13 109:19
112:3
**factors** 104:22
**facts** 47:15 51:6
54:13 57:23 105:6
**factual** 51:24 87:1
104:10 106:6
**fail** 71:16 73:12
111:22
**failed** 71:18,24
**failing** 106:1,23
**fails** 74:1
**failure** 36:10 46:5
47:25 55:3,16,21
101:20 106:12,14
107:3
**failures** 106:18
**fair** 4:15,16 5:3
17:15 42:14 90:2
90:16 95:20
**fairfield** 8:22
**fairly** 43:2 83:25
**faith** 94:9 96:12,18
**falls** 70:21
**false** 69:7 90:7
**familiar** 3:16,24
**family** 83:22
**far** 20:7 31:15
37:10 42:6 53:21
54:12,13 89:4,15
95:4,9

**fast** 18:19 75:14
**fdcpa** 17:23 24:9
24:14,17,17,19,22
27:23 28:2,13
37:13 38:11 73:20
73:20 74:8 93:5
95:10 97:8 99:14
100:2,10,11 102:3
102:12,14 107:4,5
107:10
**february** 11:9
13:17,20 41:2,4,10
41:20 53:3
**federal** 5:5 8:20
63:22 69:12,13,20
85:24 86:3 87:22
96:17 100:4
105:15
**fee** 37:19 38:3,4,13
38:15
**feel** 4:7 82:11 83:1
83:25
**fees** 35:10 40:4,8
72:2 73:16 94:10
**felt** 84:23
**fenwood** 6:2
**fide** 25:1 28:8
**fiduciary** 50:8
**figure** 38:9 42:18
**file** 30:11,12,14
32:2,2 35:17
36:16,18,19 37:3,3
37:6 38:8 41:14
42:22 43:8 44:20
46:20 57:18 63:16
74:25 75:9 78:20
87:18 89:20 93:11
94:2 100:2 105:25
**filed** 11:25 12:18
12:21 16:23 17:15
20:9 21:22 26:1

Brian Gambrell                                    November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

[filed - generated]                                                    Page 10

28:19 31:1,24,25
32:18,19,22,25
33:5 34:14 35:16
35:18,22,25 36:5
38:21 39:5 40:16
40:20 41:8,19
43:12 44:7,16,22
45:14,17 46:1,11
46:24 49:23 51:5
52:7 53:5 57:11
58:9 63:19 72:10
79:1 80:22 81:4
81:16 84:21 85:1
85:2,9,13,18,21,22
86:2,14,21 87:1,21
91:8,15,19 92:14
92:25,25 93:14,17
93:18 96:25 97:18
99:10 101:12,13
101:15 102:24
103:3,4 105:2,4,8
106:5 109:17,19
111:7,10,11
**filer**  33:20 79:15
**files**  36:17 37:7
42:19 43:16 75:4
**filing**  24:12,22
33:18,20,23 39:15
39:15 41:21 57:20
62:20,22 63:10,12
63:15 79:17 80:18
81:21 83:8 85:8
86:8 87:15,22
88:5 96:13 97:6
106:13 109:17
**filings**  42:22 45:11
87:17 88:23
**filled**  76:11
**fin**  6:3,3
**finally**  20:16

**finance**  15:22
**find**  18:19 25:8
**fine**  5:17 20:6
29:16 45:4 88:10
107:19,22
**finished**  12:12
**finwood**  5:24 6:2,3
6:6
**fire**  54:23
**firm**  14:21 17:14
18:8,11,14,16,18
18:23 19:9,11,12
19:20 30:8 36:22
39:21,23 44:19
84:25 113:24
**firms**  18:6 19:6
24:3 88:2
**first**  3:2 4:25 9:15
13:17 23:22 24:11
40:24 44:3 56:9
57:21 58:25 61:6
64:3,13 68:19
69:25 70:6,11
71:14 73:17 79:11
80:19,19 82:3
84:15,20,21 85:9
86:8,16,21 90:3,7
99:4,10,17,22
101:14 103:17
**fish**  6:4
**five**  14:24 42:14
42:15 45:2 54:4
103:4 109:25
**fix**  113:14
**fixed**  55:5
**flatly**  105:1
**flawed**  112:5
**floor**  48:3
**folder**  31:3 37:1
**folders**  36:20

**follow**  107:3
**following**  25:2
**follows**  3:2
**foot**  20:12,12
**football**  9:24 65:3
65:5
**forced**  96:21
**ford**  99:6
**foreclose**  111:14
**foreclosure**  17:9
20:18 26:22,24
31:6,7 33:4,7
35:17 36:14 40:23
41:24 42:1,22
45:12 56:17 57:11
59:6 60:8 75:8
94:3 97:10 103:10
111:14,17 113:18
116:14
**foreclosures**  20:24
44:10
**foregoing**  115:6
**forget**  12:6
**forgive**  84:22 99:4
**forgot**  15:14 63:23
**form**  11:22 37:19
76:1,3 91:15
**format**  37:18
**former**  30:8
**formidable**  16:19
**forming**  29:9
**formulate**  63:8
**formulation**  58:8
**fort**  61:10
**forth**  30:20 42:6
83:12
**forward**  26:23
77:22
**forwarded**  82:19
**found**  46:15 52:18
69:10

**four**  6:17 9:14
13:12 34:18 37:1
40:17 80:2 103:4
109:25
**fourth**  11:7,10
**frankly**  73:4 88:1
95:9
**free**  4:7 102:10
**freight**  42:15
**friarsgate**  6:22
**friday**  64:17,24,25
65:4 67:1,3,18
**fridays**  65:1
**front**  43:20 61:20
72:17 96:23
**fruitful**  22:3
**full**  4:4 5:20 16:5
42:15 58:25
**fully**  30:16
**fun**  15:14,15 25:15
**functioning**  72:20
**funny**  15:20 43:7
**further**  70:24
76:22 95:19
112:17 115:8
**fuzzy**  48:16

---

**g**

**gambrell**  1:11 3:1
3:5 5:22 7:18 33:6
34:8 45:21 57:5
63:25 92:20 110:6
116:4
**game**  50:12 65:5
**garden**  54:22
**general**  26:16
105:5,12 113:3
**generally**  13:24
16:12 18:1
**generate**  75:12
**generated**  39:11
39:12,16 76:9

Brian Gambrell     November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

**[gergel - hoa's]**        Page 11

**gergel** 17:7
**getting** 13:21 16:4
  41:12 66:20 78:17
  82:13 86:7 89:21
  89:22 110:20
  111:10 112:8
**give** 88:19 91:16
**given** 3:14 11:11
  13:3 38:1 59:17
**gives** 70:23
**giving** 70:10
**go** 3:15 7:7 8:18
  12:3 16:25 20:20
  21:2,5 25:10 32:1
  34:3,21 35:2 42:9
  43:6 55:2,8 56:23
  58:25 66:17 68:7
  69:25 75:14,15
  76:10 77:11 79:24
  80:15 83:12,16,17
  84:11 89:16 90:8
  94:8 95:19 102:1
  104:22
**goal** 37:17
**god's** 74:13
**goes** 6:21 70:19,20
  72:18 94:8 99:12
**going** 3:19 4:8
  19:8 22:2 23:7
  25:3 26:23 27:16
  29:25 33:2 35:2
  38:8 40:5 44:21
  45:1,6 48:10,20,25
  55:5 57:22 60:2
  62:22 63:14,18
  66:4 69:18,21
  72:2,4,5,6,8 76:6
  76:14 80:4 84:10
  92:24 94:4,12
  95:11 103:7

**good** 3:5,10 15:18
  16:1,11 17:2 50:1
  59:25 99:7 114:5
**gosh** 16:13
**gotten** 39:20 64:11
  65:7 79:17 80:5
  83:7
**government** 10:1
  29:25
**graduate** 10:9
**graduated** 10:10
  10:11 37:10
**grandchildren**
  8:15
**grandfathered**
  12:2
**grant** 101:1
**granted** 27:7
  112:16
**gray** 12:6,6
**great** 8:14 65:15
  65:17
**greatly** 103:2
**green** 74:14
**greene** 18:15,16
  18:20 19:5,10
**greenville** 7:3
  22:12,12 57:2
  83:13
**grew** 7:2
**ground** 3:16 43:11
**grounds** 95:23
**groused** 25:19
**guess** 95:21 109:6

**h**

**h** 116:9
**habit** 101:5
**half** 6:12 19:20,23
  72:7
**halves** 54:2

**hamilton** 19:10,13
  19:14,14,19 88:3,4
**hand** 25:3,3
  115:11
**handed** 21:20
**handle** 15:5 20:17
**handled** 15:10
**handling** 75:3
**handwrite** 92:2
**handwritten**
  37:15 38:17,25
**hang** 11:4 24:7
  81:9 110:25
**happen** 16:9 84:25
  97:3
**happened** 24:17
  59:4 61:6 82:12
**happening** 75:2
**happens** 85:11
**happy** 4:9 16:17
**hard** 4:22 16:16
  58:10 99:6
**harrison** 2:3
**harrisonfirm.com**
  2:6
**head** 6:10 18:10
  18:12,12
**headed** 96:18
**heard** 6:8
**hearing** 12:20
  25:25 35:20 43:8
  43:10 46:12 57:2
  59:5,12 60:7,22
  61:14,17 62:10,11
  62:13,25 63:3,14
  64:3,6,14 65:22,25
  66:25 67:18,22
  68:20,22 69:15,16
  69:17 70:12,24
  73:9 74:20 75:12
  76:24 78:15,17,23

**79**:4,22 80:3,8,11
  80:16,20,20 81:8
  81:24 82:13,17
  84:11,14,15 86:11
  87:2,6 89:24 90:4
  90:5,18,23 91:9
  93:2 94:20 97:14
  97:23 98:2,9
  108:8
**hearings** 21:3 27:5
  42:1
**heart** 72:18
**helmes** 18:15,15
  18:20 19:5,10
**helping** 41:14
**hereunto** 115:11
**hey** 77:16 112:4
**hickory** 36:24
**high** 65:5 84:24
**highly** 86:3
**hill** 1:2 36:25
**hilton** 18:10,11,12
**hip** 83:15
**hired** 12:3 71:18
**hitting** 9:5
**hmm** 13:19
**hoa** 16:21 20:14
  20:17,23 22:11,12
  22:13,17 23:10
  26:22,24 31:6,7
  33:4 35:9,12,17
  36:10,14 37:13,21
  40:23 41:24,25
  42:2,22 44:6,8
  45:11,14 47:22,24
  50:4,6,9,17,23
  51:2,21 55:14
  56:17 57:11 59:5
  60:8 94:3 106:8
**hoa's** 40:21 49:22
  51:8

Brian Gambrell
November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

**[hoas - judge]**                                                   Page 12

**hoas** 15:10 16:23
  17:22 20:4
**hobbit** 7:21
**hold** 10:22
**holding** 28:6
**home** 5:24 41:13
  65:7
**homeowners**
  19:25 20:1 23:17
  26:19 49:21 57:6
  103:6,8 116:23
**honest** 27:14
  52:21
**honestly** 4:6
**hoping** 96:1
**horizontal** 52:19
**horry** 115:13
**hose** 54:22,23
**hour** 38:19
**hourly** 38:3,14
**hours** 40:17
**house** 6:16 9:25
  10:1 20:12 105:3
**housing** 106:22
**hundred** 102:11
**hundreds** 13:4

**i**

**idea** 13:1 24:1
  31:14 37:18 69:21
  82:4
**identical** 84:17
  89:25
**identically** 85:12
**identification** 33:9
  34:9 45:23 57:7
  64:1 92:21 110:8
**identify** 71:12
**imaginable** 10:15
**immediately** 65:8
  68:1

**impact** 43:24
**imploded** 18:18
**important** 24:17
  90:15
**imposed** 99:25
**impossible** 95:7
**improper** 63:2
  103:15 107:14
  111:20
**inaccuracies** 90:2
**inaccurate** 70:7
  71:12
**inadvertent** 85:10
  86:9 97:4,5,8
**inch** 42:5
**incident** 35:23
**include** 47:25
**included** 50:16,18
**includes** 28:9 35:8
  110:2
**including** 14:7
  50:9 103:4
**inconsistent** 53:25
**incorporated** 90:4
**incorrectly** 104:18
**increase** 72:1
  73:15
**incurred** 53:21
**index** 2:16
**indues** 55:13
**indymac** 11:20
**inform** 63:15
**information** 17:3
  30:5,15 49:12,18
  73:1 80:12 82:1
  88:20
**informative** 95:4
**informed** 90:14
**initial** 28:18 93:24
  97:16,16

**initially** 31:25
  93:17
**inlet** 115:13
**installed** 59:14
**instruct** 48:20,25
  66:5 94:5,13
  95:12
**instructing** 95:22
**instruction** 5:13
  96:8
**instructions** 82:20
  96:2
**insurance** 49:18
**intended** 111:8
**intending** 72:13
**intent** 99:15
**intentional** 99:13
**interest** 35:11
  104:18 108:12
**interested** 101:6
  115:10
**interface** 14:5
**interfere** 73:5
**interference** 72:24
**internal** 84:7
**interpretation**
  28:13 47:18 50:14
**interpretations**
  20:5
**interrupt** 110:24
**intervening** 19:16
**interviewed** 39:6
  47:12
**intrusion** 48:15
  49:24 51:17 54:10
  54:18 55:20
**involve** 11:17
  37:21
**involved** 17:22
  20:3 22:11,20,22
  24:13 36:15 37:4

37:12,14 38:5,5
  52:23,25 61:15
  99:15 103:6,20
**involvement** 97:10
**involves** 14:6,10
**involving** 11:21
  17:21
**ipad** 37:10
**iphone** 65:16
**irmo** 6:17,20
**issue** 21:23 23:7
  31:16 48:6 49:24
  51:25 54:12 55:3
  86:22 94:9 100:19
  104:23 106:16,16
  109:14
**issues** 14:4,10
  43:18 49:10 53:23
  58:9,11 66:17
  98:14,16 103:18
  104:11 107:7,20
  110:20 111:9
**italy** 105:3

**j**

**j** 18:24
**janik** 18:8,20
**january** 6:13 41:2
  56:18,19
**jason** 14:21 17:14
  18:5,7 36:22 95:2
**jerman** 28:1
**jim** 98:21
**job** 15:15 18:19
  94:13
**joined** 18:7,17
**joining** 19:10
**jot** 73:18
**judge** 12:23 17:7
  21:7 26:7 35:21
  43:9,18 52:11
  53:10 58:4 59:13

Brian Gambrell
November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

**[judge - limb]**

Page 13

59:16 62:5 69:19
88:7 96:23 98:11
98:13 99:23 100:1
**judgement** 33:7
45:22 116:13,21
**judges** 52:16
**judgment** 27:6
35:19 40:22 41:22
45:15,25 46:23
47:6 52:6 53:6
54:5 99:21 100:22
101:13,15,19
102:12,24 108:13
108:15,17 109:1
109:15,16,23
110:8 112:16
117:7
**judicial** 57:24
100:18
**july** 6:14 59:25
60:1
**jump** 87:4
**jury** 8:18,20

**k**

**k** 18:24
**keep** 15:25 16:16
29:24
**kept** 24:16 84:8
**kershaw** 9:19
**kid** 6:11,12
**kids** 5:1 9:14
**kimball** 35:22
43:9,18 59:13
**kind** 3:17 4:22
8:19,20 10:24
12:1 19:9 20:16
24:13,15 25:3
36:24 38:6,12
44:9,9 48:9 53:25
54:2,14 56:6
59:17 60:4 66:11

74:16 78:11 84:22
94:8 95:8 98:15
98:20,25 104:1
108:17
**kinds** 15:5
**king** 7:22
**kingma** 2:9
**knew** 39:6,7 62:4
69:19 72:2,4
79:22 80:3,8,10
112:25 113:1
**knights** 7:22
**knoll** 8:12
**know** 3:7,16,23
4:7,9 6:4 8:24 9:3
9:16 16:22 21:9
22:5 27:8 31:17
38:11 39:10 40:15
40:19 43:16,17,17
43:22 44:17,25
45:1 46:23 48:14
51:4,11,16,18 52:1
56:25,25 57:14
58:12,19 59:18,19
61:3,13,19 62:15
64:11 66:18 70:3
71:10 74:23 75:5
76:1,13 77:15,17
78:20,24 79:2,5,6
79:11 80:18,24,25
80:25 82:4,6
86:10,24,25,25
87:24 89:24 90:12
90:12,13,21 91:12
92:23 95:15 99:6
99:21,21 100:14
101:3,3,22 104:6,6
107:8 108:1,4
**knowledge** 21:24
73:24

**known** 22:5 80:13
**knows** 73:22

**l**

**l** 7:17,19
**label** 92:1
**labor** 21:13
**lady** 16:17
**lafitte** 12:7
**lancaster** 8:21 9:4
9:17
**lane** 18:3
**large** 52:8 53:6
101:19 102:12
115:5
**largely** 43:11
**late** 35:10 67:9
**lauren** 1:18 115:3
115:23
**law** 10:11,20
11:13,15 14:21
15:11 17:13 19:12
20:1,2 28:9 44:7
49:25 50:24 71:17
71:21,25 93:11
95:2 96:17 98:24
102:4 103:9,11,17
105:15,16 112:7
**lawsuit** 11:21
**lawyer** 12:8 15:4,7
39:23 63:15 66:19
71:3,5,18,24 72:22
72:25 89:10,18
96:14
**lawyer's** 89:16,17
**lawyers** 12:3
20:21 40:2 72:23
72:25 87:25
**lead** 15:2
**lease** 23:4
**leased** 22:24

**leave** 21:15
**leaving** 39:6
113:24
**lee** 9:19
**left** 19:14 22:5
38:22 45:10 53:3
88:3,3
**legal** 20:3 38:6
70:10,18,21 71:1
72:20 74:6,8
88:22 89:4 98:23
103:16 104:11
**legally** 105:15
107:20
**legislation** 17:25
**lemons** 99:6
**length** 57:22
**letters** 29:7
**level** 23:23 53:1
**levied** 88:10
112:22
**lexington** 9:23
10:2
**liability** 36:6 51:8
52:9 99:15 102:25
104:25 105:2
109:14 112:17,19
112:20
**liable** 51:22 99:16
113:1,1
**liar** 98:21,21
**license** 11:4
**licked** 89:2
**lie** 71:15 72:4,8
**lien** 33:8 112:5,6
116:15
**life** 7:4 9:5 14:1
16:17 42:5
**light** 23:2
**limb** 22:17

Brian Gambrell
November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

**[limbaugh - mean]**
Page 14

limbaugh 13:18
limitations 104:20
105:18 111:22
line 75:18,20 99:7
116:3,11
lines 18:2,4 80:18
link 80:1
linked 107:7,9,21
lis 32:25
list 8:19
listed 43:13
literally 9:7
litigate 20:19
21:25
litigated 21:20
42:3,4 44:23
litigation 14:11
16:22 25:24 26:4
75:7 87:17 104:23
105:2
little 3:8,25 5:2
27:24 32:9 39:4
40:14 62:9 75:17
75:17,18 87:14
94:17,18 97:6,8
99:8 110:25 114:3
live 7:24 72:8
lived 6:9 7:3
lives 9:22,23 61:10
83:13
location 1:16 61:1
lodestar 38:10
42:17
log 65:9
logged 67:11
login 88:16
logistical 111:9
long 4:8 6:9 13:15
14:22 15:3 19:22
38:22 49:16 102:7
105:19

longer 30:1 44:18
44:19 110:25
111:1 114:3
look 10:19 32:1
34:3 54:4 55:8
57:22 70:1 75:15
79:3 80:7 81:8
looked 24:15 25:9
25:13 27:25 32:12
32:15,22 49:20
50:11 79:21
looking 4:17,22,23
11:3 43:7 54:6
64:23 67:5,15
79:10 93:16
looks 34:15 45:18
57:12 67:5 75:23
75:23 76:8,11
92:11 93:25
lot 15:10,15 42:6
47:18 71:11,11
104:21 111:1
lots 23:1
loud 23:1
lovell 2:9
ls 5:22
lynn 59:7

**m**

m 8:6,7
maiden 8:25
mail 3:8 10:1 23:6
28:19 29:13 59:9
59:22 60:10,11,14
61:3 62:21,24
63:9,11 67:6,12,15
68:4,5,10,22 69:7
76:14,15,17,21
77:1,6,8,13,23
78:8,8 79:3,8 80:5
82:14,19 83:3
85:14 86:5 87:7

87:20 89:2,15
91:15 92:5 93:9
98:20
mailed 60:15,15
60:16,16,20 61:7
65:12 68:2 77:16
82:23 85:19 86:4
87:7,11,12,13 89:6
91:13,14 92:9,11
92:14
mailing 63:12
87:16 90:19
mailings 87:18
88:23,25,25
mails 29:7,14
40:13 59:21 93:10
94:25 95:5
main 6:21 18:24
maintain 36:11,16
36:17 55:15,21,23
55:24 56:3 106:12
maintained 56:9
maintaining 47:22
55:12
maintenance 14:8
major 24:19
106:15
making 24:25 86:8
104:3
malpractice 15:12
man 15:24
march 11:9
115:24
mark 33:2
marked 33:3,9
34:6,9 45:22 57:7
64:1 92:21 110:8
married 8:2
marrying 14:18
masciale 2:9 3:4,6
5:15,17,18 15:23

16:3,13,20 33:10
34:10 45:9 49:2,6
57:8 66:7,10,21,22
92:22 94:7,15
95:15 96:4,9
110:9 111:2,4
114:1 116:6
master 21:7 43:10
43:14,20 44:1
59:5,8,14,15 61:18
62:16 70:23,25
71:3,4 80:13
masters 61:20,20
62:10
material 15:19
29:25 30:18
math 6:10
matter 28:25
49:12 71:15 72:22
72:24 74:22 78:11
87:1 112:7
mattered 12:24
matters 29:9
mccabe 19:18
21:10 22:7
mean 9:12 17:2
22:12,20 23:24
24:21 25:23,25
26:2 31:21 34:2
35:21,24 37:9
39:4,8 40:13,16
42:2,3,10 46:19
47:10,12,14,17
49:11 50:10 52:15
53:10 54:20 56:12
57:18 58:2,15,19
61:16,23 62:4,5,14
62:14,19,23 71:21
71:22 72:17 73:20
81:7 83:4,8 86:24
88:14 90:6 94:7

0:20-cv-03499-TLW    Date Filed 12/03/21    Entry Number 30-1    Page 133 of 145

Brian Gambrell
November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

[mean - notice]

Page 15

95:1,13,19,21
98:20,25 99:5
101:2 104:6,15,16
104:21 105:7,12
105:12 106:2,11
106:21 109:6,6
110:17 112:9,13
**meant** 85:2
**mechanism** 56:5,7
103:14
**medical** 15:12
**meetings** 4:20
**member** 89:20
**members** 50:9
**membrane** 50:16
**memo** 35:18 38:20
39:8 42:14,24
86:25 93:11 103:3
109:25 110:14
111:11
**memorandum**
40:20 41:21 46:24
109:19,21 110:6
117:5
**memory** 3:17 60:4
**memos** 42:2,7
**mentioned** 16:11
16:22
**mess** 32:5
**met** 3:9
**method** 103:20,21
103:22 111:20
**michael** 2:9 3:6
**mid** 21:13
**middle** 8:12,12
**mike** 5:4
**mill** 61:10
**minds** 53:11
**mine** 15:22 81:22
89:8,18 109:7

**minecraft** 5:1
**minimus** 38:22
**minute** 45:2 59:4
**missed** 21:23
**mistake** 22:1,4,4
84:22 86:18 96:25
**mistakes** 28:9
**mitigate** 56:11
**mmasciale** 2:12
**model** 44:13,14
63:23
**modify** 24:19,20
**mom** 8:13 83:13
83:15,17
**moment** 80:8
98:21
**moncks** 21:5
**monday** 67:4,8,14
67:19,20 68:3
**money** 53:19
104:16 113:14
**monies** 48:11
**month** 69:20
**monthly** 108:11
**months** 18:21 27:2
**morning** 3:5 77:11
77:14 79:4 82:6
**mornings** 23:20
**motion** 25:25 26:1
26:10 27:6 31:25
35:19,21,22 36:1
38:20 39:15 40:16
40:21,22 41:21,22
42:1 43:1,12,13
45:14,21,25 46:5
46:23 47:6 52:6
53:5,9,12,14 54:5
58:9 79:4 86:22
86:24 92:15,20
93:1,3,7,11 94:2
98:9 99:20,22

100:7,21,22,24
101:1,4,12,13,15
101:19 105:25
109:1,14,16,17,23
110:7,13 116:20
117:3,7
**motions** 66:17
69:17 87:19 96:1
98:9 99:9
**motivation** 94:9
**motorcycle** 15:8
**move** 14:14 17:12
23:19 56:16 69:23
76:6 96:11
**moved** 6:13 7:8
26:10
**movement** 4:25
**moving** 62:1 71:9
**multiple** 38:6
56:25 98:17
**murrells** 115:13
**music** 23:1
**mutually** 54:1

**n**

**n** 7:17 18:24 116:1
**name** 3:5,10 5:20
7:16,17 8:4,25
12:25 22:13,14
23:10 27:3 46:13
59:16 73:25 76:19
**named** 18:8,15
**names** 76:12
**nearly** 4:25
**necessarily** 37:12
55:20 60:24 95:16
**necessary** 63:9
80:7
**need** 3:19 4:6,9
5:11 30:2 70:15
107:24

**needed** 44:25
83:16
**needs** 98:23
**neighbor** 20:10
**neighbors** 23:2
**neither** 115:8
**never** 6:8 20:13
21:19 23:12 40:9
58:9 74:9 87:24
88:1,12,17,19,22
113:8
**new** 6:21 22:25,25
43:10,20 44:1
59:14,15
**news** 13:22
**nickel** 105:1
**night** 65:5 67:1,3,5
67:8,10 68:6,14
**nine** 35:8 64:17
**noise** 23:15
**non** 29:6
**nonexistent** 49:17
**normally** 4:18,18
61:24 67:9 77:11
**north** 6:16,20 40:1
**notary** 115:4
**note** 99:14
**notes** 30:16 38:17
38:25 40:10 46:20
84:8
**notice** 35:20,21
58:14 60:7,22
61:14 62:11,18,25
63:3,14 64:3,5,14
64:23 65:22,25
66:13,25 67:18,21
68:20,21,21 69:1
69:25 73:4,9
74:14 76:23 78:17
78:23 79:17 80:16
80:20,20 81:8,24

82:10,13,17 84:11
84:15 87:6 89:24
90:3,5,17,23 91:6
91:9,24 97:6,18
**noticed** 78:19
**notices** 28:11 59:4
75:12 86:11 87:2
93:2 94:20 97:13
97:22 98:2
**notification** 80:5
**notifications** 33:23
**notify** 62:1
**november** 1:13
11:3,5,5 45:18
53:7 115:12
**number** 17:2,4
33:16 55:18 56:3
70:23 76:2
**numbers** 102:13

**o**

**o** 9:3
**o'clock** 64:17
**obeying** 97:20
**object** 94:11
**objections** 5:6,10
**obligated** 113:4
**obviously** 3:12,18
4:10 25:9 30:21
56:14 71:10 109:3
109:4
**occasions** 48:16
**occurred** 43:4,5
43:23 54:25 59:23
59:24 60:3 67:4
67:24 75:8 88:11
88:14
**october** 39:5 77:1
77:8 93:19 94:1
**office** 12:5,10,12
14:6 15:22 18:9
18:10,12,25 28:20

59:8,25 60:25
61:1 65:1 67:9
71:4 74:15 77:12
77:12 83:18,19
88:11,15 89:9,10
89:19 95:2 97:24
98:4
**offices** 36:24
**official** 115:12
**officially** 93:14
**offset** 48:12 53:19
113:13
**oh** 7:7,20 15:14,24
16:3,6,13 41:25
60:13
**ohio** 18:8,22
**okay** 5:9,15 6:15
6:23 7:1,5,11,16
8:2,17,24 9:6,11
9:18 10:2,6 11:17
12:17 13:5,9,13
14:11,22 15:13
16:21 17:19 18:22
19:1,5,21 21:6,9
22:6,9 23:21 24:2
24:6,24 25:4,17
26:6,8,12,14 27:9
27:12 28:16,20
29:3,21 30:3,8,19
31:5,17,20 32:4,17
32:20 33:2,14,22
34:1,16,20 35:2,8
35:13,15 36:13,21
37:7,25 38:2,16,24
39:10 40:19 41:4
42:21 45:19,24
46:4,22 51:14,21
52:5,13 53:4
56:14,22 57:9,13
57:17 58:7,18,24
60:13 61:5 63:1,7

63:17 64:2,9,13,18
64:21 65:18 66:15
66:23 67:13,16,25
68:9,12,18,24 69:8
69:24 70:5 71:6
73:6,11 75:16,25
76:3,6,13,14 77:3
77:22 78:7,10,16
79:9,13 80:9,15
81:23 82:15,21,24
83:10,23 84:3
85:11 87:14 88:21
89:3,23 90:10,16
91:3,7,21 92:13,18
93:23 94:16 95:10
96:5 99:19,20
100:16 101:18,24
106:25 107:11
108:6 109:2 110:1
111:3 113:6,16,22
114:1
**old** 6:21 8:8
105:18
**older** 63:21
**oldest** 6:11 7:15
**once** 17:7 21:1
74:11 86:14 99:3
**ones** 39:3
**ongoing** 26:3
**onward** 98:3
**oops** 97:2
**opened** 18:12
75:11
**operate** 61:20
**opinion** 109:7
**opportunity** 46:12
**oppose** 47:5 51:7
102:24 109:22
**opposing** 98:20
**opposition** 40:21
42:24 46:24 103:3

109:13 110:7
111:11 117:6
**optimal** 82:14
**option** 70:12
**orange** 12:21
**orangeburg** 10:3
12:20,22
**order** 53:24 77:9
80:1 101:4 112:16
**original** 47:24
55:10,10
**originally** 6:24
**outcome** 25:25
**outlook** 76:20
**outside** 14:18
**overreaching**
72:23
**owe** 104:16 106:7
**owed** 48:12 104:17
106:7 113:13
**owes** 35:9 104:16
**owned** 96:25
**owner** 50:24
**ownership** 22:1
**owns** 56:12

**p**

**p.m.** 45:7,8 67:7
79:18 114:11
**pa** 1:6 2:3,8 3:7
**pacer** 25:10 29:13
79:25
**page** 34:18 75:16
75:19,20 87:4
116:3,11
**painfully** 10:24
**paint** 48:2,2,2
50:23,25
**paperless** 36:23
**paragraph** 34:22
35:8 54:4 68:19
69:2,10 70:6,11

Brian Gambrell
November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

[paragraph - preprinted]                                    Page 17

71:9 73:16,17,19
**paragraphs** 34:24
**paralegal** 75:9
86:10 88:5,22
**paraphrasing** 29:8
**part** 15:15 22:22
38:13 46:11 47:21
48:6 52:8 53:6
56:17 60:1 62:17
101:19 103:5,13
**partial** 101:1
**participating**
72:24
**particular** 18:1
21:17 27:23 38:8
50:15 55:2 64:14
71:20
**particularly** 20:1
52:18 85:1,7
86:18
**parties** 24:9 98:20
**partly** 18:10
**partners** 18:11
**partnership** 22:3
**parts** 99:7
**party** 62:1,10 63:4
63:5 87:6 115:9
**passed** 9:13 48:4
**passing** 83:14
**password** 88:12
88:16
**patently** 69:7
**pay** 113:8
**payment** 113:2
**peeved** 68:7
**pen** 89:7
**pendens** 32:25
**pending** 100:4
109:16 115:10
**penny** 104:17
112:24

**people** 4:23 28:11
50:21 88:15
109:10
**people's** 77:15,17
**percent** 14:9 20:25
97:21 107:12
**period** 15:3 19:17
31:8,22 41:13
59:13,15,17 60:3
74:2 80:23 98:8
**periods** 83:20
**permanent** 9:25
**permits** 102:2
**permitted** 74:10
**persist** 103:22
**person** 3:9 11:18
16:19 24:14 72:3
72:21
**personally** 87:18
**pertains** 25:21
**phases** 14:6
**phone** 43:5 57:1,3
59:23 67:11 68:16
69:11 95:1,5,6,7
98:23,24
**photo** 65:12,12
**photos** 58:12
**physical** 37:1,3
**physically** 12:11
15:4 39:2 40:2
43:6 62:20,24
63:9,11 69:16
83:18,19 86:4
87:7,7 89:1,6
91:13,19 92:2,7
**picked** 61:18
**picture** 64:16
65:16 67:17
**pictures** 47:13
51:16 58:13 110:2
110:10 111:6

**place** 67:2
**places** 37:2
**plaintiff** 1:4 2:2
24:12 45:14 52:7
53:5 62:16 101:14
101:23 104:24
111:24
**plaintiff's** 15:7,8
39:21 45:21,25
46:23 54:5 58:3
100:22 109:14
110:7 116:20
117:6
**play** 5:1 23:1
50:12
**plead** 71:16,18,24
**pleading** 28:18
87:23
**pleadings** 29:14
31:1 32:2 34:3
87:19 88:6 89:16
101:6
**pleas** 26:22
**please** 3:20 4:2,7
5:19 44:25
**pled** 71:16
**plenty** 109:10
**plus** 9:14 60:2
**point** 11:23 27:5
48:4 53:2 71:24
78:12,13 85:13,14
86:7 90:8 91:7
97:23 103:12
**pointed** 73:17 90:3
**points** 73:21 93:8
93:12
**political** 10:16
**poole** 1:3 2:2
26:20 31:7 34:14
35:9 36:5 39:11
39:12 40:6 42:11

46:16 48:1 51:22
55:2 57:6 66:24
67:17 68:16 77:22
81:5 90:11 113:20
113:22 116:24
**poole's** 40:25 46:5
51:7 52:8,23 53:6
81:18
**pop** 5:11 45:6
79:21
**posed** 20:4 90:22
**position** 13:16,24
22:17,19 54:11
106:19
**positive** 41:11
96:20
**possession** 38:24
**possibility** 48:18
**possible** 36:23
56:21 72:23 83:4
91:14
**post** 61:1
**postmarked** 92:8
**posture** 26:9 38:1
38:5 58:22
**potential** 39:25
49:19 94:10
**practice** 11:1,6
17:19 32:9 61:19
65:6 88:8,9
**practiced** 84:24
**practices** 11:24
17:16,22,24 96:6
**preexisted** 42:11
**preference** 11:22
**preparation** 28:17
**prepare** 27:21
**preparing** 24:6
25:4
**preprinted** 92:3

Brian Gambrell
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

**present** 72:3,6,8
**presented** 109:13
  109:22 112:10
**pretty** 10:21 41:7
  48:16 68:3,4,7
  77:9 80:25 91:18
  106:2,16
**prevail** 23:12
  111:20
**prevent** 12:1
  28:11 75:1
**prevents** 91:1
**previously** 28:21
**primarily** 46:5
**principal** 35:10
  104:10
**print** 37:5 76:20
  92:1
**printed** 76:19 89:5
**prior** 14:19 18:5
  19:5 62:13 85:8
  88:15 108:15
**privilege** 4:13 5:13
  30:6 65:20,24
  66:3,20 91:1
  95:13,23 96:3
  98:15
**privileged** 29:6
  30:15,22 48:25
  49:11 77:25 94:6
**privileges** 94:14
**probably** 3:24
  14:9 18:20 20:25
  21:1 42:25 65:2,2
  77:12,13,20,21
  79:23 80:22 95:18
  95:20
**problem** 54:19,24
  56:10 71:25 73:17
  86:16,19

**problems** 60:25
**procedure** 25:1,15
  28:10 29:18
**procedures** 28:8,9
**proceedings**
  112:18
**process** 74:7 99:5
  107:5
**procurement** 14:7
**produce** 28:25
  29:14,17
**produced** 11:19
  12:4,9,13 110:11
  112:12
**product** 94:6
**professional** 25:14
  29:18 71:20 93:5
  96:14 97:7 98:12
  100:19 115:4
**promissory**
  111:16
**proof** 21:21
**proper** 53:9 72:20
  97:18 102:7
  105:15 113:10,12
**properly** 56:8
**property** 48:2
  52:20 54:10
**proportion** 38:10
**propriety** 103:20
**protect** 94:14 96:3
**protecting** 72:21
**protection** 49:14
**prove** 105:14,21
**proves** 85:3
**provide** 70:23
**proving** 104:25,25
**provision** 23:3
**provisions** 27:23
**public** 10:21 115:4

**publication** 62:2
**publish** 61:24
**pull** 32:7 80:1
  110:4
**pulled** 32:11,15
  80:6
**purposely** 4:16
**purposes** 8:17
  23:5
**put** 3:10 5:9 37:6
  74:20 85:13 89:2
  89:15 92:5
**puts** 85:24

**q**

**qualified** 10:22
**quality** 65:16
**quarter** 21:2
**quarterly** 108:11
**question** 3:20 4:4
  40:6 113:17
**questioning** 94:18
  110:25
**questions** 3:18,21
  20:3 114:6
**quick** 45:3
**quite** 15:15 16:18
**quote** 55:11 86:13

**r**

**radeker** 2:3,4 5:4
  5:16 15:17 16:1,2
  16:8,16,17 45:5
  48:20 49:3 66:4
  66:16 94:4,12
  95:11,21 96:8
  110:24 111:3
  114:5
**raised** 43:18 48:18
  84:23 95:10 100:1
**ramp** 59:17

**range** 59:19
**rarely** 20:19
**ratchford** 19:13
  19:13 88:3,4
**rate** 38:3
**reaction** 81:1
**read** 43:22 54:6
  59:16 65:14 68:25
  87:3 101:4,4,7
  114:8
**readily** 17:4
**reading** 65:18
  87:3 101:6
**ready** 70:3,4
**real** 11:22 45:3
**realize** 58:15
**realized** 22:2
**really** 12:24 16:24
  22:18 34:20 38:7
  44:20 50:12 51:19
  52:19 55:25 61:23
  74:15 86:16 92:23
  92:24
**rear** 2:16
**reason** 14:13
  23:12 54:17 63:11
  79:3 102:20
**reasonable** 50:21
  53:11 74:1
**reasonably** 83:1
**recall** 12:17 22:9
  23:11,13,21 30:13
  30:24 33:15 45:17
  48:13 110:19
**recalling** 87:9 92:6
**receive** 33:14
  57:15 60:7,10
  61:6 76:16 80:19
**received** 20:13
  33:11,22 46:17
  49:14 53:12 58:20

Brian Gambrell

November 2, 2021

Poole, Stacey Darlene Vs. Black Slaughter & Black PA

[received - responses]

Page 19

60:9 64:5,6,7,18
68:21,22,23 73:8
76:21 81:23 82:17
83:2 87:13 90:10
90:18 91:9,11,12
91:20 92:7,14
**receiving** 64:22
66:25 82:10 94:20
**recess** 45:7
**recipe** 89:21
**recognize** 34:11
**recognized** 112:21
**recollection** 21:8
22:16 25:12 27:22
30:10 47:23 48:10
48:16 64:10 69:9
94:24 100:6
**reconcile** 54:2
**reconsider** 43:12
101:2,5
**reconstruct** 40:12
40:18
**record** 4:14 5:10
5:20 96:5 115:7
**recorded** 22:15
**records** 34:5 38:18
**recover** 40:7
**recovery** 50:6 55:9
94:10
**redacted** 81:17,19
**redownload** 25:11
**refamiliarize** 70:2
**refer** 26:18,22
63:18
**reference** 29:5
**referenced** 51:4
55:25
**referred** 43:14
**referring** 22:7
28:1 68:10

**refers** 68:19
**refile** 17:11
**reflected** 39:18,19
**reflects** 44:17
**refrain** 4:3
**refresh** 3:17 25:12
**refreshed** 27:22
**regard** 16:21
36:13 37:7 41:23
51:5 59:4 76:23
99:22
**regarding** 51:25
90:15 106:20
107:23 113:18
**regards** 90:4
**regime** 52:20
**regionally** 36:24
**registered** 9:22
115:3
**regularly** 73:24
**related** 9:10,16
14:4,10 29:8,24
41:12 73:1 83:22
115:9
**relates** 107:2
**relating** 28:25
**relation** 100:6
102:5,15
**relations** 9:8
**relationship** 72:25
73:5
**relationships**
98:16
**relatively** 18:19
38:21 52:7 82:11
**relatives** 8:21
**relevant** 28:8
**relied** 93:9
**relief** 44:3 100:3
100:13 111:12

**remedy** 44:8,11
100:8 103:10,17
111:18
**remember** 11:4,21
12:19 13:20 17:18
21:4,4 22:11,13
23:9,10 24:12
28:15 39:2 43:8
43:25 44:21 46:13
46:21 47:4 51:10
51:13,20 52:1
56:24 57:4 59:10
64:25 65:4 69:13
69:14 77:21,24
78:1,22,24 82:8,22
82:23 83:9,24
84:9 95:8 108:5
110:20
**remembered** 27:3
65:7 92:1
**remembering**
22:21 51:15
**remote** 65:9 70:13
**remoted** 65:11
**remotely** 69:18
**removes** 106:22
**rented** 6:16
**repair** 50:2
**repaired** 56:9
**repairs** 51:12 52:3
**repeat** 82:13
**rephrase** 49:7
**replied** 77:8
**reply** 76:25
**report** 12:13,14
57:10
**reported** 1:18
100:14
**reporter** 4:1 27:4
115:1,4 116:7

**represent** 3:6
31:10
**representation**
30:13 73:2 85:6
**represented** 24:8
31:6 72:22 73:23
87:6
**representing** 98:7
**request** 29:6 46:15
58:4
**requests** 46:6,9,17
46:17 55:22
101:20 106:24
**required** 28:24
62:11 71:17,25
87:2 89:16 97:19
100:17 111:25
**reschedule** 73:15
77:2,9
**research** 30:16
42:7,11,18,19
**reserved** 5:7
**reserving** 5:10
**resigned** 21:13
**resolved** 22:14
**resort** 44:12
**respect** 73:23
**respond** 46:6 74:1
101:20 106:18,23
**responded** 29:4,10
39:8 46:10,16
48:9
**responding** 38:20
38:20 42:2 112:2
**response** 35:15,19
41:21 46:22 58:3
64:21 66:25 82:14
94:20 108:25
109:20 110:14
**responses** 46:12

**responsibility**
14:8 49:21,22
55:13,15 61:25
72:16 74:7 102:10
104:25 105:20
**responsible** 54:9
54:18,19,20 55:12
55:19 112:23
113:8
**responsive** 29:4,11
**restrictions** 22:21
**restrictive** 20:7
47:7 106:15 113:5
**restroom** 45:2
**result** 39:20
**resulting** 106:17
**retained** 31:10
**retired** 8:14 19:13
43:9 59:13
**revealing** 65:20
81:25
**review** 12:12
20:13 28:16 35:4
**reviewed** 21:23
85:3,7,15 88:7
**reviewing** 11:18
**revolving** 105:20
**richland** 9:19,22
**right** 5:16,19 6:7
7:21 18:3,5 23:13
23:17,18 24:2
26:9 32:14,15
34:4,6 39:14 41:9
41:18 42:10 45:3
49:2 52:16 55:9
59:7 62:23 63:20
72:15 84:10 86:1
93:15,20 96:10
103:9,24 104:14
105:3,24 107:8
109:5 113:3 114:1

114:8,9
**rights** 96:17
**ripe** 57:24
**rise** 35:23
**road** 6:21 18:2
80:24
**rock** 1:2 36:25
**roger** 19:16
**rogers** 19:21 21:12
23:24 24:14 28:3
74:24 75:4
**role** 14:2,11,25
**roster** 20:22 61:23
61:25 62:2
**route** 17:7
**routine** 44:12
**routinely** 39:22
61:19 101:5
**royal** 6:16,20
**rpr** 1:18
**rs** 5:21
**rule** 62:15 63:6
71:20 72:17,19
73:19 85:5,15
87:2 98:18,19
105:23,25 106:1
**rules** 3:16 5:5,7
24:20 25:13,14
29:17,18 62:12
71:19 81:21 93:4
96:14 97:7,20
98:11 100:17,19
**ruling** 17:8,10
54:2
**run** 45:2
**rush** 13:18
**ryan** 21:21 22:6,7

**s**

**s** 2:4 85:5,12 116:9
**sac** 6:5

**safe** 95:22
**sake** 26:18 63:17
89:23
**sanctions** 35:22
36:2 40:22 41:23
43:2 92:15,21
93:1,7 94:2 98:9
99:23,24,25 100:7
101:12 109:17
117:4
**sanctuary** 22:24
22:25 23:4
**saw** 64:14 79:11
80:25
**saying** 4:2 17:9
44:1 73:13 74:21
89:14 90:13 105:8
110:16 113:8
**says** 54:8,17 58:19
60:21 70:11 72:8
72:19 73:12 78:21
81:10,14 84:5
85:10 86:9,25
98:22 102:4 104:6
**sc** 1:16 2:5,11
32:11 33:17
**scan** 85:18
**scana** 15:9
**scanned** 86:5
87:10,12
**scca** 75:23
**scdot** 13:8,10
14:20 39:6 41:10
**schedule** 20:22
77:15
**scheduled** 58:5
61:22 69:20,22
**schedules** 77:17
**scheduling** 61:15
62:10,16 74:6,19

**school** 8:11,12
10:20 11:14,15
65:5 71:21
**science** 10:16
**scott** 88:5,10
**screen** 4:23 32:5
32:13 45:20 52:10
54:3 110:4
**scrivener's** 63:21
**scroll** 76:14 85:16
87:8
**scrolled** 56:3
**scrolling** 75:14
**seal** 115:12
**season** 65:3,3
**second** 19:12 32:6
32:10 35:3 69:10
70:1 71:9 72:3,7
73:16,18 77:4
78:17 80:16 83:5
84:1,11 85:11
86:15 89:24 90:17
91:5,9 99:8,11,18
**secretary** 88:22
98:22
**section** 27:24
**see** 9:9 10:2 15:25
23:17 27:18 32:4
32:14 34:22 36:3
43:13,21,21 57:21
58:24 65:15 68:13
69:8 75:18 76:19
78:24 79:5,6,10
84:10 85:10 91:22
92:8 94:16,17
102:2 107:18
110:18,22 113:16
**seeing** 78:22
**seek** 100:3,9
111:15,16

**[seeking - start]**

**seeking** 100:10 103:16
**seen** 46:1 79:20 102:11 104:4
**selection** 8:18
**self** 106:2
**send** 28:12 62:11 62:18 67:12 87:19
**sending** 24:21 28:11 29:13 61:13 63:3 86:11
**sense** 37:1 61:9,13
**sent** 40:13 51:18 57:19 58:12 59:8 60:7,11,14,18,22 61:5 63:3 64:24 67:6,10,17,21 68:5 68:13 69:1 79:7 79:12 81:5 90:11 90:12
**sentence** 70:22 71:7,14 72:3,7
**sentences** 71:11
**separate** 36:17 48:15 50:8
**september** 59:1 60:6,21 62:6 64:4 64:15 67:17 76:16 76:23 78:18 79:1 79:18 80:21 84:15 91:10,21 92:11,15 98:3
**sequence** 61:12 67:24 77:10 93:10
**sequencing** 60:5
**series** 11:25
**seriously** 98:18
**serve** 46:12 47:1 87:20
**served** 28:21 31:4 31:4,15 32:22

**35:25 37:4 44:22 46:7,18 108:4**
**service** 10:21 60:21 63:11 81:13 89:12 97:16,17
**set** 46:6 52:4
**setoff** 52:2
**seven** 34:22
**severe** 86:16
**severely** 98:10
**share** 32:4,13 45:19 52:10 54:3 110:1,4
**sheet** 39:18
**shifts** 77:18
**short** 43:2 78:2
**shortly** 31:14
**shouts** 98:24
**shovel** 10:23
**show** 72:2,6
**showed** 51:18 91:6 91:17
**showing** 51:16
**shows** 23:2 84:19
**sick** 79:2
**side** 24:23 42:3 85:22
**sides** 104:22
**sign** 114:8
**signature** 34:17 75:17 87:15,24 88:6 89:7,17,17 91:11 110:21 115:21
**signed** 58:14,15 85:4,12,15 89:1,11 89:13
**significant** 21:23 43:24
**signing** 87:23 89:6 89:7

**simple** 98:25
**simply** 30:6 56:5 78:3 79:24 80:5 83:21 87:4 103:19
**single** 36:16,18,19
**slambrook** 21:7
**slash** 85:5,12
**slaughter** 1:6 2:8 3:7 31:2 44:13 92:10 95:18 97:12 107:3
**sleep** 77:19
**slight** 4:24
**slip** 86:13
**slipped** 86:12
**smart** 16:1
**smith** 2:3
**software** 39:22
**somebody** 74:20 77:19 90:8
**somewhat** 3:24 98:17
**son** 7:15 9:21
**soon** 49:23 81:1 97:18
**sorry** 6:1,19 7:7 7:20 23:6 47:14 52:10 78:4,19 79:18 81:12 97:3 114:3
**sort** 38:10 42:7,16 50:6 62:11 69:12 75:24 79:4 113:13
**sought** 44:9 111:12,17
**sound** 22:21 41:4 93:20
**south** 1:1 5:25 11:2,7 13:7 15:2,4 26:21 49:25 96:6 103:9 105:4,16

**115:5,13**
**southern** 7:3
**spartanburg** 20:11
**speaking** 64:2
**speaks** 56:15
**specific** 20:7 23:3 25:13 30:23 37:11 61:17 94:24 95:16
**specifically** 17:14 23:16
**spell** 6:1 9:2 18:22
**spend** 113:14
**spent** 37:11 38:19 40:14 47:17 48:7 48:11 51:12 52:3 53:19
**spilled** 97:5
**spoke** 25:17
**spoken** 113:17,22
**spring** 23:1
**square** 20:12,12
**squirted** 54:23
**stacey** 1:3 2:2 26:15,20 30:21 33:16 42:11 47:9 50:4,9 57:6 61:3 65:21 77:10 79:6 79:12 87:12 91:5 91:12,19,24 95:8 98:7 101:10 116:24
**stadium** 9:24
**staff** 89:13,20 96:23
**stage** 108:13,13
**stair** 2:9
**stamp** 57:18 87:24 92:9
**start** 41:10,16

Brian Gambrell
November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

**[started - testimony]**

Page 22

started 5:5 75:8
88:5
state 5:7,20 11:2
69:23 81:20 87:22
100:7,13 115:5
statement 84:12
statements 73:8
states 1:1
status 25:8,22 43:3
56:17 57:7,10
58:3 116:24
statute 11:25
99:15 100:3 102:6
102:8 104:20
105:18 111:22
stays 18:1
stepp 12:5,8
steps 80:2
stop 20:15 28:12
97:19 98:24
stopped 98:7
straighten 94:17
94:18
strategies 70:20
strategy 70:19
street 2:5,10
stuff 24:16 30:2
42:6 62:16 83:22
98:20
subject 105:23
submit 27:17
46:14 112:15
submitted 37:20
47:15 51:7,16,23
subparagraph
54:6
subparagraphs
54:4
subpart 27:24
74:12

subparts 27:24
subpoena 28:21
28:24 29:5,6 30:5
subsection 73:21
substance 4:13
65:22 66:8,13
78:8 80:10 90:20
90:24 92:25
substantial 9:10
42:25 83:11 88:10
substantive 43:1
99:25
substituted 41:1
substitutes 56:6
sudden 96:16
sue 11:23 20:16
48:18 49:21,22
107:10
sued 15:10 50:5
99:17
suggest 45:6
suggested 113:24
suit 12:1 99:9
suite 2:11
suits 11:25
sum 20:2
summarize 28:5
summary 12:13
12:16 27:6 35:19
40:21 41:22 45:14
45:22,25 46:23
47:6 52:6 53:6
54:5 99:21 100:22
101:13,15,19
102:24 108:13,15
108:17 109:1,15
109:16,23 110:7
112:16 116:20
117:7
summons 31:22
31:23 32:7,25

33:4,6 97:17
106:14 112:14
116:12
sumter 9:19
sunday 23:20
superfluous 62:19
support 93:12
supported 44:10
supporting 93:3
supposed 28:10
41:9
supreme 17:8
24:18 43:19 44:2
52:15 103:25
104:7
sure 3:13 4:2
12:15 16:4 24:25
35:4,18 41:7,18
50:13 52:5,20
54:8 57:16 58:23
59:24 63:13 68:3
68:4,7 71:14 77:5
77:9 82:18 91:13
91:18 93:15
106:16 108:21
surgery 83:15
surprised 91:5
suspended 88:8
swing 9:4 77:18
swore 51:12
sworn 3:2
system 33:18,20
33:23 67:12 72:20
74:18,18,23 75:1,4
75:6,6,9,10,11
76:2 79:16,25
81:20 85:4

| t |
|---|
| t 9:3 116:9 |
| tactics 70:20 |

take 4:1,8 29:24
30:2 35:3 44:25
45:1 47:1,3 54:4
70:1 92:4 108:14
taken 1:17 3:13
13:4 22:17
talk 4:17 17:10
59:1 74:10 77:7
95:24
talked 25:7 69:2
76:13 77:10 87:14
95:5,14
talking 4:3 40:16
talks 28:7
tax 18:13
taylor 14:21 17:14
18:5 36:22 95:2
teacher 8:11,13
teaches 8:11
team 24:13
technology 70:13
telephone 27:3
70:14
tell 65:23 75:13
telling 9:8 20:15
71:17,23 72:14
73:3 85:14
tells 14:2 56:9
74:15,17
ten 17:2 19:19
62:13
tenor 68:4
tenth 79:5
terms 42:21 47:15
tested 41:11
testified 3:2 73:7
107:23
testify 108:9
testifying 91:1
testimony 3:15
4:11 11:12 25:6

Brian Gambrell

November 2, 2021

Poole, Stacey Darlene Vs. Black Slaughter & Black PA

[testimony - try]

Page 23

40:8 72:9 88:21
94:21 106:19
112:25
**text** 64:22
**texted** 64:16 65:8
65:12
**theoretically** 39:1
48:11
**theory** 38:6
**thereabouts** 98:3
**thereof** 115:10
**thing** 5:14 34:21
42:8 43:1 61:12
69:23 109:15
112:13
**things** 22:5 24:20
35:25 41:15 44:15
44:21 54:1 55:19
60:3 69:20,21
71:11 76:20 84:25
89:7,16 103:4
**think** 3:9,23 4:8
6:18 7:11,14 9:15
10:6 11:9 12:5,14
12:22,24 13:22
15:11 18:16 21:1
21:2,6 22:14,15,20
24:2,5,8 26:1,15
27:2,7,15,17 29:15
29:20 30:11,25
31:25 32:8 33:16
35:18,20 36:3
39:23,25 40:17
42:15 43:4,4,5,11
43:25 45:1 46:11
48:8,15 50:10,20
51:10,19 53:4,10
54:16 55:8 56:2,6
56:15 58:13 59:7
59:15,16,20,22,22
60:9,12,14,15,17

60:20 62:8,12,14
63:20,21 66:11
67:8,19,20,23 69:9
69:10,10,17 70:19
70:19,21 76:4
79:7,13 81:1
83:15 85:18 89:25
91:12 92:18 93:6
93:8,11 94:7,8
95:18,20 96:10,19
96:19,20 98:12
100:25 102:16
104:1,8 106:2,21
108:1,24 109:2
110:20 111:8
112:3,17,19
113:16 114:2
**thinking** 105:7
**thomas** 19:16
**thought** 14:15
88:19
**thousands** 48:8
**threat** 73:13
**three** 9:13,14
13:12 18:21 21:5
21:14 38:19 40:16
48:15 62:6 80:2
94:22 103:4
105:17 109:24
**threw** 4:25 96:22
**thrown** 21:16
**ticks** 72:19
**time** 1:14 4:7 5:1
5:11 11:13,23
12:7,20 14:9 15:3
16:15 19:16,17
20:15 24:18 31:8
31:22 33:19 37:8
37:9,11,14,21,23
38:7,12,17,25 39:4
39:7,22,24 40:10

40:15 41:13 42:12
45:13 46:16 47:18
53:16 55:18,19
57:25 58:22 59:13
59:15,17 60:1,3
62:5 64:13 69:4
72:13 73:8 74:2
74:10 75:5 77:4
79:11 80:23 83:12
83:20 84:14,21
85:11,14 86:15
87:20 90:8 92:4
97:21 98:6,8 99:4
99:8,10,11 100:5
101:11 102:22
105:19 106:4,13
107:12 108:24
114:2
**timeline** 26:5
44:20 84:7
**timelines** 43:15
**timely** 31:24 46:6
**times** 21:5 42:15
76:12 83:18 94:22
94:25 95:4
**timesheets** 40:2
**timestamp** 38:21
67:15 93:21
**timing** 31:16 60:2
61:11 82:16 93:15
**title** 12:17,25
**tittle** 73:18
**tlw** 1:5
**today** 12:5 24:7
25:5 32:3 36:14
113:19 114:3
**today's** 28:21
**told** 27:5,19 65:22
100:6,25 113:24
**tolkien** 7:23

**tone** 68:4
**top** 75:15 76:20
85:25
**total** 94:22
**touched** 79:13
**tower** 6:17,20
**townsend** 19:16
19:22 21:12 23:24
24:14 28:3 74:24
75:4
**traces** 92:10
**track** 27:17 37:8
39:22 74:19
**tracked** 38:12,16
**trade** 17:19,22,23
96:6
**traded** 95:5
**trades** 11:24
**transcript** 2:16
114:8 115:6
**transfers** 41:14
**transpired** 45:7
**transportation**
13:8
**transposing** 37:18
**travel** 18:13
**treated** 71:15
**tree** 6:4
**trial** 5:8,11 8:18
23:23 52:15,18,25
57:22 108:13
**tried** 17:6,6 36:23
**triggers** 74:12
**trotter** 19:18
21:10
**trouble** 89:21
**true** 10:24 15:17
21:6 115:6
**trust** 16:6
**try** 32:4 42:18
49:7

Brian Gambrell
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

November 2, 2021

**[trying - went]**

Page 24

**trying** 15:11 32:7
38:9 48:18 56:1
66:16 69:13 77:19
82:16 91:16
104:19
**tuesday** 76:15
**turn** 4:18 31:5
50:1
**turning** 34:20
**twice** 86:15,18
99:3
**two** 5:21,21 7:13
9:13 12:3 17:23
18:21 27:25 32:24
36:17 41:12 43:15
43:16 48:15 54:1
56:3 64:10 74:12
86:20 93:1 94:20
97:13,22 98:2
103:4 107:6,20
109:24
**type** 75:7
**typed** 40:3 57:14
**types** 30:23
**typically** 14:2
17:24 37:2,23

**u**

**u.s.** 11:6,8 28:4
**ultimate** 104:24
**ultimately** 22:14
37:17 46:15 53:10
105:13
**unavailable** 49:18
**uncles** 9:13,14
**uncontested** 20:22
20:23 21:3 71:15
**uncounseled** 73:1
**undercut** 53:18
**undergraduate**
10:10,13

**underlying** 26:18
102:5 104:12
108:23
**undermine** 107:1
**understand** 3:12
9:9 14:16 52:19
54:11 74:13 84:25
94:11 96:13 98:7
98:14,15,18 99:2
106:23 107:2,15
111:15
**understanding**
26:8 53:24 73:7
78:9 79:16 86:17
91:4 108:20
**unfair** 11:24 17:19
17:22,23 96:6
**unit** 48:5 50:24
54:25 55:17
106:12 113:15
**united** 1:1
**unnecessary** 61:16
62:24
**unpaid** 36:6 51:8
51:23 106:7
108:10
**unquote** 55:11
86:13
**upheld** 54:14
**uploading** 78:22
**upstate** 57:2
**usc** 7:4 10:7
**use** 42:13 47:5
74:19 103:10
**useless** 10:15
**uses** 44:14

**v**

**v** 57:6 116:24
**vacation** 89:9
**valid** 102:9 103:14
107:4,6,14 111:19

111:21
**validated** 88:19
104:2
**validity** 102:4,18
103:21 104:11
108:3
**value** 38:7 42:12
**van** 21:7
**various** 9:8 42:19
93:12
**verbatim** 84:14
**versus** 26:20 28:2
103:11 113:13,14
**videoconference**
1:12,19 2:4,10
70:14
**viewed** 58:21
**vigorously** 42:4
**vinyl** 50:22
**violate** 63:6 102:8
107:5
**violates** 97:7
**violating** 98:11,14
**violation** 71:19
73:19,20 87:4
93:13 102:3,5
105:10,11,25
106:1
**violations** 11:24
93:4
**virtually** 84:17
**vis** 47:22,22
**volume** 84:24
**vote** 9:23
**votes** 10:1
**vs** 1:5

**w**

**wait** 68:2 75:13
**waited** 77:13
85:18 91:12 92:7
92:13 99:18

**waites** 88:7
**waiting** 41:16
**waives** 114:9
**wall** 51:2 54:23
**want** 16:8 30:4
34:21 35:3 43:25
44:24 51:10 58:25
63:13 69:25 77:20
80:15 82:12 84:12
94:11 95:19 102:7
**warned** 86:19
99:11
**warnings** 24:20
**watch** 16:4
**watched** 5:1
**watching** 4:17,19
**water** 48:3,14
49:24 51:17 54:9
54:18,23 55:17,18
55:20 56:5,11
**waterproofing**
47:23,25 50:15
**way** 5:11 16:7
18:12 34:2 48:5
49:20 50:23 54:1
58:13 63:8 75:3
90:21 103:6
105:14 110:12
**we've** 3:8 24:2
36:3
**weaver** 59:16
69:20 98:11 99:24
100:1
**webex** 4:20 32:10
**website** 32:12
**weekend** 21:14
**weeks** 21:14 32:24
41:12 83:16
**weird** 4:20
**went** 7:4 18:19
33:17 42:6 43:20

Brian Gambrell
November 2, 2021
Poole, Stacey Darlene Vs. Black Slaughter & Black PA

**[went - zoom]**

Page 25

44:18 54:22 63:24
68:6 75:9 79:8
85:4 88:4 103:19
109:3 114:3
**white**   8:12 18:2,4
105:10
**whoa**   74:21
**wife**   8:23 9:19
14:18 15:20 41:10
**wife's**   8:4,25
**williams**   12:23
**wilson**   59:8 67:6
68:2,10 72:4
73:22 76:15,17
78:14 91:16 96:21
97:11 98:10 99:23
100:14 102:21
**wilson's**   58:6
**win**   25:20
**window**   24:1
**winrose**   43:19,21
43:24 44:10
103:12,25 104:5
**withdraw**   40:25
**withdrew**   113:20
**withholding**   30:4
**witness**   1:15 15:18
16:6,10,14,18 45:4
66:19 108:9 114:7
115:11
**woman**   20:11
**wondering**   45:5
**wood**   6:4,4
**wooten**   26:7
**word**   9:9 39:17
54:19,20 84:18
90:9
**wording**   25:12
**words**   24:15 102:6
102:8 111:23
113:4

**work**   15:20 17:24
40:10 62:9 77:15
77:17 79:3 87:17
88:4 94:6 95:1
**worked**   12:10,11
18:7 19:8,12,15,18
20:14 43:1 77:18
88:2 100:23
**working**   16:16
21:18
**works**   8:20 15:21
**world**   72:14 85:6
86:13 87:5 98:19
**worship**   23:5,14
23:14,15
**worth**   27:16
**wrecks**   15:8,8
**write**   18:13 92:4
**writing**   39:3
**written**   37:18 84:4
**wrong**   45:13 62:9
**wrote**   21:20 40:3
103:19

**x**

**x**   116:1,9

**y**

**y**   8:5,6,7
**yeah**   8:7 10:20
16:8 17:6 19:3,8
25:21 28:15 32:8
34:23 41:6,7
47:17 49:3 59:20
60:20 66:4,16,21
70:8 75:16,22
76:4 79:10 86:24
92:6 93:23,25
94:4,7,12 96:24
102:23 104:4
105:24 109:6
110:22 111:2,6

**year**   18:9 19:2,3,4
19:20,23 41:3
103:17
**yearly**   108:11
**years**   6:11,11,12
6:17 13:1 14:24
19:19 51:13 77:18
105:17
**yep**   3:11
**yesterday**   25:7,18
27:1
**york**   8:21 26:21
59:12
**youngest**   6:12

**z**

**zero**   14:13
**zoom**   3:22 4:20

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.